**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DOMINGINHO POWELL on behalf of himself and others similarly situated,<br>     Plaintiff, | )<br>)<br>)<br>) | 1:10-cv-3709<br><br>Judge Kendall |
| v. | )<br>) | |
| COLLECTO, INC. d/b/a<br>COLLECTION COMPANY OF AMERICA d/b/a<br>EOS CCA,<br>     Defendant. | )<br>)<br>)<br>) | JURY DEMANDED |

**PLAINTIFF'S REVISED MOTION AND INCORPORATED**
**MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION**

Plaintiff respectfully requests that this Court certify this case as a class action as explained below, and designate plaintiff Dominginho Powell as class representative and Burke Law Offices, LLC as class counsel.  In support of this motion, plaintiff states:

**I.  INTRODUCTION**

The defendant debt collection agency called plaintiff on his cellular telephone at least five times in an attempt to collect a debt allegedly owed to AT&T by a person named Sharmaine Hunter.  Apparently, Collecto was calling plaintiff erroneously; the calls to plaintiff were "wrong number" telephone calls.  The message Collecto left for plaintiff went something like this:

> ...84-0290, to remove this phone number from our records.  If you are Sharmaine xxxxxxx, please continue to listen to this message.  By continuing to listen to this message, you acknowledge you are Sharmaine Hunter.  There will now be a three second pause.  [pause]  This is EOCCA [sic].  This is an attempt to collect a debt, and any information obtained will be used for that purpose.  Please contact us about an important personal business matter at 877-384-0290.  Again, the telephone number is 877-384-0290 and the account number that is needed when calling is  xxxxxxxxx.  Thank you.[1]

---

[1] The message transcription here appears to be partial; cut off in the beginning.

1

Plaintiff called the number mentioned in the above prerecorded message to request that his phone number be removed from defendant's records.  Plaintiff informed defendant that they had been calling the "wrong number."  Defendant made the notation "IC CBR WRG#" in its collection notes at that time.  Exhibit D at 4.  It is defendant's policy and practice to make such a notation every time a person calls in and notifies Collecto that it has called the wrong number, and the class includes only persons whose collection notes indicate such a call was made. Burns Depo at 13-17 (explaining collection notes); 61-62 (explaining wrong number abbreviations).

The Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)(A)(iii) ("TCPA"), prohibits any person from calling the cellular telephone of another person, unless the recipient has provided "prior express consent" to receive such calls.  The TCPA is strict liability, and there is no "bona fide error" defense, as exists with other laws.

Plaintiff thus brought this case pursuant to the TCPA on behalf of himself and other persons with who received "wrong number" calls on their cell phones from defendant pursuant to both Fed.R.Civ.P. 23(b)(2) and 23(b)(3).  Both proposed classes are defined as:

> All persons with Illinois, Indiana and Wisconsin phone numbers who defendant or some person on its behalf called on their cell phone using an automatic telephone dialing system and/or prerecorded or artificial voice message, where defendant was notified that defendant was calling the incorrect person, where any prerecorded message was left for the subject phone number at any time between and including June 15, 2006, and June 15, 2010.

For the following reasons, the motion should be granted.

## II.  Both Classes Should be Certified.

Class actions are favored as an effective means of adjudicating numerous small, similar claims.  As the United States Supreme Court has observed, "[c]lass actions serve an important

function in our system of civil justice." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981). One such

"function of the class suit is to provide a procedure for vindicating claims which, taken

individually, are too small to justify individual legal action but which are of significant size and

importance if taken as a group." *Brown v. Brown*, 6 Wash. App. 249, 253, 492 P.2d 581 (1971);

see also *Phillips Petroleum v. Shutts*, 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)

("Class actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate

individually. [In such a case,] most of the plaintiffs would have no realistic day in court if a class

action were not available."); *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir.

2006)(maximum statutory damage claims of $1,000 per class member are well-suited for class

treatment).

 This is particularly true in cases involving consumer protection issues. As stated in

*Eshaghi v. Hanley Dawson  Cadillac Co.*, 214 Ill. App.3d 995, 574 N.E.2d 760, 764-66 (Ill. App.

1991) (citation omitted):

> In a large and impersonal society, class actions are often the last barricade of
> consumer protection. . . . To consumerists, the consumer class action is an
> inviting procedural device to cope with frauds causing small damages to large
> groups. The slight loss to the individual, when aggregated in the coffers of the
> wrongdoer, results in gains which are both handsome and tempting. The
> alternatives to the class action -- private suits or governmental actions -- have
> been so often found wanting in controlling consumer frauds that not even the
> ardent critics of class actions seriously contend that they are truly effective. The
> consumer class action, when brought by those who have no other avenue of
> legal redress, provides restitution to the injured and deterrence to the
> wrongdoer.

Class certification prevents multiplicity of litigation, allows class members to share the costs of

litigation when individual suits may be economically prohibitive, and frees defendants from the

prospect of identical future suits and the risk of inconsistent results.  *Smith v. Behr Process*

*Corp.*, 113 Wn. App. 306, 318, 54 P.3d 665 (2002). Class actions also serve the important purpose of educating individuals about their rights. *Ergonomic Solutions, LLC v. United Artists*, 50 P.3d 844, 848 (Ariz. App. 2002); *Demetropoulos v. Bank One Milwaukee, Inc.*, 915 F. Supp. 1399, 1419 (N.D. Ill. 1996). This Court should certify the proposed Class to achieve the purposes of Fed.R.Civ.P. 23 and to ensure that thousands of class members obtain a legally enforceable remedy that otherwise might not be available given the small damages provided by the statutes.

To obtain class certification, it is not necessary for the plaintiff to establish that he will prevail on the merits of the action. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) ("[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.") (internal quotation marks and citation omitted).  The determination of class certification turns not on the ultimate merits of the case, but rather on whether the party seeking certification meets its burden of showing that all the certification requirements are met. *General Tele. Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

"Rule 23 establishes two main requirements for class certification.  First, the action must satisfy all four elements of Rule 23(a): numerosity, commonality, typicality and adequacy of representation. Second, the proposed class must satisfy at least one of the three provisions under Rule 23(b)." *Maxwell v. Arrow Financial Services, LLC*, No. 03 C 1995, 2004 WL 719278, *2 (N.D. Ill., March 31, 2004).

### A.    Both classes Satisfy All of the Requirements of Fed.R.Civ.P. 23(a).

As explained below, the requirements of Rule 23(a) have been satisfied.

## 1.    <u>Fed.R.Civ.P. 23(a)(1): The class is sufficiently numerous.</u>

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." "Courts have found this element satisfied when the putative class consists of as few as 10 to 40 members," and "the court is permitted to make common sense assumptions in order to find support for numerosity" where the plaintiff has shown "some evidence or reasonable estimate of the number of class members." *Maxwell*, 2004 WL 719278, *2 (internal quotation marks and citations omitted); *Williams v. Chartwell Fin. Servs.*, 204 F.3d 748, 760 (7th Cir. 2000).

"Although there is no magic number at which a class becomes certifiable, courts have held that a class of forty is generally sufficient to satisfy Rule 23(a)(1)." *Jackson v. NAFS, Inc.*, 227 F.R.D. 284, 287 (N.D.Ill. 2005) citing *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n9 (7th Cir. 1969). "Courts in this Circuit have held that alleged FDCPA violations via a form letter sent by a large commercial defendant is sufficient to satisfy numerosity. [citing cases ]." *Wahl v. Midland Credit Mgmt.,* 243 F.R.D. 291, 296 (N.D.Ill. 2007).

Here, although defendant has steadfastly refused to permit plaintiff to review its records in order to determine the precise number of class members, Collecto has admitted that there are more than 40 persons in the class. <u>Exhibit A</u>. Although plaintiff estimates the true number as well into the thousands given that defendant makes between 10 and 15 million calls per year, Burns Depo, <u>Exhibit B</u>, at 82:4-8, the admitted 40 class members is sufficient to satisfy numerosity. *Heastie v. Community Bank of Greater Peoria*, 125 F.R.D. 669 (N.D. Ill. 1989).

## 2.    Fed.R.Civ.P. 23(a)(2):  There are Common Questions of Law or Fact.

Rule 23(a)(2) of the Federal Rules of Civil Procedure requires that there be a common question of law or fact. "However, not all factual or legal questions raised in a lawsuit need be common as long as a single issue is common to all class members." *Evans v. Evans*, 818 F. Supp. 1215, 1219 (N.D.Ind. 1993).  "Factual variation among class members' grievances will not defeat class certification. Instead, it is sufficient for Plaintiffs to demonstrate that the claims arise from a common nucleus of operative fact." W*allace v. Chi. Hous. Auth.*, 224 F.R.D. 420, 427 (N.D.Ill. 2004).  "Common nuclei of fact are typically manifest where, like in the case sub judice, the defendants have engaged in standardized conduct towards members of the proposed class by mailing to them allegedly illegal form letters or documents."  *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); see also *Day v. Check Brokerage Corp.*, 240 F.R.D. 414, 418 (N.D.Ill. 2007); *Warcholek v. Medical Collections Sys.*, 241 F.R.D. 291, 294 (N.D.Ill. 2006). "This Court has previously held that the requisite common nucleus of operative fact exists in FDCPA cases when the controversy arises from standard form debt collection letters. [citing N.D.Ill. cases]. Like [those cases], this case involves a standard form letter, and the Court would have to resolve a question common to all potential members of [the] Class." *Wahl*, 243 F.R.D. at 297.

 "Commonality under Rule 23(a)(2) is not a demanding requirement: It calls only for the existence of at least one issue of fact or law common to all class members." *Eldred v. Experian Info., Inc.*, 233 F.R.D. 508, 511 (N.D.Ill. 2005).  "The commonality requirement has been characterized as a 'low hurdle' easily surmounted." *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 185 (N.D.Ill. 1992).

For example, in an FDCPA suit, "[t]o establish commonality, it is sufficient that plaintiff allege that all class members received the same collection letter." *Swanson v. Mid Am., Inc.*, 186 F.R.D. 665, 668 (M.D. Fla. 1999). "The plaintiff's and the class' claims arise from the defendant having sent the same debt collection letters resulting in the same alleged violations of the act. . . Therefore, the proposed class members share common questions of law and fact . . ." *Silva v. National Telewire Corp.*, 2000 WL 1480269 *2-3; 2000 U.S.Dist.LEXIS 19386,*7-8 (D.N.H. Sep. 22, 2000).

The common issue in this case is that Collecto called each of the class members with the same illegal equipment, and none of the class members consented to receive such calls. Thus, the commonality requirement is met. *CE Design v. Beaty Const., Inc.*, 2009 WL 192481, at *9-10 (N.D.Ill. Jan. 26, 2009); *CE Design Ltd. v. Cy's Crabhouse North, Inc.*, 259 F.R.D. 135, 143 (N.D.Ill. 2009); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, 2009 WL 2581324 (N.D.Ill. Aug. 20, 2009).

### 3. Fed.R.Civ.P. 23(a)(3): Plaintiff's Claims are Typical.

Under Rule 23(a)(3), a plaintiff's claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Maxwell*, 2004 WL 719278, *4 (internal quotation marks and citation omitted).

Here, there is no question that plaintiff's claims are typical. Plaintiff was subjected to precisely the same illegal practice as each member of the proposed class.

**4.     Fed.R.Civ.P. 23(a)(4):  Plaintiff and
<u>Counsel will Adequately Represent the Class.</u>**

Rule 23(a)(4) requires that "both the class representative and counsel for the named

plaintiff must be able to zealously represent and advocate on behalf of the class as a whole."

*Maxwell*, 2004 WL 719278, *5. The class representatives must not have "antagonistic or

conflicting claims with other members of the class," and must have a "sufficient interest in the

outcome of the case to ensure vigorous advocacy." *Id.* (internal quotation marks and citation

omitted).

Here, plaintiff's interests are aligned with the interests of other class members.  If

appointed, plaintiff will be a "zealous advocate[s] as the named representative[s] on behalf of

the class." *Id.*

Similarly, plaintiff's attorney has broad experience in class litigation and other complex

litigation, <u>Exhibit C</u>, Declaration of Alexander H. Burke, including being found to be suitable

class counsel by Judge Dow in one of the only TCPA autodialer/cell phone class action

settlements in the country. *Fike v. The Bureaus, Inc.*, 1:09-cv-2558, docket item 113 (June 6,

2010) (preliminary approval order).

**B.     The Damages Class Satisfies the Requirements of Rule 23(b)(3).**

As explained below, the class asking for damages meets the standards for certification

under Rule 23(b)(3).

**1.   <u>Fed.R.Civ.P. 23(b)(3)</u>  Common Issues Predominate.**

Rule 23(b)(3) is met when "the questions of law or fact common to the members of the

class predominate over any questions affecting only individual members." FED.R.CIV.P. 23(b)(3).

The predominance requirement is met when a common factual link between the class members and defendants under which the law requires a remedy exists. *Smith v. Nike Retail Servs. Inc.*, 234 F.R.D. 648, 666 (N.D. Ill. 2006); 7A Charles Alan Wright, et al., Federal Practice and Procedure § 1778, at 528 (2d ed. 1986) (Predominance is met "when common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for having the dispute on a representative rather than on an individual basis").

"Generally, when a class challenges a uniform policy or practice, the validity of the policy or practice tends to be the predominant issue in the ensuing litigation." *CE Design Ltd.*, 259 F.R.D. at 142 (citing *General Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 159 n.15 (1982)). The predominance requirement is thus generally satisfied where a "common nucleus of operative facts" exists. *Maxwell*, 2004 WL 719278, *5.

While the common issues must predominate, they "need not be exclusive." Maxwell, 2004 WL 719278, *5; see also, Pleasant v. Risk Management Alternatives, Inc., No. 02 C 6886, 2003 WL 22175390, at *5 (N.D. Ill. Sept. 19, 2003) (certifying class where "the central factual inquiry will be common to all" the class members); Kremnitzer, 202 F.R.D. at 242 (finding predominance met in class action where "[l]iability in this case is predicated on the same legal theory and the same alleged misconduct[.]").  Class certification is not defeated if there is some possibility that "separate proceedings of some character will be required to determine the entitlements of the individual class members to relief." *Carnegie v. Household Int'l Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

9

In the most concrete terms possible, Rule 23(b)(3) requires that the resolution of the common issues will significantly move all of the claims forward. This is unquestionably the case here, because defendant has wronged each class member in the same way. The only determinations needed after certification will be (1) whether the equipment used by Collecto is proscribed by the TCPA, and (2) damages. The key -- and essentially only -- issues in this case are common ones.

**2.**     <u>Fed.R.Civ.P. 23(b)(3)</u> **This Class Action Is A Superior Method For The Adjudication Of The Controversy.**

Under Rule 23(b)(3), plaintiff must also show that the class action vehicle is superior to other available methods of adjudicating this controversy. Certifying a class is the "superior" method when the "'class action would achieve economies of time, effort, and expense, and promote … uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Adv. Comm. Notes, 28 U.S.C. App., at 697); *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 183 (N.D.Ill. 1992) ("Equally important, judicial economy and efficiency, as well as consistent judgments, are achieved by certifying the class.").

Here, because of the costs associated with bringing the claims made in this case, few if any class members could, or would, pursue their rights individually. This is particularly true here because the TCPA, unlike many other consumer protection statutes, is not fee-shifting. Furthermore, to plaintiff's knowledge there is no related litigation that has been brought by any class member. Indeed, the most reasonable assumption is that few, if any, of the other class members know of the violation of their rights. Finally, there are no potential difficulties in managing a class action here, and the use of the class action form will save considerable judicial

resources. Every one of these factors militates for a finding of superiority. See, e.g., *Maxwell*,

2004 WL 719278, *6; *Sadler v. Midland Credit Mgmt.*, 06 C 5045, 2009 U.S. Dist. LEXIS 26771

(N.D. Ill. March 31, 2009)(impossibility of computer search to determine identities of class

member does not preclude certification where administrative review, even where arduous, will

reveal class members); *Ramirez v. Palisades Collection, LLC*, 250 F.R.D. 366, 370 (N.D.Ill. 2008);

*Lau v. Arrow Fin. Servs., LLC*, 245 F.R.D. 620, 624 (N.D. Ill. 2007).

  **C.**  **The Fed.R.Civ.P. 23(b)(2) Injunctive Class Should be Certified Because Defendant's Actions Are Applicable Generally.**

  Rule 23(b)(2) allows for class certification where "the party opposing the class has acted

or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P.

23(b)(2). The TCPA, 47 U.S.C. §227(b)(3)(A), expressly authorizes the issuance of an injunction.

  In this case, a class-wide injunction is appropriate because each of the class members

has been subjected to the same illegal practice of defendant's using proscribed technology to

call.  Defendant's procedures are admittedly imperfect, and permit numerous illegal calls to slip

through the cracks.

  Not only this, but Collecto's practice is to continue calling even in cases where it has all

of the information necessary to determine that its calls are illegal.  The records of Collecto's

dealings with plaintiff thus demonstrate why an injunction is necessary to stop future

violations. The collection notes show that Collecto continued to call plaintiff using the

proscribed technology even though it obtained actual knowledge on April 19, 2010, that the

phone number it was calling was a cell phone, and obtained actual knowledge that plaintiff's

cell phone did not belong to the debtor it was trying to reach on May 29, 2010, when it left a message with a third party. Exhibit D, collection notes, at 3; Burns Depo, Exhibit B, at 53.

Class-wide Injunctive relief under the TCPA 47 U.S.C. §227(b)(3)(A), along with corresponding declaratory relief is therefore appropriate. Fed.R.Civ.P. 23(b)(2). All class members, who are the incorrect party, would benefit from the cessation of these annoying calls and defendant's opt-out policy.

**CONCLUSION**

WHEREFORE, plaintiff respectfully requests that this Court certify this case as a class action pursuant to Fed.R.Civ.P. 23(b)(2) and 23(b)(3), as to the following class:

All persons with Illinois, Indiana and Wisconsin phone numbers who defendant or some person on its behalf called on their cell phone using an automatic telephone dialing system and/or prerecorded or artificial voice message, where defendant was notified that defendant was calling the incorrect person, where any prerecorded message was left for the subject phone number at any time between and including June 15, 2006, and June 15, 2010.

Plaintiff also requests that this Court designate Domingonho Powell as class representative, and Burke Law Offices, LLC as class counsel.

Respectfully submitted,

/s/Alexander H. Burke

Alexander H. Burke
**BURKE LAW OFFICES, LLC**
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com

# Exhibit A

## Alex Burke

| | |
|---|---|
| **From:** | jvlahakis@hinshawlaw.com |
| **Sent:** | Wednesday, November 10, 2010 2:23 PM |
| **To:** | Alex Burke |
| **Subject:** | Re: Powell |

Yes, 40 post cell scrub.

---

**From:** aburke
**Sent:** 11/11/2010 12:20 AM GMT
**To:** James Vlahakis
**Subject:** Re: Powell

40 persons where the number was a cell phone number, or just 40 persons?

In other words, is this after a scrub was performed?

Sent via BlackBerry by AT&T

---

**From:** jvlahakis@hinshawlaw.com
**Date:** Wed, 10 Nov 2010 18:14:55 -0600
**To:** <aburke@burkelawllc.com>
**Subject:** Re: Powell

Alex:

I am writing to you to update you regarding Defendant's efforts to determine whether more than 40 persons called Defendant to notify Defendant that it "was calling the incorrect person" as you have alleged in your complaint and class certification motion.

As a general matter, we disagree with your contention that Defendant has failed to properly address this issue.  I will detail Defendant's various objections and efforts to undertake this task tomorrow.  For the purposes of this letter, I should note that in agreeing to search of its records for the sole purpose of determining whether more than 40 putative class members existed, we reserved the right to argue that class certification was not appropriate, including the argument that an individual review of all records would be required to identify each putative class member.  We also reserved the right to argue that additional verification of data was necessary to determine the identify of the owner of subject cell phone to make sure that a debtor did not call collector to falsely state that Defendant was calling the wrong person.  We also explained to you that the subject message was not used during the duration of the proposed class.

Subject to the above statements, which I shall detail in our forthcoming letter, it appears that more than 40 persons called Defendant during the class period to inform Defendant that it "was calling the incorrect person."  Having said that, we believe that your proposed class should not be certified under FRCP 23 and FRCP 1.

Sorry for the delay, I hope you enjoy your vacation.

-James
_____

James C. Vlahakis
Hinshaw & Culbertson, LLP
222 N. LaSalle, Suite 300
Chicago, IL 60601
312-704-3715
312-704-3001 [fax]


**aburke@burkelawllc.com**

11/10/2010 05:16 PM

| Please respond to |
| aburke@burkelawllc.com |

To  jvlahakis@hinshawlaw.com

cc

Subject  Re: Powell


That sounds fine. I think, but will have to see it before I commit.

Sent via BlackBerry by AT&T

**From:** jvlahakis@hinshawlaw.com
**Date:** Wed, 10 Nov 2010 17:13:48 -0600
**To:** <aburke@burkelawllc.com>
**Subject:** Re: Powell

Understood.  FYI, I'm sending the requested material in the form of a letter.
_____

James C. Vlahakis
Hinshaw & Culbertson, LLP
222 N. LaSalle, Suite 300
Chicago, IL 60601
312-704-3715
312-704-3001 [fax]

**aburke@burkelawllc.com**

11/10/2010 05:12 PM

| Please respond to |
| aburke@burkelawllc.com |

To  jvlahakis@hinshawlaw.com

cc

Subject  Re: Powell

# Exhibit B

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

- - - - - - - - - - - - - x

DOMINGINHO POWELL, on behalf
of himself and others similarly
situated

      Plaintiff     Case No.:

V.      1:10-cv-3709

COLLECTO, INC. d/b/a
COLLECTION COMPANY OF AMERICA
d/b/a EOS CCA

      Defendants

- - - - - - - - - - - - - x

30(b)(6) Notice to Collecto, Inc.
Deposition of John F. Burns, Jr.
October 14, 2010, 9:45 a.m.
Hinshaw & Culbertson, LLP
One International Place
Boston, Massachusetts
Reporter:  Deborah Roth, RPR/CSR

## Page 2

1  PRESENT:
2
3  On Behalf of the Plaintiff:
4  Alexander Burke, Esq.
5  155 N. Michigan Avenue, Suite 9020
6  Chicago, Illinois  60601
7  312 729 5288
8  aburke@burkelawllc.com
9
10  On Behalf of the Defendants:
11  James C. Vlahakis, Esq.
12  Hinshaw & Culbertson, LLP
13  222 North LaSalle, Suite 300
14  Chicago, Illinois  60601
15  312 704 3000
16  jvlahakis@hinshawlaw.com
17
18
19
20
21
22
23
24

## Page 3

1  INDEX
2  WITNESS:  John F. Burns, Jr.
3  EXAMINATION     PAGE
4  By Mr. Burke     4
5
6  EXHIBITS           PAGE
7  EX 1  Final Notice of Deposition    8
8  EX 2  FAC System Manual    13
9  EX 3  Screen Shot (four pages)    18
10  EX 4  Call Search Report    36
11  EX 5  Calling a Consumer's Cell
12      Phone Number    67
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1       P-R-O-C-E-E-D-I-N-G-S
2       JOHN F. BURNS, JR.,
3       having been satisfactorily
4  identified by the production of his
5  Massachusetts driver's license, and duly sworn
6  by the Notary Public, was examined and
7  testified as follows:
8       EXAMINATION
9    BY MR. BURKE:
10    Q.  Good morning.
11    A.  Good morning.
12    Q.  My name is Alex Burke, and I represent
13  the plaintiff in an action called Powell
14  versus Collecto, Inc.
15      Could you state your name for the
16  record, please?
17    A.  My name is John Francis Burns, Jr.
18    Q.  And, Mr. Burns, have you ever given a
19  deposition before?
20    A.  Yes, I have.
21    Q.  How many times?
22    A.  Approximately six times.
23    Q.  Then you know the drill.
24    A.  Yes, I do.

Page 5

1    Q.  Please give verbal answers.  If you
2  don't understand a question, please speak up
3  and let me know, and I'll try to rephrase it
4  or make it understandable to you; but if you
5  answer a question, I'll understand that you
6  understood the question and answered
7  completely and truthfully, okay?
8    A.  Yes.
9    Q.  Is there any reason why you wouldn't be
10  able to testify completely and truthfully
11  today?  Medication?  Anything else like that?
12    A.  No.
13    Q.  Great.  Where are you employed,
14  Mr. Burns?
15    A.  I am employed at Collecto Incorporated
16  that does business under the trade name of
17  EOS CCA.
18    Q.  Is it also known as Collection Company
19  of America?
20    A.  It formerly was known under that name.
21    Q.  Are there any other names that Collecto
22  Inc. is known as?
23    A.  The company has subsidiary entities
24  that operate under other names.

Page 6

1    Q.  What are those names?
2    A.  U.S. Asset Management, ACA Healthcare
3  Management Services, Receivables Resources,
4  California Service Bureau, True North, LLC.
5    Q.  Is that it?
6    A.  Pretty much, yeah.
7    Q.  Okay.  What is your job at -- let me
8  back up for a second.
9       During this deposition, when I
10  refer to "Collecto," please understand that to
11  mean Collecto, Incorporated, and EOS CCA,
12  okay?
13    A.  Yes.
14    Q.  Great.  What's your job at Collecto?
15    A.  My position is vice president of
16  corporate services.
17    Q.  What are your duties as vice president
18  of corporate services?
19    A.  I have oversight over the compliance,
20  risk management area, human resources,
21  facilities, asset purchasing.
22    Q.  How many people, roughly, do you have
23  underneath you then?
24    A.  15 or 16.

Page 7

1    Q.  And when you say oversight of
2  compliance, do you mean compliance with, for
3  example, the FTC TCPA?
4    A.  Compliance includes licensing,
5  approving of operational tactics and
6  strategies.  It includes the response to
7  consumer inquiries, complaints.  If there's
8  litigations that are filed against the
9  company, compliance would be responsible for
10  responding to those.
11    Q.  What about the Telephone Consumer
12  Protection Act, are you responsible for
13  Collecto's compliance with that law?
14    A.  Yes.
15    Q.  Is there anyone else who is lateral to
16  you at the company that's also responsible for
17  compliance with the TCPA?
18    A.  All employees are responsible for
19  compliance to the TCPA.
20    Q.  Right.  But you're a compliance
21  officer, right?
22    A.  That's correct.
23    Q.  Okay.  Are there any other compliance
24  officers that are responsible for ensuring

Page 8

1  compliance with the TCPA?
2    A.  Any other compliance officers?  Yes.
3  There's a person who is the vice president of
4  compliance and risk management.
5    Q.  Who is that?
6    A.  Susan Giordano.
7       EXHIBIT NO. 1 MARKED
8  (A discussion was held off the record.)
9    BY MR. BURKE:
10    Q.  I have handed you what has been marked
11  as Exhibit 1.  Do you see it?
12    A.  Yes.
13    Q.  Have you seen this document before?
14    A.  Yes, I have.
15    Q.  There are four topics on Exhibit 1.
16  Would you please read them to yourself and let
17  me know if you're competent to testify as to
18  each of these four topics.
19    A.  Yes, I am.
20    Q.  As to each of the four?
21    A.  Yes.
22    Q.  Great.
23       MR. VLAHAKIS:  And, Alex, let the
24  record reflect that we did receive yesterday a

Page 9

1   re-notice of deposition with a fifth topic
2   which states, "What human intervention is
3   involved when defendant's dialers are used to
4   call debtors?"
5        Mr. Burns is qualified and willing
6   to testify to that topic should you want to go
7   into that today; and if you want to get him on
8   the record to say he is qualified to answer
9   that, rather than me saying so, feel free to
10  do so; and if you've got time, I would like to
11  have that one done.
12       I do feel that may fall under
13  Topic 3, arguably, as well. He would be
14  prepared to give answers regardless of whether
15  it has been highlighted in that manner.
16  Q.   Are you also competent to testify as to
17  what human intervention is used when the
18  dialers are dialing numbers?
19  A.   Yes.
20  Q.   Great.
21       MR. VLAHAKIS: Thanks, Alex.
22       MR. BURKE: Thank you.
23  Q.   What is the highest level of education
24  you've obtained?

Page 10

1   A.   I attended graduate business school.
2   Q.   Where did you attend business school?
3   A.   At Babson College.
4   Q.   Is that in Massachusetts?
5   A.   Yes. It's in Wellesley, Massachusetts.
6   Q.   Any other postgraduate degrees?
7   A.   No.
8   Q.   Where did you go to college?
9   A.   I went to Colombia College in New York
10  City.
11  Q.   What was your major at Colombia?
12  A.   Anthropology.
13  Q.   How long have you been in the debt
14  collection business?
15  A.   I've been in the business, with my
16  current employer, since 1995. Prior to that,
17  but not immediately prior to that, I worked
18  for a company called Dun & Bradstreet that was
19  also in the debt collection business, and I
20  was there for a period of three years.
21  Q.   When you began at Collecto, what was
22  your position?
23  A.   Vice president of corporate services.
24  Q.   The same as now?

Page 11

1   A.   Yes.
2   Q.   15 years. Very good. Have your duties
3   changes over that time?
4   A.   Yes.
5   Q.   Generally how have the duties evolved?
6   A.   After the first year of my employment,
7   I was also designated as the senior financial
8   officer and kept that position up until
9   probably five years ago, five or six years
10  ago.
11       I left the company for about a year,
12  came back in the role of interim chief
13  financial officer, and subsequently have
14  relinquished those responsibilities to a new
15  VP of finance.
16  Q.   Are you familiar with the computer
17  systems that Collecto uses to keep track of
18  its debt collection activities?
19  A.   Pretty much.
20  Q.   For example, the FACS system?
21  A.   Yes.
22  Q.   What is the FACS system?
23  A.   It's a collection program, software
24  program that was developed by Ontario

Page 12

1   Corporation that is used by many collection
2   agencies to keep track of their accounts and
3   to run programs and to sort data and to
4   interface with other vendors that provide
5   various ancillary services to the collection
6   effort.
7   Q.   How long has Collecto been using the
8   FACS system?
9   A.   Collecto has been using the FACS system
10  for 18 years.
11  Q.   Are there any other systems that
12  Collecto uses for the purpose of tracking its
13  debt collection activities?
14  A.   Not really.
15  Q.   For example -- so you say "not really."
16  Why not just an unequivocal "no"?
17  A.   There are other systems that interface
18  with FACS. So that if a dialer system such as
19  a Soundbite is an interface with FACS, you're
20  going through FACS to access it. So that's
21  why I answered the way I did.
22  Q.   I see. So would it be accurate to say
23  that the base computer system is FACS, and
24  then there are other systems that sort of feed

Page 13

1  into it?
2      A. Yes.
3          EXHIBIT NO. 2 MARKED
4      Q. The court reporter has marked Exhibit 2
5  that you have in front of you. Do you see
6  that?
7      A. Yes.
8      Q. Is this the -- what is this document?
9      A. It appears to be the information that
10 is used in the training of the operations
11 staff at our company.
12     Q. The operations staff? Does that
13 include the collectors themselves?
14     A. Yes.
15     Q. Okay. Turning to Page 4, on the top of
16 that page it says, "Effective Notes." Do you
17 see that?
18     A. Yes.
19     Q. Are you familiar with notetaking by
20 debt collectors?
21     A. Yes.
22     Q. What are the notes that debt collectors
23 take? What does that mean, notes?
24     A. It's mostly information that pertains

Page 14

1  to the account that might have been
2  transmitted to the collector via a phone
3  conversation with the consumer or any other
4  person that might have been contacted relative
5  to an account. It's basically a summary of
6  the information that has occurred on the
7  account.
8      Q. So it would include, for example,
9  summaries of telephone conversations; is that
10 right?
11     A. Yes.
12     Q. And it would also -- notes would also
13 include records of telephone calls; is that
14 right?
15     A. Yes. Some notes are entered by an
16 individual collector, some are entered through
17 various processes that are done in the
18 processing of the data on the file.
19         So it might indicate that it's from
20 our IT group rather than specifically from a
21 collector. So there's different people that
22 could answer information on the account from
23 different sources.
24     Q. So, for example, if a dialer dials a

Page 15

1  number, it would be the dialer that enters the
2  entry on the notes; is that right?
3      A. The phone call or the phone attempt
4  would be entered into the notes, that's
5  correct.
6      Q. Similarly, a letter that would be sent
7  would be automatically placed into the notes?
8      A. Yes.
9      Q. And if there was an incoming call, that
10 would go into the notes and then there would
11 be some notation of the conversation; is that
12 right?
13         MR. VLAHAKIS: I object to the
14 form.
15     A. Usually, yes.
16     Q. Would you explain to me the process by
17 which a note might be taken when there's an
18 incoming call?
19     A. The person receiving the call would ask
20 the caller to identify themselves and to
21 identify which account they might be calling
22 on; and then they would attempt to get the
23 account on the screen and locate it, so
24 whatever information was being communicated by

Page 16

1  the person calling in could be put into the
2  note on the system.
3      Q. And are there instructions about what
4  the collector is supposed to write down about
5  the conversation into the collection notes?
6      A. Yes.
7      Q. What are those instructions?
8      A. It depends on what the information is.
9  There's -- you know, the document you handed
10 me is part of the training material, and it's
11 telling people what dispositions to put on
12 accounts, to put -- giving them examples of
13 how to make notes. So it's part of the
14 training, the initial training. It's part of
15 the ongoing training.
16     Q. So would you say that this passage
17 regarding "Effective Notes" on Page 4 of
18 Exhibit 2, where it says, "Effective notes
19 will describe the debtor's situation briefly
20 but in detail," would you say that that's an
21 accurate description of what the notes
22 regarding a conversation with a debtor are
23 supposed to be like?
24     A. Yeah. The goal is to put in

1 information that pertains to the account that
2 assists us in how to manage the account.
3     Q. Now, I understand from looking at this
4 Exhibit 2 that abbreviations are part of the
5 normal notetaking process; is that right?
6     A. That's correct.
7     Q. If you'd turn to Page 3, there's a
8 master code sheet. Do you see that?
9        MR. VLAHAKIS: Go back one
10 (indicating).
11     A. Yes.
12     Q. What is this master code sheet, do you
13 know?
14     A. It appears to be various code numbers
15 or abbreviations that are in the FACS system
16 to assist the person in identifying proper
17 coding to be used.
18     Q. And then there's a column that's
19 entitled "Collector Notes." Do you see that
20 on the right-hand side?
21     A. Yes.
22     Q. Would that refer to notes that --
23 abbreviations that collectors are supposed to
24 use when they're talking to debtors and making

1 notes about the conversations?
2     A. Yes. It would give the collector a
3 reference to look at.
4     Q. Okay. A reference to look at in order
5 to use an abbreviations for the notes, right?
6     A. Right. It's a training document. So
7 when the person is learning how to utilize the
8 system, it shows them codes that they could
9 use to abbreviate the topics that are
10 identified with that.
11     Q. Are collectors supposed to use these
12 codes?
13     A. It's not a firm requirement, but
14 they're directed to use these if at all
15 possible.
16     Q. Okay.
17       EXHIBIT NO. 3 MARKED
18     Q. I have handed you what has been marked
19 as Exhibit 3. Do you see that?
20     A. Yes.
21     Q. Are you familiar with this document?
22     A. Yes.
23     Q. What is it?
24     A. It's a screen print of the notes of an

1 account that was in the name of Sharmaine
2 Hunter.
3     Q. Is this a screen print or a printout of
4 the FACS system?
5     A. This is a printout of the information
6 on the FACS system.
7     Q. Okay. What I would like to do is go
8 through this Exhibit 3 and talk about some of
9 the notations that are made on this exhibit,
10 okay?
11     A. Yes.
12     Q. It appears that this Sharmaine Hunter
13 account was an AT&T account; would that be
14 accurate?
15     A. Yes.
16     Q. So beginning at the top of the first
17 page, there's a line that says, "List," and
18 then "4/12/10" and then "Srv:04/07/10," and
19 then "Ltrs:1." Do you see that?
20     A. Yes.
21     Q. What does that line mean?
22     A. It identifies the date that the account
23 was listed with us. The service date would be
24 the chargeoff by the client. The letters

1 would be the number of letters that were sent
2 on the account. The time would be the time in
3 the system that the account's been worked.
4     Q. In days?
5     A. No. No. In minutes.
6     Q. Okay.
7     A. And then the calls would be the number
8 of phone attempts that were made on the
9 account.
10     Q. Any number?
11     A. Yes.
12     Q. What is "Con"?
13     A. "Con" is the number of contacts, when
14 the phone call connected with the consumer.
15     Q. With a live person?
16     A. Yes, with the...
17     Q. With the debtor?
18     A. Yes.
19     Q. Okay. And it appears that this is a
20 $110.24 debt that was being collected?
21     A. That's correct.
22     Q. Can you tell from looking at these
23 notes what phone numbers were provided by AT&T
24 to collect on?

1    A.  Yes.
2    Q.  What were those numbers?
3    A.  (773) 367-7272 and (773) 468-3732,
4    (773) 367-7431, (773) 815-3583 and
5    (773) 367-7431.
6    Q.  Now, I'm guessing here -- and let me
7    know if I'm right -- the first two numbers
8    came from the top of the page, and then the
9    last three came from inside the notes; would
10   that be accurate?
11   A.  Yes.
12   Q.  So the first number, the 7272 number,
13   there is a notation before that number.  Does
14   that notation mean anything about the status
15   of that number?
16   A.  Are you referring to the CBR?
17   Q.  Yes.
18   A.  That's just another field for a "can be
19   reached" number that may have been given by
20   the customer to our client as an additional
21   phone number to contact.
22   Q.  Is that field blank?
23   A.  That field is blank.
24   Q.  So "Ph" is just phone number?

1    A.  Correct.
2    Q.  And then what's the number below that,
3    the 3732?  There's an "Rp Ph."  What is that?
4    A.  That's the responsible party.
5    Q.  And I notice, it looks like that phone
6    number is included in the account number that
7    was received from AT&T.  Do you see that?
8    A.  Yes.
9    Q.  So would it be accurate to say that
10   that phone number was the AT&T phone number
11   that was part of the account?
12   A.  That may be the case.
13   Q.  All right.  Now turning down to the
14   notes, I see a lot of stuff happened on
15   April 12, 2010.
16   A.  Yes.
17   Q.  Including a bunch of stuff at 9:56.
18   Would you please go through the 9:56 items?
19   A.  The 9:56 items are just basically
20   information from the client that was on the
21   account, additional information.
22   Q.  Why are those phone numbers not
23   populated into the data on the top of the FACS
24   screen here?

1    A.  They weren't provided as the number,
2    calling numbers on the account.  They were
3    numbers that had been associated with the
4    account but were not in the fields that would
5    be the "call to" numbers.
6    Q.  What is the second line there,
7    "N NA FOOD STAMPS"?
8    A.  A reference that the client had in
9    their notes that we just copied over into our
10   notes.  I'm not exactly sure what it means.
11   It could mean that the individual was a
12   Welfare recipient or something to that effect.
13   Q.  Going down to 10:20 a.m. on April 12th,
14   there are a bunch of notes.  Would you go
15   through those line by line and tell me what
16   they mean?
17   A.  The first one, where it says,
18   "Stopped 0 letters" means that there is a hold
19   on sending letters by the individuals doing
20   that function at that time.
21        The next code is "lr # 1,"
22   et cetera, which is basically a request being
23   made by the data processing people to have a
24   letter sent on the account, which is usually

1    determined by various aspects of the account
2    that would indicate that a letter would be
3    sent.
4        The "NCOA HAS BEEN PERFORMED," NCOA
5    is a change-of-address scan that's done before
6    letters are sent out to see if the address is
7    a valid address, where mail would be received.
8    So we wouldn't send out a letter to a -- to
9    something that was not a good address.
10       The "2SCR" is a request through a
11   sub-vendor, Experian, for a credit score that
12   would determine what tactics would be used on
13   the account once the account started to be
14   worked on, and the next notation is "Scheduled
15   a disposition change" on a future date.
16   Q.  Now, on the far left, there is a
17   designation "WGR" for each of those entries
18   that we looked at.  What does that mean?
19   A.  That's just an IT designation.  There's
20   different people in our IT department that run
21   different functions.  So that's just the
22   individual who has the responsibility for, you
23   know, doing that aspect of that.
24   Q.  For the stuff we just went over, would

1   WGR have looked at this particular debtor's
2   file and made these designations, or would
3   that be done in like a batch?
4       A. It's all done in a batch. He wouldn't
5   look at any individual accounts. It's just an
6   automated process.
7       Q. On April 13th at 3:13, it looks like
8   the disposition change was removed; is that
9   right?
10      A. Yes.
11      Q. Then what happened?
12      A. Then the next code is "3BEG BEGIN
13  COLLECTION," which means that the hold on the
14  account to do the scrub was basically
15  released.
16      Q. Does Collecto ever scrub phone numbers?
17      A. Yes.
18      Q. Does it scrub all -- well, let's back
19  up.
20          Going forward, when I ask questions
21  about the policies, practices or procedures of
22  Collecto, please understand that I'm asking
23  about the time frame of June 15th, 2006 and
24  ending June 15, 2010. So even if I ask a

1   question in the present tense, please answer
2   for that time period.
3           MR. VLAHAKIS: What are the dates
4   again?
5           MR. BURKE: June 15th, 2006 to
6   June 15th, 2010.
7           MR. VLAHAKIS: One thing, John, if
8   there's -- maybe we can start off smaller and
9   get bigger: Over a certain period of time, we
10  did this; and going forward, we are doing
11  this. For this particular client, we do A, B
12  and C, and for different clients we do X, Y
13  and Z. What is done here? What is your
14  general practice?
15          I think that's a broad time frame.
16  Things may have changed, but maybe things
17  haven't changed. Has it always been the same?
18  I don't know.
19          MR. BURKE: Right. I want accurate
20  responses. So if things have changed, please
21  let me know. So I will ask that scrub
22  question again, and then we can work our way
23  to get as accurate a response as possible.
24          MR. VLAHAKIS: What was done here

1   on this particular account that he knows of
2   and expand that out to what is done on this
3   campaign, what may be done with this client
4   and what may be done broadly. It's up to you.
5           THE WITNESS: Should I make a
6   statement?
7           MR. BURKE: No. I will ask another
8   question.
9       BY MR. BURKE:
10      Q. Has Collecto always scrubbed telephone
11  numbers?
12      A. No.
13      Q. About when did Collecto begin scrubbing
14  telephone numbers?
15      A. I can't give you an exact date, but it
16  may be eight years ago.
17      Q. And do you know why eight years ago
18  Collecto began scrubbing telephone numbers?
19      A. Because the technology became available
20  that allowed us to do that.
21      Q. In order to find a more accurate number
22  for the debtor?
23      A. Yes.
24      Q. Any other reason that it was initiated

1   18 years ago?
2           MR. VLAHAKIS: He said eight.
3       Q. Eight years ago?
4       A. As new technologies become available to
5   us, we evaluate them and utilize them if they
6   are advantageous to use.
7       Q. If it's efficient and feasible?
8       A. There are a lot of things done today on
9   collections that were not available eight or
10  ten years ago.
11      Q. Like scrubbing?
12      A. Like scrubbing.
13      Q. Now, eight years ago when Collecto
14  began scrubbing, did they scrub every number
15  they called?
16      A. I'm not sure.
17      Q. At some point did Collecto begin
18  scrubbing telephone numbers to determine
19  whether they were cell phones?
20      A. Yes.
21      Q. When did that first happen?
22      A. That was probably -- I'm not going to
23  be able to put into specific dates changes in
24  certain policies because many of these things

1  are constantly evolving and the technology
2  evolves.
3       So when that technology was
4  available, which might be two or three years
5  ago, that may have been done, but I can't be
6  giving you an accurate answer because that
7  information -- I was not, in the preparation
8  of this, to have an historical account of
9  every change that happened in our policies
10 relative to tactics used on accounts.  So I
11 can give you a best guess, but I can't give
12 you an accurate exact answer.
13    Q.  What's your best guess?
14    A.  Rephrase the question.  Ask the
15 question again.
16    Q.  When did Collecto first begin scrubbing
17 for cell phones?
18    A.  I would say three years ago.
19    Q.  Why did Collecto begin scrubbing for
20 cell phones three years ago?
21    A.  I can't tell you the exact reason.
22    Q.  Was it because of the TCPA?
23    A.  That could have been one of the issues.
24    Q.  Can you think of any other reasons why

1  Collecto would begin scrubbing for cell
2  phones?
3     A.  Yes.  It would begin scrubbing for cell
4  phones so it could get contact numbers to call
5  the consumers to collect the accounts.  It
6  would be good business practice to call the
7  correct number.
8     Q.  Can you define what a scrub is for me,
9  please?
10    A.  It's giving the account information to
11 an outside vendor who performs a task in which
12 they have a specialized service.
13    Q.  And what is that specialized service?
14    A.  It could be identifying whether the
15 phone number is a cell phone or not.  It could
16 be identifying whether the person has filed a
17 bankruptcy.  It could be determining whether
18 the person is now deceased and whether there's
19 a death notice that has been recorded.  It
20 could be to locate phone numbers that are
21 attached to it.  It could be to identify a
22 credit score.  Any number of things along
23 those lines.
24    Q.  So when I'm asking about cell phone

1  scrubs, I'm asking for any determination that
2  a phone number is a cell phone number, okay?
3     A.  Yes.
4     Q.  When Collecto began scrubbing for cell
5  phone numbers two to three years ago, did it
6  begin scrubbing all the numbers that it
7  called, or did it begin with just scrubbing
8  certain phone numbers before it called them?
9         MR. VLAHAKIS:  I object to the
10 form.  When you say "called," are you saying
11 manual calls?  Calls with dialers?
12        MR. BURKE:  Just calls generally
13 for this question.
14    A.  The answer is no.
15    Q.  Was there a process by which certain
16 numbers were scrubbed before they were called?
17    A.  At what point in time?
18    Q.  When it first began using the cell
19 phone scrub.
20    A.  Yes.  There was a process.
21    Q.  What was that process?
22    A.  I can't give you the exact explanation
23 of the process three years ago, but my best
24 guess would be that it related to certain

1  clients and certain batches of business that
2  we had, but not to all clients or all
3  business.
4     Q.  Does Collecto -- I'll start that
5  question over.
6         Has Collecto ever had processes
7  whereby it is attempting to comply with the
8  TCPA?
9     A.  Yes.
10    Q.  When did Collecto first begin to comply
11 with the TCPA?
12    A.  It's always attempted to comply with
13 the TCPA.
14    Q.  Do you know when Collecto first learned
15 that the TCPA may apply to its collections?
16    A.  I don't recall that date.
17    Q.  What are the policies, practices and
18 procedures that were in place in June of 2006
19 that comply with the TCPA?
20    A.  I can't answer for that specific date.
21    Q.  Generally for 2006?
22    A.  Whatever information we had relative to
23 compliance would have been discussed by the
24 compliance staff and would have been related

1  to the operations staff for their procedures.
2      Q. So what were the procedures?
3      A. I can't recall what they were four
4  years ago in June of 2006.
5          MR. VLAHAKIS: I want to object to
6  the scope on this, because when you're asking
7  for this in the dep notice, you don't identify
8  as going back that far. The only time where
9  you discuss a time frame is in Topic 4.
10     Q. How about for 2007, do you know what
11 the policies, practices and procedures for
12 compliance to the TCPA were during any time in
13 2007?
14     A. I can't recall.
15     Q. How about 2008, do you know what the
16 policies, practices and procedures for
17 Collecto compliance to the TCPA were in 2008?
18     A. I don't recall the exact information.
19     Q. How about 2009, do you know what the
20 policies, practices and procedures that
21 Collecto had in place in 2009 for compliance
22 to the TCPA were?
23     A. That's closer to our current date. So
24 I would say that the practices and processes

1  and procedures from that period of time to the
2  current period of time have not varied.
3      Q. What are those policies, practices and
4  procedures that have not varied between 2009
5  and the present?
6      A. That we -- the policies, practices and
7  procedures is that the staff is trained to --
8  not to contact the consumers unless there has
9  been prior consent given on the phone number,
10 that's a cell phone number.
11     Q. So how was that policy implemented?
12 What did Collecto do in order to avoid
13 contacting consumers on their cell phone using
14 its dialer or prerecorded messages during that
15 time frame to the present?
16     A. What did it do?
17     Q. Yes.
18     A. Followed the practice of calling the
19 numbers that had been supplied by our client
20 as being a valid number; and if the number had
21 otherwise been collected through a skip-
22 tracing mode, they would run it through a
23 scrub for phone numbers prior to putting the
24 numbers into a dialer pool, and the trainers

1  who train the operations staff will explain
2  the TCPA in training and the importance of
3  following the practice of that.
4          Additionally, if information is
5  obtained where a phone number is deemed to be
6  a bad number, there may not have been
7  permission granted, and it was determined that
8  that was the case, they would code the number
9  in the account so we would not re-call the
10 account and cause an issue.
11     Q. How would the bad numbers be coded in
12 the FACS system?
13     A. Following the number, the capital
14 letter B is placed on that number.
15     Q. Would there also be a notation in the
16 collection notes?
17     A. There can be, yes.
18     Q. Is there a notation in these collection
19 notes as to that there was a wrong number?
20     A. Yes.
21     Q. Maybe on Page 4 on 6/14/2010.
22     A. Yes. That would appear to be a note
23 indicating that we got a wrong number.
24     Q. Could you decipher the note there,

1  please.
2      A. Incoming call, can be reached, wrong
3  number.
4      Q. And that call, incoming call came at
5  3:07 p.m. on 6/14/2010?
6      A. Yes.
7          MR. VLAHAKIS: What time zone, if
8  you know?
9          THE WITNESS: That's our time zone.
10         The account is in Chicago. It would
11 be their time zone. It's the zone in which
12 the account is being worked.
13         EXHIBIT NO. 4 MARKED
14     Q. Would you turn to Page 4 of Exhibit 4,
15 please.
16         First of all, do you know what
17 Exhibit 4 is?
18     A. No.
19     Q. Okay. We'll move on.
20         Directing your attention again to
21 the first page of Exhibit 3, the account
22 notice. You can put Exhibit 4 aside.
23         At 3:13 p.m. on April 13th it says,
24 "FILE RETURNED FROM EXPERIAN." Do you see

Page 37

1    that?
2        A.  Yes.
3        Q.  What does that mean?
4        A.  That means that one of the tactics that
5    was being done on the account had been
6    completed and the file had been returned.
7        Q.  And what did Experian perform for
8    Collecto in this case?
9        A.  Most likely, it was the credit score.
10       Q.  Does Collecto use Experian for
11   scrubbing also?
12       A.  Yes.
13       Q.  What would it look like if Experian had
14   scrubbed the data for the debtor?
15       A.  If there was information, it would
16   appear in a certain file.
17       Q.  So would the information show up in the
18   notes after the file was returned from
19   Experian?
20       A.  I don't believe so.
21       Q.  So going down to the line below that,
22   it looks like a phone call was made; is that
23   accurate?
24       A.  Yes.

Page 38

1        Q.  Okay.  Was the phone call on
2    April 12th, 2010 at 5:20 p.m.?
3        A.  April 12th, 5:20 p.m.?  I don't see
4    that.
5            MR. VLAHAKIS:  (Indicating.)
6            THE WITNESS:  Oh, okay.  Down here
7    (indicating).
8        Q.  Would that be accurate?
9        A.  That note, I think, relates to the
10   disposition change, not an actual call.
11       Q.  Okay.  Was there a call?
12       A.  The next line, where it says "Call
13   Details," and it identifies a number, and it
14   says, "ATTEMPTED ANSWER MACHINE HUNG UP."
15       Q.  Okay.  So in the call details, there's
16   a phone number there.  Is that the phone
17   number that was called?
18       A.  Yes.
19       Q.  In parentheses, you just read it.  What
20   does that mean?
21       A.  It would indicate to me that there was
22   an attempt.  There was an answering machine.
23   So no message was left.
24       Q.  And was this call made using one of

Page 39

1    Collecto's dialers?
2        A.  Yes.
3        Q.  Let's talk about the dialers for a
4    minute.
5            I understand that Collecto utilizes
6    three different types of dialers; is that
7    correct?
8        A.  Yes.
9        Q.  The Noble, the GC, and the Soundbite
10   dialer; is that right?
11       A.  That's right.
12       Q.  I understand that the Soundbite dialer
13   is offsite; is that right?
14       A.  Yes.
15       Q.  And the Noble dialer is also offsite?
16       A.  Yes.
17       Q.  And the GC dialer is onsite?
18       A.  Yes.
19       Q.  Can you tell which of those dialers
20   were used to make this phone call?
21       A.  Yes.
22       Q.  Which one?
23       A.  That was the Noble.
24       Q.  How can you tell?

Page 40

1        A.  The WGR is the code for the person that
2    runs the Noble programs.
3        Q.  And I think you testified earlier that
4    that's an IT person?
5        A.  Yes.
6        Q.  Does WGR run any dialer other than the
7    Noble?
8        A.  I'm not aware of that.
9        Q.  So would this call have been made as
10   part of a dialing campaign?
11       A.  Most likely, yes.
12       Q.  How can we tell definitively whether it
13   was or was not?
14       A.  I guess you could say every dialing
15   effort is called a campaign.  So I guess the
16   answer would be yes.
17       Q.  Well, then what's your definition of a
18   dialing campaign?
19       A.  The automated messaging being done for
20   one or more consumers.
21       Q.  So the process whereby numbers are
22   loaded into the dialer as a batch and the
23   dialer calls those numbers; is that right?
24       A.  Yes.

Page 41

1    Q.  When a batch of numbers is entered into
2  the dialer, does the dialer automatically dial
3  those numbers?
4    A.  Yes.
5    Q.  Is that true for all three dialers:
6  the Noble, the GC and the Soundbite?
7    A.  The Soundbite, if it identifies the
8  number as a cell phone, would not call that
9  number.
10   Q.  Okay.  But the process by which the
11  numbers are entered in and then are dialed by
12  the dialer itself is essentially the same for
13  all three dialers, right?
14   A.  The process to enter them in is
15  similar, yes.
16   Q.  So what I am asking here is whether any
17  human being uses his fingers to dial these
18  phone numbers or whether the machine
19  automatically dials the numbers?
20   A.  No.  It's automatically dialed, if it
21  is in a dialer campaign.
22   Q.  So on that first call that we were
23  talking about earlier, I think you said that
24  Collecto did not leave a message; is that

Page 42

1  right?
2    A.  That's correct.
3    Q.  Okay.  It looks like another call
4  happened a couple lines down to a different
5  phone number, correct?  On Page 1 still.
6    A.  Which line is that?
7    Q.  (Indicating).
8    A.  Yes.
9    Q.  What happened with that call?
10   A.  The note says:  Attempted possible
11  disconnect.
12   Q.  Okay.  So does that mean that the
13  dialer tried to call and something made the
14  dialer think there was a disconnected number?
15   A.  Yes.  It didn't ring through or didn't
16  have the normal answering, no answering
17  machine.
18   Q.  So there was no message left by
19  Collecto at that time?
20   A.  Yes.  There would be no connection,
21  with no answering machine or any individual.
22  So there would be no way to leave a message.
23   Q.  The last line on Page 1, it looks like
24  there was a bankruptcy scrub performed; is

Page 43

1  that right?
2    A.  Yes.
3    Q.  To see whether the debtor had been in
4  bankruptcy; is that right?
5    A.  It would identify whether the
6  individual on the account who is identified as
7  the accountholder had filed bankruptcy within
8  a certain period of time.
9    Q.  Turning to Page 2, please.  It looks
10  like there was a deceased scrub performed?
11   A.  Yes.
12   Q.  To check to see if Ms. Hunter had died?
13   A.  If there was a record of that
14  individual having passed away, yeah.
15   Q.  And that's all automated; isn't it?
16   A.  Yes.
17   Q.  Now, next to both of those scrubs on
18  the far left-hand corner are the initials
19  "nj."  Do you see that?
20   A.  Uh-huh, yes.
21   Q.  Is that an employee?
22   A.  That "nj" stands for night job.
23   Q.  So given that it was a night job, I'm
24  guessing that it was automated; is that right?

Page 44

1    A.  Yes.
2    Q.  Going down to April 19th at 8:58 a.m.,
3  it looks like there was another call to the
4  7272 number.
5    A.  There was an attempt in the dialer.
6    Q.  Okay.
7    A.  But the "WIRELESS NOT ATTEMPTED" would
8  indicate to me that the dialer picked it up as
9  a cell phone number and did not complete the
10  call.
11       MR. VLAHAKIS:  You're talking about
12  4/19?
13       MR. BURKE:  4/19 or 4/16.
14       MR. VLAHAKIS:  Right.
15  BY MR. BURKE:
16   Q.  Now, there are two dates associated
17  with that -- those two lines, those two rows.
18  On the left column, it says, "4/19/10," but in
19  the first row it says the call date is
20  4/16/2010.
21       Would it be accurate to say that
22  the call date was 4/16 and the date it was
23  loaded into the system was 4/19?
24   A.  I don't think so.

1    Q.  Can you tell which dialer recognized
2    that this was a wireless number and decided
3    not to call?
4    A.  That was the Soundbite.
5    Q.  Because of the "MGR"?
6    A.  Right.
7    Q.  What does "MGR" mean?
8    A.  Manager.
9    Q.  So would it be accurate to say that
10   every call that was attempted with the
11   designation "MGR" is a Soundbite call?
12   A.  Yes.
13   Q.  Going down to 4/22/2010 --
14       MR. VLAHAKIS:  Alex, do you want to
15   ask what "ACR" means?
16       MR. BURKE:  Sure.
17   Q.  Back up to 4/19, one last question.
18       At the end of the second row,
19   there's an "ACR" designation.  Do you see
20   that?
21   A.  Yes.
22   Q.  What does that mean?
23   A.  That's the designation of the route
24   that the account is located in, the collector

1    route.
2    Q.  What does that mean?
3    A.  The business is from a client such as
4    AT&T, and there's hundreds of thousands of
5    accounts.  So one collector is not going to
6    work them all.  They're going to be placed in
7    individual routes.  So the ACR is a
8    designation of a route.  So there might be
9    5,000 accounts in that route.
10   Q.  And then as the dialer works a batch or
11   a campaign, if somebody answers a call, the
12   call is routed to a collector; is that right?
13   A.  Yes.  If the dialer -- the collectors
14   are plugged into the dialers and the dialers
15   are calling out, and if a contact is made with
16   an individual, then that comes back to a
17   specific collector.
18   Q.  So is that what you're talking about
19   with the route?
20   A.  Right.  That's just saying that this --
21   for purposes of paying bonuses to employees
22   and identifying who is selecting what.  Each
23   employee has a certain code.  So the ACR is a
24   router or a code for that route.

1    Q.  For a collector?
2    A.  In this particular case, this is what
3    they refer to as a house route.  So it's not
4    associated with a specific collector.
5        You know, typically small balance
6    accounts of this type aren't associated with a
7    collector.  Any collector could take the call.
8        A larger account with higher
9    balances that might be a more complex case
10   would typically be held with specific
11   collectors.
12   Q.  So ACR is the house route?
13   A.  Yes, one of them.
14   Q.  Moving down, it looks like there is
15   another call on 4/22/2010 at 5:57 --
16   A.  Uh-huh, yes.
17   Q.  -- a.m.; is that right?
18   A.  The note that you have, the line that
19   says, "Call Dated: 4/21/10"?
20   Q.  Yes.
21   A.  I think that call date refers to a date
22   in the system where it was set up for the next
23   possible call, so that it doesn't represent
24   the actual call.

1        The next line, "Call details,
2    attempted answering machine, hung up," that
3    would be the line that is the actual call.
4    Q.  So what's the date and the time on the
5    left side then?
6    A.  You're talking about the entry that's
7    "WGR" with the call date 4/21/10, 1:01 p.m.?
8    Q.  No.  I'm just trying to figure out what
9    happened at 5:57 a.m.
10       MR. VLAHAKIS:  Are you asking if
11   the call took place at 1:01 p.m., and the data
12   was entered in on 5:57 at a different date?
13       MR. BURKE:  Yes.  I am trying to
14   determine what the times and dates are.  What
15   happened at these times and dates.
16   Q.  So what happened on 4/22/2010 at 5:57
17   a.m.?
18   A.  I'm not sure.  Where do you see "a.m."?
19   Q.  Well, if you look at all the dates, all
20   the times in that column, lots of them have
21   "P," and that one doesn't.  So I'm
22   understanding that to be a.m.
23   A.  Okay.
24       MR. VLAHAKIS:  Are you asking if

1 the call above that, Alex, it says 4/21/10,
2 1:01 p.m., are you asking if the call was made
3 if on 4/22 but it has been logged into the
4 computer at 5:57 in the morning?
5         MR. BURKE:  Let's go off the record
6 for a second.
7     (A discussion was held off the record.)
8     BY MR. BURKE:
9     Q.  All right.  Looking at the call that
10 was attempted or that's listed at 4/22/2010 at
11 5:57 a.m., do you see that?
12     A.  Yes.
13     Q.  Okay.  Can you tell me what happened at
14 5:57 a.m. on 4/22?
15     A.  The note relative to the call attempt
16 was entered into the FACS system at that time.
17     Q.  Would it be accurate to say that the
18 call date to the right of that where it says
19 4/21/2010 at 1:01 p.m. is when the call was
20 attempted?
21     A.  Yes.
22     Q.  And there was prior testimony that you
23 gave that may be inconsistent with this, but I
24 think maybe we had a misunderstanding.

1     A.  Yes.  I may have misunderstood the
2 question, but that is the case with the prior
3 one, also.
4     Q.  Okay.  So for the FACS system,
5 generally, when it says "Call Date" with any
6 of the three dialers, does that date and time
7 correspond with the date and time that the
8 call was attempted?
9     A.  Yes.
10     Q.  Or clarifying further, at least that
11 the call was sent to the dialer, because, for
12 example, with the Soundbite dialer in the
13 previous one, it was sent to the dialer on
14 4/16/2010 at 7:00 Central Daylight Time, but
15 there was no call attempted because it was
16 scrubbed?
17     A.  That's correct.
18     Q.  And it was too early?
19     A.  Correct.
20     Q.  Okay.  Going down to May 3rd at 6:01
21 a.m.
22         MR. VLAHAKIS:  Could we go off the
23 record?
24         MR. BURKE:  Sure.

1     (A discussion was held off the record.)
2     BY MR. BURKE:
3     Q.  Okay.  Looking at 5/3, it looks like
4 there was call on 5/2 at 4:51 p.m.  Do you see
5 that?
6     A.  Yes.
7     Q.  To the 7272 number?
8     A.  Yes.
9     Q.  There's a notation in parentheses.  Can
10 you please decipher that for me?
11     A.  Left message on machine.
12     Q.  Now, was that an automated message?
13     A.  Yes.  It would appear it is, yes.
14     Q.  How can you tell it was an automated
15 message?
16     A.  Because the entry was done by WGR,
17 which is the Noble dialer, not done by an
18 individual.
19     Q.  Skipping down four lines, it looks like
20 there was another call or another designation
21 for a call to the 7272 number by the Soundbite
22 dialer, but it was again aborted because of
23 the wireless scrub; is that correct?
24     A.  Yes.

1     Q.  So no call was made or attempted?
2     A.  That's correct.
3     Q.  Would it be accurate to say that
4 happened again on 5/12/2010, just a few lines
5 from the bottom?
6     A.  Yes.
7     Q.  Or actually on 5/11/2010 is the call
8 date, right?
9     A.  Yes.
10     Q.  Okay.  Again, on 5/19 there's another
11 Soundbite designation where the scrub picked
12 up the cell and decided not to call on 5/18 at
13 10:48, right?
14     A.  Yes.
15     Q.  And down to the next "WGR" destination,
16 the Noble, it looks like the Noble dialer left
17 a message on plaintiff's machine on 5/22/2010
18 at 1:41 p.m.; is that right?
19     A.  Yes.
20     Q.  And it was an automated message?
21     A.  Yes.
22     Q.  The same thing on -- moving down, the
23 entry line is 6/1/2010, it looks like there
24 was a call on 5/29/2010 at 11:11?

Page 53

1    A. Yes.
2    Q. And it says, the notation for the
3  message is a little different. Would you
4  decipher that for me, please?
5    A. Left message with third party.
6    Q. What does that mean?
7    A. It means that somebody, not the
8  consumer, answered the phone and a message was
9  left.
10    Q. Now, how did the dialer know that it
11  wasn't the consumer?
12    A. Wait a second. What line is that
13  again?
14    Q. That's on 6/1.
15    A. Because it unattended messaging. If
16  somebody picks up the call, there is a message
17  that is still left.
18      I don't know. Let me think this
19  through.
20      It may be where the party hung up.
21  It asked, "If you are not Sharmaine Hunter,
22  please hang up the call." That's would be my
23  best understanding of how that could have
24  occurred.

Page 54

1    Q. You mentioned unattended messaging a
2  moment ago. Would you explain in your own
3  words what unattended messaging is?
4    A. A phone call made by a dialer where a
5  message is left for the consumer that has the
6  account to call back to the office to discuss
7  the account.
8    Q. So "unattended" would mean that it was
9  a recorded message?
10    A. Yes.
11    Q. For an unattended message, would there
12  be anyone on Collecto's end of the call, a
13  human being, or is it just the recording?
14    A. It's a recording.
15    Q. Only?
16    A. Unattended, yes. That would be the
17  definition of "unattended" is that there is no
18  -- right.
19    Q. It looks like there is another call.
20  The line is 6/7/2010. The call date is
21  6/6/2010 at 2:00 p.m. Do you see that?
22    A. Uh-huh.
23    Q. Yes.
24    A. Yes.

Page 55

1    Q. It appears that there may have been a
2  different dialer that dialed it: ANM. Do you
3  see that?
4    A. Yes. I see that, yes.
5    Q. Is that a different dialer?
6    A. I don't know the answer to that
7  question.
8    Q. We haven't seen the GC dialer yet.
9  Could that be the GC dialer?
10    A. No.
11    Q. What's the designation for the GC
12  dialer?
13    A. GC.
14    Q. Please don't write on those exhibits.
15    A. No. I have my own copy.
16    Q. Okay.
17      MR. VLAHAKIS: Alex, let me make a
18  suggestion. To see what those initials are,
19  let's maybe have the deponent look through the
20  notes and see where that pops up again, which
21  then may explain those initials.
22      MR. BURKE: Sure.
23    Q. Would you take a moment to just --
24    A. It's the only entry --

Page 56

1      MR. VLAHAKIS: No, (indicating).
2      THE WITNESS: I don't have that on
3  my page.
4      MR. VLAHAKIS: Can we go off the
5  record.
6    (A discussion was held off the record.)
7  BY MR. BURKE:
8    Q. Okay. So for that one, we don't know
9  whether it was a dialer or what, but we do
10  know that there was a call on the date of
11  6/6/2010 at 2:00 p.m., right?
12    A. Yes.
13    Q. And we know that there was a message
14  left on the machine; is that right?
15    A. Yes.
16    Q. Okay.
17      MR. VLAHAKIS: Alex, what kind of
18  message?
19    Q. Do you know what kind of message was
20  left?
21    A. A TCPA-compliant message.
22    Q. Can you tell from these notes if it was
23  an unattended message or a live message?
24    A. I cannot, based on those initials, ANM.

Page 57

1  The other entry with ANM is -- would mostly be
2  done through an individual, but I can't
3  answer. I'm not certain. So I'm not going to
4  guess.
5      Q. Okay.
6          MR. VLAHAKIS: Do you want us
7  during a break to find out?
8          MR. BURKE: Yes. Let's find out
9  what happened.
10     Q. It looks like on 6/8 --
11         MR. VLAHAKIS: Could we take a
12  break so I could ask you something outside?
13         MR. BURKE: Sure.
14         (A recess was taken from
15         11:03 to 11:12 a.m.)
16  BY MR. BURKE:
17     Q. Could you please explain what the
18  initials ANM on 6/7/2010 are?
19     A. ANM is Andrew Morgan, who works on our
20  IT staff at the office and manages the
21  functions of one of the dialers. So that
22  entry would be based on the information in the
23  dialer.
24     Q. So this was also a dialer call and then

Page 58

1  also an unattended message?
2     A. Yes.
3     Q. Do we know which dialer he works with?
4     A. I'm not sure, but I would assume it's
5  Noble.
6     Q. In any event, it's not the Soundbite,
7  right?
8     A. Right.
9     Q. It looks like, moving down on 6/7/08,
10  we have the Soundbite entry, and there was no
11  call attempted; is that correct?
12     A. Yes.
13     Q. Now, it looks to me like there are two
14  entries for that non-attempt, first at 13:53
15  and 13 seconds. Do you see that?
16     A. Yep.
17     Q. And then the second one has a "UA"
18  designation at the beginning of the
19  parentheses. Do you know what that means?
20     A. I don't, offhand.
21     Q. Okay.
22         MR. VLAHAKIS: Do you want John to
23  find out at the break?
24         MR. BURKE: If you can remember

Page 59

1  that, that would be great.
2          MR. VLAHAKIS: Just the UA?
3          MR. BURKE: Yes.
4  BY MR. BURKE:
5      Q. Okay. Go on to Page 4. We have our
6  incoming call with the wrong number.
7          On the left-hand column there is an
8  "AP3." Is that a collector that received that
9  call or a live person?
10     A. That's a live person, yeah.
11     Q. Do you know who that person is?
12     A. Peggy Moriarty.
13     Q. Can you spell "Moriarty"?
14     A. M-O-R-I-A-R-T-Y, Moriarty.
15     Q. Is she a collector on the floor?
16     A. She was at that time.
17     Q. Is she not -- do you know where she is
18  now?
19     A. I don't.
20     Q. Is she employed by Collecto?
21     A. No.
22     Q. How many collectors does Collecto
23  typically have working the dialer on a typical
24  weekday?

Page 60

1     A. I wouldn't have any way to know that
2  number.
3     Q. More than five?
4     A. Yes. Oh, yeah.
5     Q. You think more than a hundred?
6     A. Yes.
7     Q. More than 500?
8     A. No.
9     Q. Somewhere in the 100 to 500 range?
10     A. Would be a guess.
11     Q. Okay.
12     A. Yeah.
13         MR. VLAHAKIS: I object to the
14  form, as beyond the scope; and if you want a
15  closer number, because I think that's a broad
16  range, we could try to get that for you.
17         MR. BURKE: I'm just trying to get
18  a general idea.
19         MR. VLAHAKIS: Okay.
20     Q. Do you know how often debtors or
21  non-debtors call in -- I will start over.
22         Do you know generally how often
23  Collecto gets incoming calls telling it that
24  it's been calling the wrong number?

Page 61

1      A.  No.
2      Q.  Do you know how many phone calls
3  Collecto makes roughly per month with its
4  dialers?
5      A.  I don't have that number, no.
6      Q.  A million calls?
7      A.  It could be, yeah.
8      Q.  A lot of calls?
9      A.  Oh, yeah.
10     Q.  I notice that the designation in the
11  notes are "WRG" and the pound sign or
12  number sign?
13     A.  Uh-huh, yeah.
14     Q.  It is different than the wrong number
15  suggestion in Exhibit 2, Page 3, for wrong
16  number, which is "WN."  Can you explain that?
17     A.  The training materials give the
18  collection staff guidance as to how to enter,
19  but there is a general discussion about making
20  sure that the information is accurate, making
21  sure that it can be understood, and the
22  collectors are not required to use only those
23  codes on that script.  It's given to them as a
24  training tool.

Page 62

1      Q.  But the collectors are instructed to
2  use comprehensible abbreviations, right?
3      A.  They should, yes.
4      Q.  So when you look at an individual
5  debtor's FACS collection notes, you should be
6  able to tell if there was an incoming call
7  that notified Collecto that there was a wrong
8  number being called; is that right?
9      A.  Yes.
10     Q.  Moving down from the wrong number on
11  6/26/10, it says "3GPH."  Do you see that?
12     A.  On what date?
13     Q.  6/26.
14     A.  Yep.
15     Q.  Do you know what that means?
16     A.  The "3GPH" would be "good phone
17  number."
18     Q.  Do you know what the good phone number
19  was here?
20     A.  No.
21     Q.  Is there any way to tell?
22     A.  No.  I think the collector would look
23  in the notes or windows above to see if there
24  is a number that is there.

Page 63

1      Q.  In our four pages of notes here, do we
2  have those phone numbers that the collectors
3  would look up in the other window?
4      A.  The entries in the notes, the other
5  call to numbers could be identified as
6  potential numbers.
7      Q.  Are there different windows for this
8  debtor that we don't have here in these four
9  pages?
10     A.  I'm not certain.  I would assume this
11  would be all of the information on that
12  particular account, but I can't tell you if
13  there is an Experian window that might not
14  show on here, or any other attached type of
15  thing, but all of the notes and all of the
16  information should be on these notes.
17     Q.  For example, there is a file return
18  from Experian on 4/13.
19     A.  Yes.
20     Q.  But I don't see the file or a credit
21  score.
22     A.  Yep.  I'm not exactly sure where that
23  information would appear.  It may be -- it may
24  be a lookup that could be done separately, but

Page 64

1  it's not on this.
2      Q.  On 6/26 they found a good phone number.
3  On 6/28, it looks like CB put in an
4  instruction to begin collection; is that
5  right?
6      A.  Yep.
7      Q.  Now, the entry for the good phone
8  number is an automated entry, that's NG?
9      A.  Uh-huh.
10     Q.  Right?
11     A.  Yes.
12     Q.  So would that be a scrub that was
13  performed at that point?
14     A.  It may be that, you know, changing one
15  number to a bad category could latch onto
16  another number to be called.
17     Q.  What is the "SWEEP23GPH" there on the
18  6/26 entry?
19     A.  I think "sweep" just indicates it was a
20  general tactic run on all of the accounts.
21         A sweep is normally just that there
22  is a certain tactic run, maybe to identify
23  good numbers, and then anything that has a
24  number in it is put into a certain

1  disposition, indicating that there is a number
2  that could be called, and that would be any
3  number that doesn't have -- you know, hasn't
4  been identified as a bad number.
5     Q. So going back to our discussion about
6  the policies, practices and procedures for
7  avoiding violations of the TCPA between and
8  during January -- I'll start over.
9       Going back to our discussions of
10  the policies, practices and procedures that
11  Collecto had in place in 2009 to the present
12  regarding compliance with the TCPA. You
13  testified earlier that there were policies,
14  practices and procedures in three categories:
15  You testified that there are instructors at
16  Collecto that are instructed to only call
17  numbers that are supplied by the client with
18  the dialer; second is that if the number is
19  obtained through a skip trace or other means,
20  then there is a scrub performed; and you
21  testified that if there's a bad number, then
22  there's a code placed in the notes: B.
23      Is that correct?
24     A. Yes.

1     Q. Is there anything else during that time
2  period that Collecto did to ensure compliance
3  with the TCPA?
4      MR. VLAHAKIS: I object to the form
5  of the question.
6     A. Yes.
7     Q. Okay. What?
8     A. The training of the staff is an ongoing
9  process, and new staff are trained at various
10  intervals of time, managers are trained at
11  various intervals of time, and information
12  pertaining to compliance is distributed with
13  -- you know, to the staff at various points in
14  time, so the operations people are aware of,
15  you know, those areas that impact our business
16  and areas where we need to be compliant. So
17  it's an ongoing process.
18     Q. Are those training materials written?
19     A. Some of them are.
20     Q. Are there oral presentations that are
21  -- that have been made about compliance with
22  the TCPA?
23     A. Yes.
24     Q. Who has given those presentations?

1     A. Most likely the trainers that we have
2  or operations managers.
3     Q. Do you know whether they used notes or
4  other written materials to provide that
5  training?
6     A. Yes.
7     Q. Did they?
8     A. Yes.
9     Q. What written materials did they use?
10     A. They used a sheet that is called
11  "Calling a Consumer's Cell Phone Number."
12     Q. Is there anything else written that any
13  person instructing, regarding compliance with
14  the TCPA, has used?
15     A. The information in the FACS manual is
16  also -- in the manual, the FACS manual,
17  there's a section on phone flags.
18      MR. VLAHAKIS: You're looking for
19  it. That wasn't within the initial
20  production.
21      EXHIBIT NO. 5 MARKED
22     Q. I'm handing you what has been marked as
23  Exhibit 5. Is this document entitled "Calling
24  a Consumer's Cell Phone Number," is that the

1  document you referred to in your last answer?
2     A. Yes.
3     Q. And this is a one-page document?
4     A. Yes, it is.
5     Q. In the second paragraph it says
6  something about implied consent.
7      "If our client provides a cell
8  phone number to us because the consumer listed
9  it as a reference number at the time of the
10  transaction." Do you see that?
11     A. Yes.
12     Q. Would it be accurate to say that
13  Collecto relies on its clients -- I'll start
14  over.
15      Cell phone numbers are sometimes
16  provided to Collecto from Collecto's clients,
17  right?
18     A. That's correct.
19     Q. Does Collecto know when it receives a
20  phone number from its client whether the
21  consumer listed it as a reference number at
22  the time of the transaction?
23      MR. VLAHAKIS: I object to the form
24  of the question.

1    A. We don't know what time it was
2  provided, but we know it was provided at some
3  point on the account.
4    Q. By the consumer to the client?
5    A. The assumption is if the number is
6  being provided to us with the account, the
7  only way the client is going to get that
8  information is getting it from the consumer.
9    Q. How does Collecto know that the numbers
10  it receives from its clients were given
11  directly from the consumer to the client?
12    A. We have no absolute way of knowing
13  that, but the clients will tell us the only
14  way they're going to get the numbers is from
15  the consumer. So based on their statement to
16  us, we assume what they're telling us is
17  accurate.
18    Q. Which statement to you are you
19  referring to?
20    A. That the numbers that they enter have
21  been obtained from the consumer, either at the
22  time the account was set up, the transaction
23  was done, or at a subsequent time when the
24  information was provided for a contact number

1  by the consumer. So if there was a need for
2  communications, the information would be
3  available in the account.
4    Q. Is this something that the client tells
5  Collecto directly, or is it an assumption that
6  Collecto makes through receipt of these
7  numbers?
8    A. No. The customers tell us that these
9  were the calling numbers on the account. They
10  represent to us that these are good numbers to
11  call.
12    Q. So with respect to the Sharmaine Hunter
13  account, was there a representation from AT&T
14  that the 7272 number was listed by the
15  consumer as a reference number at the time of
16  the transaction?
17    A. Yes.
18    Q. Where did that happen?
19    A. Where did that happen? We confirmed
20  this with AT&T, and their manager, Mary
21  Fornaire, said, "At the point of new service
22  or any time during the lifetime of this
23  account the process is to ask the customer for
24  a current number to reach them outside of the

1  home number. If the AT&T rep gets such a
2  number, the rep updates the customer account.
3    I cannot state explicitly what
4  occurred in this account, but the rep would
5  not have known about this number without
6  asking for it and getting it from the
7  consumer."
8    Q. What is the date of that communication
9  that you just read from?
10    A. Tuesday, October 12, 2010.
11    Q. Now, is there anything -- that's the
12  day before yesterday?
13    A. Yes.
14    Q. Okay. Is there anything before that
15  email that made Collecto believe that the
16  phone numbers it was receiving from AT&T were
17  provided as a reference number by the debtor
18  at the time of the transaction?
19    MR. VLAHAKIS: I object to the
20  form.
21    Are you asking just with regard to
22  this Sharmaine Hunter account or the
23  representation that he testified to that our
24  client tells us they have this information

1  generally?
2    MR. BURKE: Let's talk about
3  Sharmaine first.
4    Q. So is there anything other than this
5  email that Collecto relied upon in calling
6  this cell phone number a bunch of times?
7    A. Well, Collecto relies on the fact that
8  it has a relationship with AT&T for many years
9  and has handled several of hundreds of
10  thousands of accounts for AT&T, and the
11  practices and the processes and procedures are
12  very common and familiar with us.
13    So this has been standard practice
14  for any number of years that we've been doing
15  business with AT&T, maybe 10 years. So there
16  is nothing new or different about the
17  Sharmaine Hunter account than any of the other
18  three million accounts they might have given
19  to us.
20    Their practice internally of putting
21  information on the accounts is pretty much a
22  standard-industry-type practice. So we rely
23  upon their information because it's never been
24  their intent to provide us with bad phone

Page 73

1  numbers.
2      Q.  There's a difference between a bad
3  phone number and a phone number that was
4  provided by the consumer, right?
5          MR. VLAHAKIS:  I object to the
6  form.
7      A.  No.
8          MR. VLAHAKIS:  It's vague and
9  confusing.
10     A.  They could be the same.
11     Q.  They could be the same, but they're not
12  necessarily the same, right?
13     A.  That's true.
14     Q.  So would it be accurate to say that
15  Collecto relies upon this information received
16  from the clients, but it might not necessarily
17  be the case that the phone number was provided
18  by the consumer as a reference number at the
19  time of the transaction?
20     A.  We have no knowledge of that.
21          All we know is that the number was
22  provided to AT&T.  They entered it on the
23  account, and they sent us the number with the
24  account.

Page 74

1      Q.  You don't know for sure that the number
2  was provided to AT&T, right?
3          MR. VLAHAKIS:  I object to the form
4  of the question.  It misstates what he said.
5          He gave two scenarios earlier.  One
6  was when it was set up, and one later when
7  it's time to communicate with the consumer
8  that that number is being provided to the
9  client.
10          MR. BURKE:  My question stands.
11  Would you please read it?
12          (The record was read:  Q. You
13          don't know for sure that the
14          number was provided to AT&T,
15          right?)
16     A.  Yes.
17     Q.  You do know?
18     A.  No, I don't know for sure, because I
19  can't know anything for sure.  How can I be
20  sure you're Alex Burke?  I have no way of
21  verifying that.  You didn't show me your ID.
22          Am I certain that the number came
23  from AT&T?  Yes, I am, because it's on their
24  screen and system.

Page 75

1          They provided us with that number.
2  In the past history of handling accounts,
3  they've always given us accurate and good
4  numbers.
5          If that information is inaccurate,
6  or they were given incorrect information,
7  which is the possible reason why this
8  occurred, then it's a possibility, but we
9  don't know.  We can only speculate.
10          MR. VLAHAKIS:  Can we go off the
11  record?
12          MR. BURKE:  I'm in the middle of
13  this.
14          MR. VLAHAKIS:  Off the record,
15  though.
16      (A discussion was held off the record.)
17      BY MR. BURKE:
18     Q.  Do you think it's possible Sharmaine
19  gave the wrong phone number to AT&T?
20     A.  I think it's possible, certainly.
21     Q.  I mean, based on the email that you
22  read, it seems like AT&T doesn't know for sure
23  where the number came from itself?
24     A.  Unless the person sending the message

Page 76

1  was the person that wrote the information
2  down, I don't think she's going to say with a
3  hundred percent degree of certainty that that
4  was the case.
5          So it's -- you know, all she knows
6  is what is in their system, and the reps take
7  the information from the consumer, and the
8  consumer is applying for service, and they
9  entered that information on the system.
10          If the rep put a wrong digit in it,
11  or the person made up the number to give to
12  AT&T, which is, you know, a possibility, then,
13  you know, that may have been why the number
14  appeared there.
15          You know, my guess is that the
16  consumer made up a number, and it happened to
17  be your client's number.
18     Q.  So we just don't know?
19     A.  We don't know for a hundred percent,
20  sure.  All we know is AT&T had this number in
21  their system, and that is the number they
22  gave, representing that this is a valid number
23  that we could contact the consumer at.
24     Q.  And just going back, the representation

Page 77

 1  that this is a valid number that the consumer
 2  gave to AT&T, that representation is based on
 3  a course of dealing; is that right?
 4      A. Well, based on our past experience of
 5  dealing with them, and then it was reconfirmed
 6  when we contacted their manager, the OCA
 7  manager for AT&T who gave us her information
 8  once she looked up the account.
 9      Q. Go ahead.
10      A. She verified what the information was
11  that they gave us.
12      Q. I mean, but she hedged a little bit.
13  She said something like I can't tell you
14  explicitly, right?
15      A. She used waffle words, as I refer to
16  them.
17      Q. Yes.
18      A. So, you know, like anything else, we
19  can say things with a high degree of
20  certainty. Unless you do it yourself, you
21  can't say with absolute certainty.
22          She wasn't the person who did it.
23  She's speaking as a manager would, in all
24  probability, or most likely, in using the

Page 78

 1  waffle words that, you know, where she could
 2  say, well, I told you that the probability is
 3  there, but that's one-tenth of one percent
 4  that it didn't happen the way things normally
 5  happen.
 6      Q. So as I understand it, the process that
 7  Collecto had during '09 and to the present for
 8  sifting out debtors where it was a wrong
 9  number is that they have a process by which
10  they designate wrong numbers in the collection
11  notes; is that right?
12      A. Yeah. That is one process, yes.
13      Q. Are there any other processes by which
14  wrong numbers are designated?
15      A. Some of the skip trace. If new numbers
16  are identified as being valid to a consumer,
17  the other numbers may be deleted from the
18  record so the numbers are not called.
19          We may contact the consumer who says
20  here's my best number to reach me. So that
21  number is put into the system as a focus
22  point, and the prior numbers that may have
23  been provided by the client may have been
24  deleted, you know, which is particularly true

Page 79

 1  with phone services, because people, you know,
 2  once they stop paying their bills, they tend
 3  not to use the phone service, and there's
 4  going to be a new number to contact them.
 5      Q. So doesn't the process of -- I will
 6  start that question over again.
 7          I understand that the automated
 8  script for the automated messages that
 9  Collecto uses says something like if you're
10  the wrong person, please call us and let us
11  know; is that right?
12      A. That's correct.
13      Q. Is it your understanding that some
14  people do that sometimes, call Collecto and
15  tell them that's it's the wrong number?
16      A. Yes.
17      Q. Do you have any idea how often that
18  happens?
19          MR. VLAHAKIS: Objection.
20  Foundation.
21      A. I don't know how often it happens.
22      Q. Would it be reasonable to assume that
23  it happens more than 10 times a day out of a
24  million calls?

Page 80

 1          MR. VLAHAKIS: Objection. This is
 2  beyond the scope of the deposition. We were
 3  not noticed that you were attempting to have a
 4  deponent to speak for Collecto in
 5  hypothesizing about the amount of times
 6  someone may call in response to the voicemail
 7  message that you just described.
 8      A. I have no way of knowing the number. I
 9  don't really want to guess at a number because
10  I'm not supposed to guess.
11      Q. If a consumer calls Collecto after
12  having received a call from the dialer, isn't
13  it already too late when they receive the
14  message that says please call us to be taken
15  off our list? They already received the call,
16  right?
17      A. They received a message, that's
18  correct, and if the information is incorrect
19  or we have the incorrect person when they call
20  in, then we want to note that in the account
21  so we don't make the same call again.
22      Q. So it is -- it's not a perfect system,
23  but it's a system that if somebody calls in it
24  will stop them from getting more calls; is

Page 81

1 that right?
2     MR. VLAHAKIS:  I object to the
3 form.
4     A.  The system is perfect, but, you know,
5 the people that are involved in the system,
6 you know, may not follow the system.
7     Q.  Well, take, for example, Domi Powell,
8 the plaintiff in this case.  He didn't give
9 his phone number, hypothetically, he didn't
10 given his phone number to AT&T.  He never
11 consented to be called.  He got a few calls,
12 and he called and requested to be taken off,
13 but the damage was already done, he got the
14 calls, right?
15     MR. VLAHAKIS:  I object to the
16 form.
17     A.  I don't see what the damage is.  There
18 is no damage.
19     Q.  He got the calls.  I'm not asking you
20 to concede that there was damage.
21     A.  I receive wrong phone numbers, also.
22 Why?  He got wrong phone numbers not intended
23 for him, which happens to most people.
24     Q.  And given the way the system is set up,

Page 82

1 that probably happens -- that probably has
2 happened more than once in the last four
3 years; would you agree?
4     A.  Probably has happened more than once.
5 I would imagine with our 10 to 15 million
6 phone calls per year that there is a
7 possibility that that might have happened more
8 than once.
9     Q.  Okay.  Other than the testimony that
10 you've already given today -- I will start
11 that question over.
12     We have talked about some of these
13 issues, but I'm going to ask this question
14 straight on.
15     As to persons that Collecto called
16 using its dialer, any of its three dialers,
17 between June 15th of 2006 and June 6th of
18 2010, where the person at any time notified
19 Collecto that the calls were in error or asked
20 to stop the calling because of the wrong
21 number, please explain to me any prior express
22 consent that Collecto claims any of those
23 persons provided to receive cellular phone
24 calls on their cell phones using the dialers

Page 83

1 or the prerecorded messages?
2     MR. VLAHAKIS:  I object to the
3 form.  You're asking him to add to whatever he
4 discussed, or you're asking him to summarize
5 it?
6     THE WITNESS:  Summarize it.
7     MR. VLAHAKIS:  You lost me halfway
8 through it.  We got Topic 4 here.
9     MR. BURKE:  I want to stick with
10 this.
11     BY MR. BURKE:
12     Q.  We have discussed a bunch of compliance
13 procedures and policies and maybe they apply.
14 Maybe they don't.  I'm asking the direct
15 question on the fourth topic, provide the
16 prior express consent evidence.
17     MR. VLAHAKIS:  I object.  The
18 phrase "prior express consent," which is not
19 defined in this topic, if you want to define
20 it or ask my client if he has an understanding
21 of what you mean, that might be better to
22 launch into this.
23     Q.  Let's just use "consent."  Explain to
24 me how those, any of those people on Topic 4

Page 84

1 consented to receive autodialed or prerecorded
2 messages calls?
3     A.  Okay.  In order for us to work an
4 account we have to have information provided
5 by our client, who is the creditor.
6     The creditor assembles information
7 in their data file provided by the consumer
8 which is necessary to open up and set up an
9 account.
10     When the account is placed for
11 collection, the information that the creditor
12 has is transmitted to us as a way of us being
13 able to contact the consumer via the mail or
14 phone in order to effectuate a collection of
15 the account.
16     The information from the client was
17 obtained from the consumer; and based on the
18 fact that the client is providing us with
19 numbers that they have been provided from the
20 consumer, then we assume that the consumer
21 willingly provided them with the numbers, and,
22 in fact, agreed that that would be a contact
23 number for any information or any action or
24 any communication that would be required on

1  the account.
2      So the consumer provides the
3  information to our client, and then based on
4  that -- and that information conveyed to us,
5  we then enter that into our system for
6  purposes of contacting the account, and we
7  would assume that if the consumer did not want
8  to be contacted and did not want to give
9  consent, they would not have provided the
10 number, or they would have contacted the
11 client and told them that the number was no
12 longer valid or they no longer wanted to be
13 contacted at that number, and that's the way
14 our business operates.
15     That's the way I'm sure every other
16 collection agency operates, and that's the
17 only information that we can rely upon is the
18 representation from our clients that these are
19 good and valid numbers for their customers.
20  Q. I have two followup questions. One has
21 to do with the portion of this question that
22 says that these are wrong numbers, and the
23 second has to do with our discussion earlier
24 about -- that there's maybe an understanding

1  but there's no explicit statement one way or
2  another about whether the numbers were
3  provided by the consumer to the client. So
4  let's hit the wrong number portion of this
5  first. The topic excludes any persons for
6  whom the number was correct.
7      Does Collecto contend that it had
8  prior expressed consent from persons who were
9  called, where those persons did not provide
10 the phone number to the client?
11     MR. VLAHAKIS: I object to the
12 form. You lost me on that one.
13  A. Yeah, I would have to hear that
14 question again.
15     MR. VLAHAKIS: Why don't you ask
16 how this relates to your client and expand it
17 out?
18     MR. BURKE: No. Read it back.
19     (The record was read Q: I have
20     two followup questions. One has
21     to do with the portion of this
22     question that says that these
23     are wrong numbers, and the
24     second has to do with our

1  discussion earlier about -- that
2  there's maybe an understanding
3  but there's no explicit
4  statement one way or another
5  about whether the numbers were
6  provided by the consumer to the
7  client. So let's hit the wrong
8  number portion of this first.
9  The topic excludes any persons
10 for whom the number was correct.
11 Does Collecto contend that it
12 had prior expressed consent from
13 persons who were called, where
14 those persons did not provide
15 the phone number to the client?)
16     MR. VLAHAKIS: I object to the form
17 of the question. Incomplete hypothetical.
18     Let me see if I understand --
19     MR. BURKE: Please, no.
20     MR. VLAHAKIS: Do you understand
21 the question?
22     THE WITNESS: Yes.
23     MR. VLAHAKIS: Okay.
24  A. Collecto works for various clients, and

1  Collecto is an agent for those clients,
2  working to do receivables management,
3  collection work for the clients.
4      When the client provides us with the
5  information in their file, we assume that the
6  information that they have provided to us is
7  their best knowledge of what the correct
8  information is on an account.
9      They represent to us that they're
10 providing us with their accurate information
11 from their files; and under that
12 representation, we proceed forward, until we
13 find that the information may not be accurate.
14     If the information is not accurate,
15 then we take the steps to correct that so that
16 the people who may be contacted incorrectly or
17 inappropriately will then be deleted from our
18 records, and the problem will be corrected.
19     So we act, you know, on behalf of
20 our clients and contact their customers at
21 their direction based on the information that
22 they provided to us.
23  Q. Does Collecto contend for those
24 incorrect or improper phone calls that were

1  made to people within this category were made
2  with the prior expressed consent of the
3  recipient?
4      MR. VLAHAKIS: I object to the form
5  of the question. We're assuming -- it's an
6  incomplete hypothetical. I understand your
7  situation where your client --
8      MR. BURKE: It's not a
9  hypothetical. It's a real question.
10     MR. VLAHAKIS: I understand you
11 showed us bills showing that your client had
12 that phone number that was owned by his mom or
13 whatever, and the assumption is that that call
14 happened in that time period and did not go to
15 the right person.
16     Topic 4 is sort of expanding that
17 scenario to an assumption that this happened
18 on other occasions, where somebody has called
19 in, and exactly like your client's scenario,
20 and we're assuming that there's proof that the
21 person is calling in and saying I'm John Doe,
22 and you called for Jane Doe. I'm not that
23 person.
24     I'm not sure, absent further

1  evidence, we can assume that the person
2  calling in saying it's the wrong number is
3  truly the scenario that your client is in. I
4  don't dispute your recitation of the fact that
5  your client is the wrong person.
6      MR. BURKE: Your objection has to
7  do with some application to this case. My
8  question is my question. I just want an
9  answer to my question.
10     THE WITNESS: Repeat his question
11 again.
12     (The record was read: Q.
13     Does Collecto contend for
14     those incorrect or improper
15     phone calls that were made
16     to people within this
17     category were made with the
18     prior expressed consent of
19     the recipient?)
20 A. In the context of the client providing
21 us with the information on the consumer and
22 the -- and the information being valid as to
23 it being provided to them, you know, we assume
24 that consent has been granted, because the

1  client is providing us with the numbers which
2  they would only obtain from the consumer.
3      MR. VLAHAKIS: This question was
4  different, though.
5      You're asking -- Alex, can I
6  simplify -- does Collecto believe that it had
7  express consent from anybody that has called
8  Collecto and said you have the wrong number,
9  and it's the recipient of the call, which may
10 be different than the consumer that they were
11 calling. Is that what you are saying?
12     MR. BURKE: I think the answer was
13 fine.
14     MR. VLAHAKIS: Okay.
15 Q. Why does Collecto use a dialer?
16 A. In order to increase the number of
17 contacts it makes with the customers.
18 Q. To collect debt more efficiently?
19 A. The more people you speak to the more
20 likely you are to make collections.
21 Q. Is Collecto entitled to use a dialer?
22     MR. VLAHAKIS: I object to the
23 form. Beyond the scope of the deposition
24 notice. Calls for a legal conclusion as well.

1  A. Are we entitled? I mean, I don't
2  understand your question. Could you rephrase
3  it?
4  Q. Yes. A dialer is specific
5  technological equipment that is regulated, and
6  it's possible to make a phone call without a
7  dialer.
8      So my question is, is there
9  entitlement that Collecto has to use a dialer?
10 A. I don't think there is an entitlement.
11 It's just a legal right, like any other
12 business entity that's a valid corporation,
13 that there's no laws or regulations that
14 preclude Collecto or any other collection
15 agency or any number of creditors, the U.S.
16 government, state, local governments that use
17 automated dialers as part of the communication
18 process with their customers, clients or
19 residents.
20 Q. Is Collecto required to use a dialer?
21     MR. VLAHAKIS: I object to the form
22 of the question.
23 A. Required by whom?
24 Q. By anybody.

1       MR. VLAHAKIS:  Beyond the scope.
2   Q.  That you know of?
3   A.  You know, the clients that we have will
4 inquire as to what our processes are, and
5 they, based on the representation as to what
6 our processes are, will make a decision as to
7 whether they want to hire us or somebody else.
8      So industry norm is that an agency
9 trying to contact consumers is going to
10 utilize a dialer to enhance and improve their
11 results.
12   Q.  If Collecto scrubbed every phone call
13 before it made the phone call to a cell, do
14 you think that it would be able to avoid
15 calling wrong numbers using its dialer?
16      MR. VLAHAKIS:  I object to the
17 scope.  Beyond the scope of the 30(b)(6)
18 notice.
19   A.  It may reduce the number.  It won't
20 eliminate the number.
21   Q.  Let's go back to the second prong of
22 what I mentioned a few minutes ago about the
23 understanding between Collecto and its clients
24 as to consent, specifically referring to

1 fourth topic and your answer to the question
2 about the fourth topic.
3      I think you testified earlier that
4 there was no explicit understanding between
5 Collecto and its clients about where the phone
6 numbers come from that the clients transmit to
7 Collecto; is that correct?
8      MR. VLAHAKIS:  I object to the
9 form.
10   A.  No.
11   Q.  Explain.
12   A.  Well, you said "explicit
13 understanding."  There is no explicit
14 understanding where the numbers come from.
15 There is an understanding that numbers were
16 provided by the customer of our client, and
17 that the information is obtained when they set
18 up the account, you know, with the -- our
19 client.
20   Q.  Does Collecto take steps to ensure that
21 this is the case for each client?
22   A.  Once we've started working the business
23 of a client, if there's some aspect of their
24 business that is not valid, where information

1 that they are providing is not valid for some
2 reason, we would then communicate back to the
3 client to straighten out if it was something
4 that came -- you know, if there was charges or
5 something in there that shouldn't be part of
6 the file, we would communicate back to the
7 client.  Our business with AT&T has been
8 ongoing for 10 years or more.  It's not
9 anything new or different.  It's the same
10 process.
11   Q.  Did AT&T ever, except for this email on
12 Tuesday, tell Collecto explicitly these are
13 all numbers, phone numbers that we got from
14 our clients, from our customers?
15      MR. VLAHAKIS:  I object to the
16 form.  Beyond the scope of the 30(b)(6)
17 notice.
18   A.  You're asking me if there was a point
19 in time when AT&T, which is a corporation,
20 told us that these were the numbers?
21      We have been instructed by them that
22 these are the numbers that they have in their
23 system that are valid numbers for the
24 consumer, at least at the time that they put

1 the information in their system.
2      There is no guarantee that numbers
3 don't change or people move and numbers get,
4 you know, repositioned with somebody else, but
5 you know, the information they provide us is
6 that what they believe they have in their
7 records is accurate information.
8   Q.  The critical distinction is not whether
9 it's accurate information.  The critical
10 distinction is whether the customer gave the
11 client that number, that's what my question
12 is.
13      MR. VLAHAKIS:  Objection.  Asked
14 and answered.
15      THE WITNESS:  Yeah.
16   Q.  You can answer again.
17   A.  The client tells us that the source of
18 the numbers that are in the file were provided
19 by the consumer, that's what the client tells
20 us.
21   Q.  When did AT&T tell you that?
22   A.  When did they tell us that?
23   Q.  Yes.
24   A.  I can't give you the exact date and

1  time.

2    Q. When did any other -- who would know

3  the exact date and time when AT&T told

4  Collecto that?

5    A. There wouldn't be a person that I could

6  think of that might have that knowledge as to

7  when that specific information is provided.

8  It may be part of the contract that they are

9  going to provide us with information, valid

10  information, but I can't give you the specific

11  date and time.

12     It's been the ongoing practice for

13  more than 10 years with this client. So it

14  isn't a new revelation. It isn't something

15  they just thought up. It's been standard

16  practice for numerous years.

17    Q. I'm not quibbling that they gave you

18  numbers that they thought were valid. I'm

19  asking what direct knowledge Collecto has as

20  to whether the customers gave these phone

21  numbers to AT&T or any other creditor --

22    A. We have no direct knowledge.

23    Q. Going back to the B designation in the

24  collection notice, you testified earlier that

1  the B is used to designate the wrong numbers;

2  is that correct?

3    A. Yes.

4    Q. Are there other designations that the B

5  is used for?

6    A. No.

7    Q. It's not used to designate a

8  disconnected number?

9    A. If it's a bad number, it could be used

10  for that.

11    Q. Okay. That's what I'm trying to figure

12  out, what it's used for.

13    A. Uh-huh.

14    Q. So is the B used for disconnected

15  numbers?

16    A. It's used for any bad number, which

17  could include disconnected.

18     MR. VLAHAKIS: This is what he's

19  reading off of (indicating).

20    Q. So other than disconnected numbers,

21  unreachable numbers or wrong numbers, is there

22  any reason that the B designation would be

23  used?

24    A. I can't think of one.

1    Q. Well, as to this issue, you're

2  testifying for the corporation --

3     MR. VLAHAKIS: Objection. Beyond

4  the scope of the 30(b)(6) notice.

5    Q. So I'm asking --

6     MR. VLAHAKIS: I know what you are

7  asking. It's not particularly identified as a

8  topic to say please have Collecto identify any

9  and all reasons for calling the wrong number,

10  including your clarification of the

11  interrogatory answer, I believe it's 4 or 3.

12     You talk about in Topic 2 the

13  notetaking process for incoming calls,

14  including requests not to be called and

15  defendant's policies, practices and procedures

16  in deciding what numbers to call and not call,

17  that's Topic 3.

18     I don't see it there, the prior

19  consent. I don't see it there.

20     MR. BURKE: Okay.

21     MR. VLAHAKIS: I am willing after

22  this deposition to go through that with you

23  pursuant to 37.2 in more detail so we can

24  clarify that question.

1     MR. BURKE: I want a final answer

2  on that question.

3     MR. VLAHAKIS: Fair enough. Save

4  it for another day.

5     (Witness and counsel confer.)

6     MR. VLAHAKIS: Oh, this reminds me,

7  Alex, that you may want to go through this

8  (indicating).

9     MR. BURKE: Let's go off the

10  record; is that okay?

11     MR. VLAHAKIS: Yes.

12    (A discussion was held off the record.)

13  BY MR. BURKE:

14    Q. I'm looking at the third topic on

15  Exhibit 1. We've talked about some policies,

16  practices and procedures about what numbers

17  Collecto calls and does not call using its

18  dialers and prerecorded messages.

19     As I understand it, phone numbers

20  that Collecto receives from a skip trace

21  service are scrubbed before they're called on

22  the autodialer; is that correct?

23    A. That's correct.

24    Q. Are there any other phone numbers or

1   types of phone numbers, categories, that are
2   scrubbed before they're called using the
3   dialer?
4       A.  Yes.  I think I previously testified to
5   the fact that a scrub is used for bankrupt
6   accounts, deceased accounts.
7       Q.  Scrub for a cell phone?
8       A.  No.  Other than the Soundbite, that's
9   the...
10      Q.  So numbers that come from skip traces
11  are sent to Soundbite to scrub for cell
12  phones, right?
13      A.  Yes.
14      Q.  Are there any other types of phone
15  numbers that are sent to the Soundbite dialer
16  in order to scrub for cell phones?
17          MR. VLAHAKIS:  I object to the
18  form.
19      A.  I don't understand your question.
20          MR. VLAHAKIS:  In this case, it was
21  this campaign.
22      A.  All the numbers are sent to Soundbite,
23  and Soundbite determines those that are cell
24  phone numbers.

1       Q.  Okay.
2       A.  So...
3       Q.  Once the Soundbite dialer determines a
4   certain number is a cell phone number, it
5   makes that notation in the notes; doesn't it?
6       A.  Yes.
7       Q.  Okay.  But then sometimes, as with what
8   happened with Mr. Powell, the cell phone
9   number is called after a determination that
10  the number is a cell phone number by a
11  different dialer; is that correct?
12      A.  Yes.
13      Q.  Would it be accurate to say that all
14  phone numbers are called using all the
15  dialers, generally, until B is placed on the
16  number?
17          MR. VLAHAKIS:  Can you ask it
18  again?
19          (The record was read: Q.
20          Would it be accurate to say that
21          all phone numbers are called
22          using all the dialers,
23          generally, until B is placed on
24          the number?)

1           MR. VLAHAKIS:  I object to the
2   form.
3       A.  No.
4       Q.  Okay.  Explain why that's not accurate?
5       A.  Because all numbers are not necessarily
6   put into the dialer.  Only selected pools are
7   put into the dialer.
8       Q.  And how are those pools selected?
9       A.  There's criteria that's established
10  relative to the accounts.  So that, for
11  example, if the account was a very low balance
12  account, it might not be called, because it's
13  an account that's not -- there's not a value
14  to working the account.
15          If any other information that were
16  to come back that the -- you know, that the
17  account was not a valid account, then it might
18  be excluded from the pool.
19          I mean, there's a circumstance where
20  low credit scores would indicate persons that
21  are unable to pay, with numerous collection
22  accounts, would get low credit accounts.
23          They would be excluded from the
24  program.  They try to selectively tailor the

1   accounts contacted to be accounts that have a
2   prior probability of actually being able to
3   pay the account.
4       Q.  So when a pool is put together, I would
5   imagine like a manager or somebody, not just a
6   debt collection person on the phone, some sort
7   of manager puts the pool together based on
8   criteria; is that right?
9       A.  That's correct.
10      Q.  The pool probably says, all right, take
11  these -- people that fall into this criteria
12  based on the credit scores and other criteria,
13  call all these people's primary phone based,
14  you know, on this particular criteria; is that
15  accurate?
16      A.  That's accurate, yeah.
17      Q.  And then the three dialers work in
18  concert on that particular request, is that
19  right, or do the dialers have separate
20  campaign pools?
21      A.  They have separate pools.
22      Q.  Okay.  So one pool might go to the
23  Soundbite, and the Soundbite dialer is the
24  only dialer who calls having to do with that

1  pool unless they happen to be part of another
2  pool that's part the Noble dialer?
3    A.  The accounts can start out in one pool,
4  and they re-modify the pool to exclude
5  accounts before it is sent to another type of
6  a dialer.
7        So the account doesn't stay in one
8  category throughout the life of the account.
9  It can be moved to different categories,
10  depending upon, you know, what the tactics
11  are.
12    Q.  Because with Mr. Powell, he started at
13  the Noble dialer, and then he went to the
14  Soundbite, and then back and forth between
15  Noble and Soundbite?
16    A.  Yeah.
17    Q.  So would that be the same campaign, or
18  are those separate campaigns for the two
19  dialers?
20    A.  Separate campaigns.
21    Q.  Is there a way to tell what campaign he
22  was part of, these calls were part of?
23    A.  I don't know.
24        MR. VLAHAKIS:  That's beyond the

1  scope as well.
2    Q.  Other than -- I will start over and
3  explain where I'm going with this.
4        I understand that phone numbers
5  that Collecto receives from a skip trace
6  company are typically scrubbed by the
7  Soundbite dialer before they're called, right?
8    A.  Yes.
9    Q.  Are telephone numbers that are received
10  from a skip trace ever called by the Noble or
11  the GC dialer?
12        MR. VLAHAKIS:  I object to the form
13  of the question.  Beyond the scope.
14    A.  I'm not certain.
15    Q.  Okay.  How does Collecto figure out
16  which telephone numbers it should call using
17  its dialer and which telephone numbers it
18  should call not using its dialers?
19    A.  The numbers that are in the top line of
20  the account that are in those fields, the
21  "can be reached" number is usually the
22  targeted number for the purposes of the
23  dialer, because that's been determined to be
24  the best calling number.

1        If a different number is obtained,
2  it would be entered into that field so that
3  the call would be directed.
4    Q.  Now, is that the case regardless of
5  whether the number was received from the
6  client or whether it was received from a skip
7  trace?
8        MR. VLAHAKIS:  I object to the form
9  of the question.
10    A.  Yeah, I'm not sure.  Because the skip
11  trace numbers go into another field, and it
12  may be the case where the dialer can pick up
13  something from that field if it's programmed
14  correctly.  I don't know what the actual
15  programming is.
16        MR. VLAHAKIS:  (Indicating).
17        THE WITNESS:  That's not in every
18  case, though, sorry.
19    Q.  Are phone calls ever manually dialed?
20    A.  Yes.
21    Q.  How does that look in the notes when
22  that happens?
23    A.  The collector's initials would be in
24  there, and then the number dialed would be

1  entered.
2    Q.  Now, we have a case here where --
3  Page 3 of Exhibit 3, on 6/7/10, do you see
4  that?
5    A.  Uh-huh.
6    Q.  Yes?
7    A.  Yes.
8    Q.  We've got someone's initials?
9    A.  Yep.  It was one of the dialer
10  managers.
11    Q.  Right.  A dialer manager.
12        Who are the other persons, the
13  dialer managers whose initials might appear to
14  show that it was a dialer that made the call,
15  do you know?
16    A.  I think you've got most of them on
17  here.  You know, you got the WGR and MGR.
18        MR. VLAHAKIS:  Are you asking him
19  if he knows who those people are?
20        MR. BURKE:  No.  I want to know
21  what designations there may be.
22    A.  And I found out that that other ANM is
23  16, 17 people in the IT department.  So I
24  don't always know who all of them are.  The

Page 109

1  nj, the DEB, those are all IT-related.
2      MR. BURKE:  All right.  I have
3  nothing more at this time.  Because I got some
4  of these documents after I had left, I'm going
5  to leave the deposition open with the
6  possibility of reconvening, if appropriate.  I
7  hope it's not appropriate or necessary.
8      MR. VLAHAKIS:  Fair enough.  Did
9  you go into that Topic 5 at all?
10      MR. BURKE:  Yes.
11      MR. VLAHAKIS:  We will reserve
12  signature.
13   (The deposition was adjourned at 12:52 p.m.)
14
15
16
17
18
19
20
21
22
23
24

Page 110

1  CERTIFICATE
2  COMMONWEALTH OF MASSACHUSETTS )
3  COUNTY OF SUFFOLK            )
4      I, Deborah Roth, a Registered
5  Professional Reporter and Notary Public duly
6  commissioned and qualified in and for the
7  Commonwealth of Massachusetts, do hereby
8  certify:
9      That John F. Burns, Jr., the witness
10  whose deposition is hereinbefore set forth,
11  was duly identified and sworn by me, and that
12  the foregoing transcript is a true record of
13  the testimony given by such witness to the
14  best of my ability.
15      I further certify that I am not
16  related to any of the parties in this matter
17  by blood or marriage, and that I am in no way
18  interested in the outcome of this matter.
19      IN WITNESS WHEREOF, I have
20  hereunto set my hand and affixed my notarial
21  seal this 15th day of October, 2010.
22  _____
23  Deborah Roth, RPR
24  My Commission Expires:  January 23, 2015

Page 111

1      The Deposition of John F. Burns,
2  Jr., was taken in the matter, on the date, and
   at the time and place set out on the title
   page hereof.
3      It was requested that the deposition
   be taken by the reporter and that same be
4  reduced to typewritten form.
5      It was agreed by and between counsel
   and the parties that the Deponent will read
   and sign the transcript of said deposition.
6  DEPOSITION ERRATA SHEET
   Re:  Esquire Deposition Solutions
7  File No.: 180300
   Case Caption:  Powell v. Collectco
8  Deponent:  John F. Burns, Jr.
   Deposition Date:  10/14/10
9  To the Reporter:
   I have read the entire transcript of my
10  Deposition taken in the captioned matter or
   the same has been read to me.  I request that
11  the following changes be entered upon the
   record for the reasons indicated.  I
12  have signed my name to the Errata Sheet and
   the appropriate Certificate and authorize you
13  to attach both to the original transcript.
   Page No. _____ Line No. _____ Change to:
14  _____
   Reason for change:
15  _____
   Page No. _____ Line No. _____ Change to:
16  _____
   Reason for change:
17  _____
   Page No. _____ Line No. _____ Change to:
18  _____
   Reason for change:
19  _____
   Page No. _____ Line No. _____ Change to:
20  _____
   Reason for change:
21  _____
   Page No. _____ Line No. _____ Change to:
22  _____
   Reason for change:
23  _____
   Page No. _____ Line No. _____ Change to:
24  _____

Page 112

1  _____
   Page No. _____ Line No. _____ Change to:
2  _____
   Reason for change:
3  _____
   Page No. _____ Line No. _____ Change to:
4  _____
   Reason for change:
5  _____
   Page No. _____ Line No. _____ Change to:
6  _____
   Reason for change:
7  _____
   Page No. _____ Line No. _____ Change to:
8  _____
   Reason for change:
9  _____
   Page No. _____ Line No. _____ Change to:
10  _____
   Reason for change:
11  _____
   Page No. _____ Line No. _____ Change to:
12  _____ Line No. _____ Change to:___Page No.
13  _____
   Reason for change:
14  _____
   Page No. _____ Line No. _____ Change to:
15  _____
   Reason for change:
16  _____
   Page No. _____ Line No. _____ Change to:
17  _____
   Reason for change:
18  _____
   Signed under the pains and penalties of
19  perjury this _____ day of
   _____, 2010.
20  _____
   John F. Burns, Jr.
21      Subscribed and sworn to before me
   this _____ day of _____, 2010.
22  _____
   Notary Public      My Commission
23  Expires:_____
24

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DOMINGINHO POWELL on behalf of himself<br>and others similarly situated,<br>    Plaintiff, | )<br>)<br>)<br>) |
|              v. | )<br>) |
| COLLECTO, INC. d/b/a<br>COLLECTION COMPANY OF AMERICA d/b/a<br>EOS CCA,<br>    Defendant. | )   JURY DEMANDED<br>)<br>) |

## DECLARATION OF ALEXANDER H. BURKE

I am Alexander H. Burke, manager of Burke Law Offices, LLC.

In September 2008, I opened Burke Law Offices, LLC. This firm concentrates on consumer class action and consumer work on the plaintiff side. Since the firm began, it has prosecuted cases for consumers under the Fair Debt Collection Practices Act, Fair Credit Reporting Act, Equal Credit Opportunity Act, Electronic Funds Transfer Act, Illinois Consumer Fraud Act, Truth in Lending Act and the Fair Labor Standards Act, among others. The firm also occasionally accepts mortgage foreclosure defense or credit card defense case. Except for debt collection defense cases, the firm works almost exclusively on a contingency basis.

My legal career began at Edelman, Combs, Latturner & Goodwin, LLC, in Chicago, Illinois, where I spent nearly three years litigating exclusively consumer cases. I estimate that approximately sixty-five percent of those cases were class actions. In 2007, I joined the Law Offices of Keith J. Keogh, Ltd., another consumer rights law firm, where my practice was again limited almost exclusively to consumer class action.

I make substantial efforts to remain current on the law, including class action issues. I attended the National Consumer Law Center Consumer Rights Litigation Conference in 2006, 2007, 2008 and 2009, and was an active participant in the Consumer Class Action Intensive Symposium at each of those conferences. In October 2009, I spoke on a panel of consumer class action attorneys welcoming newcomers to the conference. In addition to regularly attending Chicago Bar Association meetings and events, I am the vice-chair of the Chicago Bar Association's consumer protection section, and in November 2009, I moderated a panel of judges and attorneys discussing recent events and decisions concerning arbitration of consumer claims and class action bans in consumer contracts.

Some notable class actions that I have worked on include:

*Greene v. DirecTV, Inc.*, 2010 WL 1506730 (N.D.Ill. April 14, 2010) (motion to dismiss denied as to class TCPA and FCRA claims); *Donnelly v. NCO Financial Systems, Inc.*, 263 F.R.D. 500 (N.D.Ill. Dec. 16, 2009) Fed.R.Civ.P. 72 objections overruled in toto, --- F.Supp.2d ----, 2010 WL 308975 (N.D.Ill. Jan 13, 2010) (novel class action and TCPA discovery issues decided favorably to class); *Cicilline v. Jewel Food Stores, Inc.*, 542 F.Supp.2d 831 (N.D.Ill. 2008) (FCRA class certification granted); 542 F.Supp.2d 842 (N.D.Ill. 2008) (plaintiffs' motion for judgment on pleadings granted); *Harris v. Best Buy Co.*, 07 C 2559, 2008 U.S. Dist. LEXIS 22166 (N.D.Ill. March 20, 2008) (Class certification granted); *Matthews v. United Retail, Inc.*, 248 F.R.D. 210 (N.D.Ill. 2008) (FCRA class certification granted); *Redmon v. Uncle Julio's, Inc.*, 249 F.R.D. 290 (N.D.Ill. 2008) (FCRA class certification granted); *Harris v. Circuit City Stores, Inc.*, 2008 U.S. Dist. LEXIS 12596, 2008 WL 400862 (N.D. Ill. Feb. 7,2008) (FCRA class certification granted); aff'd upon objection (Mar. 28, 2008); *Harris v. Wal-Mart Stores, Inc.*, 2007 U.S. Dist. LEXIS 76012 (N.D. Ill. Oct. 10, 2007) (motion to dismiss in putative class action denied); *Barnes v. FleetBoston Fin. Corp.*, C.A. No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072 (D.Mass. Aug. 22, 2006) (appeal bond required for potentially frivolous objection to large class action settlement, and resulting in a $12.5 million settlement for Massachusetts consumers); *Longo v. Law Offices of Gerald E. Moore & Assocs.*, P.C., 04 C 5759, 2006 U.S. Dist. LEXIS 19624 (N.D.Ill. March 30, 2006) (class certification granted); *Nichols v. Northland Groups, Inc.*, case nos. 05 C 2701, 05 C 5523, 06 C 43, 2006 U.S. Dist. LEXIS 15037 (N.D.Ill. March 31, 2006) (class certification granted for concurrent classes against same defendant for ongoing violations); *Lucas v. GC Services, L.P.*, case No. 2:03 cv 498, 226 F.R.D. 328 (N.D.Ind. 2004) (compelling discovery), 226 F.R.D. 337 (N.D.Ind. 2005) (granting class certification); *Murry v. America's Mortg. Banc, Inc.*, case nos. 03 C 5811, 03 C 6186, 2005 WL 1323364 (N.D. Ill. May 5, 2006) (Report and Recommendation granting class certification), aff'd, 2006 WL 1647531 (June 5, 2006); *Rawson v. Credigy Receivables, Inc.*, case no. 05 C 6032, 2006 U.S. Dist. LEXIS 6450 (N.D. Ill. Feb. 16, 2006) (denying motion to dismiss in class case against debt collector for suing on time-barred debts).

I graduated from Colgate University in 1997 (B.A. International Relations), and from Loyola University Chicago School of Law in 2003 (J.D.). During law school I served as an extern to the Honorable Robert W. Gettleman of the District Court for the Northern District of Illinois and as a law clerk for the Honorable Nancy Jo Arnold, Chancery Division, Circuit Court of Cook County. I also served as an extern for the United States Attorney for the Northern District of Illinois and was a research assistant to adjunct professor Honorable Michael J. Howlett, Jr.

I was the Feature Articles Editor of the Loyola Consumer Law Review and Executive Editor of the International Law Forum. My published work includes International Harvesting on the Internet: A Consumer's Perspective on 2001 Proposed Legislation Restricting the Use of Cookies and Information Sharing, 14 Loy. Consumer L. Rev. 125 (2002).

I became licensed to practice law in the State of Illinois in 2003, and am a member of the bar of the United States Court of Appeals for the Seventh and First Circuits, as well as the Northern District of Illinois, Central District of Illinois, Southern District of Illinois, Eastern District of Wisconsin, Northern District of Indiana and Southern District of Indiana. In 2009-10, I was the vice chair of the Consumer Protection section of the Chicago Bar Association, and will

be the president of that group for the 2010-2011 year. I am also a member of the Illinois State Bar Association, the Seventh Circuit Bar Association and the American Bar Association, as well as the National Association of Consumer Advocates.


    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Chicago, Illinois

June 15, 2010

Alexander H. Burke

# Exhibit D

```
07/19/10                           EOS CCA                           PAGE 1
12:36 PM  PD                       SELECTED
-------------------------------------------------------------------------------
STATUS      Acct███████   Disposition:9999 INACTIVE      Wait: 09/16/10

DEBTOR      Name:HUNTER SHARMAINE        Ssn ██████   Cbr: Ph:773-███-7272B
            Rp: /                        Ssn:          Rp Ph:773-███-3732B
            Adr1:                  POE:             Lgl:   POE Ph:
            City:CHICAGO █████     Cty:            Canc:RCL  Born:
             St: IL  Zip███        St:    Zip:      COF:   Sal:

            Clnt██████  at&t, ████████          Org: ███████
            List:04/12/10 Srv:04/07/10 Ltrs:1  Time:16  Calls:14 Con:0  Bal:  0.00

MULTIPLE ACCOUNTS
RM# Acct       Name / Client      Chk# / Lst  Srv    Lpy  Col Disp    Bal   Check Reason      Drivers License #
      PRN INT   BAD CHK DIR ADV    AIN    CC   ATY    MS1   PJI
1 ██████  HUNTER SHARMAINE
          ██████ at&t                               Returned    0.00
      0.00    0.00    ██ ██ ██ ██ ██  0.00         0.00   0.00
                                                    0.00

PAYMENTS No payments.


NOTES            WGR 04/12/10  9:56  ███████████████  CHGO, IL FLR █
                 WGR 04/12/10  9:56  ████████████
                 WGR 04/12/10  9:56  █████████
                 WGR 04/12/10  9:56  ████████  █
                 WGR 04/12/10  9:56  ████████
                 WGR 04/12/10 10:20  ██████████████████
                 WGR 04/12/10 10:20  ████████████████
                 WGR 04/12/10 10:20  █████████████████
                 WGR 04/12/10 10:20  ████████████████
                 sys 04/13/10  3:13  ██████████████████
                 WGR 04/13/10  3:13  ████████████
                 WGR 04/13/10  3:13  ██████████████████
                 WGR 04/13/10  3:13  ████████████████
                 WGR 04/13/10  3:13  ████████████
                 WGR 04/13/10  3:13  FILE RETURNED FROM EXPERIAN
                 WGR 04/13/10  6:41  Call Date: 04/12/10 5:20 PM
                 WGR 04/13/10  6:41  Call Dtls: 773-███-7272 (ATTEMPTED ANS MACHINE HUNG UP AT)
                 WGR 04/13/10  6:41  - ACR
                 WGR 04/13/10  6:41  Call Date: 04/12/10 5:20 PM
                 WGR 04/13/10  6:41  Call Dtls: 773-███-3732 (ATTEMPTED POSS DISC AT) - ACR
                 BCM 04/13/10  1:49P  ls #1
                 nj  04/13/10  5:22P  █████████████████
                 nj  04/13/10  5:22P  █████████  ██████████████
                 nj  04/14/10  6:51P  █████████████████████
```

07/19/10
12:36 PM  PD

EOS CCA
SELECTED

PAGE 2



```
nj   04/14/10   6:51P
nj   04/14/10   6:51P
nj   04/14/10   6:51P
DEB  04/15/10  12:46P
DEB  04/15/10  12:46P
DEB  04/15/10  12:46P
DEB  04/15/10  12:46P
MGR  04/19/10   8:58   Call Date: 04/16/2010 07:00:00 CDT
MGR  04/19/10   8:58   Call Dtls: 773-    7272 (WIRELESS NOT ATTEMPTED AT) - ACR
nj   04/19/10   5:32P  Updated udw 777,22 with   et DATESTMP index 347719982
nj   04/19/10   5:32P
DEB  04/21/10   2:01
DEB  04/21/10   2:01
DEB  04/21/10   2:01
DEB  04/21/10   2:01
WGR  04/22/10   5:57   Call Date: 04/21/10 1:01 PM
WGR  04/22/10   5:57   Call Dtls: 773-    7272 (ATTEMPTED ANS MACHINE HUNG UP AT)
WGR  04/22/10   5:57   - ACR
nj   04/22/10   5:41P
nj   04/22/10   5:41P
nj   04/30/10  12:48P
nj   04/30/10  12:48P
nj   04/30/10
nj   04/30/10
DEB  05/02/10                       date to 05/05/10 et ADVDATE index 350185756
DEB  05/02/10
DEB  05/02/10                       date to 05/05/10 et ADVDATE index 350185757
DEB  05/02/10  12:29P (R-13126778)
WGR  05/03/10   6:01   Call Date: 05/02/10 4:51 PM
WGR  05/03/10   6:01   Call Dtls: 773-    7272 (LM ON MACH AT) - ACR
nj   05/03/10   5:28P  Updated udw 777,22 with   et DATESTMP index 350307112
nj   05/03/10   5:28P  (A-13126778)
MGR  05/04/10   9:58   Call Date: 05/03/2010 07:00:00 CDT
MGR  05/04/10   9:58   Call Dtls: 773-    7272 (WIRELESS NOT ATTEMPTED AT) - ACR
nj   05/04/10   5:20P
nj   05/04/10
WGR  05/05/10
nj   05/07/10
nj   05/07/10
nj   05/07/10
nj   05/07/10
WGR  05/10/10
DEB  05/10/10
DEB  05/10/10
DEB  05/10/10
DEB  05/10/10
MGR  05/12/10   8:51   Call Date: 05/11/2010 11:16:42 CDT
MGR  05/12/10   8:51   Call Dtls: 773-    7272 (WIRELESS NOT ATTEMPTED AT) - ACR
nj   05/12/10   5:33P                              DATESTMP index 352483103
nj   05/12/10   5:33P  (A-13126778)
```

EOS CCA
SELECTED



```
nj   05/14/10 12:39P
nj   05/14/10
nj   05/14/10
nj   05/14/10
DEB  05/17/10
DEB  05/17/10
DEB  05/17/10
DEB  05/17/10
MGR  05/19/10 6:06   Call Date: 05/18/2010 10:48:35 CDT
MGR  05/19/10 6:06   Call Dtls: 773-    7272 (WIRELESS NOT ATTEMPTED AT) - ACR
nj   05/19/10 5:16P  Updated udw 777,22 with  et DATESTMP index 354335045
nj   05/19/10 5:16P  (A-13126778)
MGR  05/20/10 9:43   Call Date: 05/18/2010 10:48:35 CDT
MGR  05/20/10 9:43   Call Dtls: 773-    7272 (WIRELESS NOT ATTEMPTED AT) - ACR
nj   05/20/10 5:13P  Updated udw 777,22 with  et DATESTMP index 354713255
nj   05/20/10 5:13P
nj   05/21/10
nj   05/21/10
nj   05/21/10
nj   05/21/10 12:50P
WGR  05/24/10 4:24   Call Date: 05/22/10 1:41 PM EST EST
WGR  05/24/10 4:24   Call Dtls: 773-    7272 (LM ON MACH AT) - ACR
nj   05/24/10 5:25P  Updated udw 777,22 with  et DATESTMP index 355518967
nj   05/24/10 5:25P
nj   05/28/10
nj   05/28/10
nj   05/28/10 12:47P Changed wait date to 05/31/10 et ADVDATE index 356963902
nj   05/28/10 12:47P (R-13126778)
WGR  06/01/10 6:17   Call Date: 05/29/10 11:11 AM EST EST
WGR  06/01/10 6:17   Call Dtls: 773-    7272 (LM W 3RD PARTY AT) - ACR
nj   06/01/10 4:53P  Updated udw 777,22 with  et DATESTMP index 357259669
nj   06/01/10 4:53P
nj   06/04/10
nj   06/04/10
nj   06/04/10
nj   06/04/10 1:14P  (R-13126778)
ANM  06/07/10 8:46   Call Date: 06/06/10 2:00 PM EST EST
ANM  06/07/10 8:46   Call Dtls: 773-    7272 (LM ON MACH AT) - ACR
nj   06/07/10 5:22P  Updated udw 777,22 with  et DATESTMP index 358443247
nj   06/07/10 5:22P  (A-
MGR  06/08/10 9:39   Call Date: 06/07/2010 13:53:13 CDT
MGR  06/08/10 9:39   Call Dtls: 773-    7272 (WIRELESS NOT ATTEMPTED AT) - ACR
nj   06/08/10 5:07P  Updated udw 777,22 with  et DATESTMP index 358740044
nj   06/08/10 5:07P  (A-13126778)
MGR  06/09/10 10:30  Call Date: 06/07/2010 13:53:13 CDT
MGR  06/09/10 10:30  Call Dtls: 773-    7272 (UA-WIRELESS NOT ATTEMPTED AT) -
MGR  06/09/10 10:30  ACR
nj   06/09/10 5:15P
nj   06/09/10
nj   06/11/10
```

07/19/10
12:36 PM  PD

EOS CCA
SELECTED

PAGE 4



nj  06/11/10 12:38P
nj  06/11/10 12:38P (R-1312677B)
AP3 06/14/10  3:07P IC CBR WRG#
nj  06/18/10 12:41P Changed wait
nj  06/18/10 12:41P

** END OF REPORT **