IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DOMINGINHO POWELL on behalf of himself and others similarly situated,<br>　　　Plaintiff,<br><br>　　　　　v.<br><br>COLLECTCO, INC. d/b/a<br>COLLECTION COMPANY OF AMERICA d/b/a<br>EOS CCA,<br>　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:10-cv-3709<br><br>Judge Kendall<br>Magistrate Judge Brown<br><br>JURY DEMANDED |

### PLAINTIFF'S MOTION TO COMPEL

Plaintiff respectfully requests that this Court compel defendant to produce (1) a class list (or data from which plaintiff can create a class list), and (2) evidence of defendant's affirmative defenses, both of which defendant has refused to produce, and the absence of which defendant apparently plans to cite as "authority" that the class should not be certified.

All courts to have considered the issues herein have rejected defendant's position. *Donnelly v. NCO Financial Systems, Inc.*, 263 F.R.D. 500 (N.D.Ill. Dec. 16, 2009)(Nolan, J.) Fed.R.Civ.P. 72 objections overruled in toto, 2010 WL 308975 (N.D.Ill. Jan 13, 2010)(Guzman, J.); *Fike v. The Bureaus, Inc.*, 1:09-cv-2558, transcript of proceedings (Nov. 11, 2009)(Keys, J.) Appendix 1; *Balbarin v. North Star Capital Acquisition, LLC*, 1:10-cv-1846 (Nov. 9, 2010)(Cox, J.) Appendix 2. In support of this motion, plaintiff states:

### I.　Introduction

The Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)(A)(iii) ("TCPA"), prohibits any person from calling the cellular telephone of another person, unless the recipient has provided "prior express consent" to receive such calls. *Sengenberger v. CCS, Inc.*, 2010 WL

1791270 (N.D.Ill. May 5, 2010), reconsideration denied (Jun. 17, 2010). The TCPA is strict liability, and there is no "bona fide error" defense, as exists with other laws. Thus, autodialed calls to "wrong number" cell phones violate the TCPA. See *Edeh v. Midland Credit Management, Inc.*, 2010 U.S. Dist. LEXIS 103888, at * 15-18 (D. Minn. Sept. 29, 2010).

The defendant debt collection agency called plaintiff on his cellular telephone several times in attempts to collect a debt allegedly owed to AT&T by a person named Sharmaine Hunter. Apparently, Collecto was calling plaintiff erroneously, and the calls to plaintiff were "wrong number" telephone calls. The message Collecto left for plaintiff went something like this:

> ...84-0290, to remove this phone number from our records. If you are Sharmaine xxxxxxx, please continue to listen to this message. By continuing to listen to this message, you acknowledge you are Sharmaine Hunter. There will now be a three second pause. [pause] This is EOCCA [sic]. This is an attempt to collect a debt, and any information obtained will be used for that purpose. Please contact us about an important personal business matter at 877-384-0290. Again, the telephone number is 877-384-0290 and the account number that is needed when calling is xxxxxxxxx. Thank you.[1]

Plaintiff called the number mentioned in the above prerecorded message to request that his phone number be removed from defendant's records. Plaintiff informed defendant that they had been calling the "wrong number." Defendant made the notation "IC CBR WRG#" in its collection notes at that time. Exhibit A at 4. It is defendant's policy and practice to make such a notation, and to designate the number as a "B" (for "bad") phone number, every time a person calls in and notifies Collecto that it has called the wrong number, and the class includes only persons whose collection notes indicate such a call was made. Burns Depo, Exhibit B, at 13-17 (explaining collection notes); 61-62 (explaining wrong number abbreviations).

---

[1] The message transcription here appears to be partial; cut off in the beginning.

The class in this case is thus defined as:

All persons with Illinois, Indiana and Wisconsin phone numbers who defendant or some person on its behalf called on their cell phone using an automatic telephone dialing system and/or prerecorded or artificial voice message, where defendant was notified that defendant was calling the incorrect person, where any prerecorded message was left for the subject phone number at any time between and including June 15, 2006, and June 15, 2010.

Plaintiff issued discovery asking for, among other things, a list of all persons with Illinois, Indiana and Wisconsin cell phone numbers, where defendant's records indicate that the cell phone number called was a "wrong number," and for materials and information concerning any affirmative defenses defendant has asserted. Exhibit C.

Defendant objected, arguing it had not duty to provide such information because no class has been certified.  Through extensive Rule 37 and Local Rule 37.2 discovery talks, including technical discussions regarding the nature of the data in defendant's files, defendant volunteered to attempt to compile a list (and number) of class members for an approximately six-month sample period.

Anticipating that defendant might take this position, plaintiff offered in the very beginning of the discovery and technical talks to compile the class list himself.  In other words, plaintiff requested that defendant produce the "raw" data for the class members, and plaintiff's counsel would do whatever administrative review necessary to compile a list.

Defendant insisted upon doing the search itself, exclusively through computer search. After several apparently arduous attempts compiling a list, defendant decided that compiling the class list is too difficult, and has taken the position that, for this reason, the class cannot ever be certified.

Plaintiff's counsel, Alexander Burke, and defense counsel, James Vlahakis have exchanged more than fifty emails since the middle of November, 2010, and several protracted telephone conversations for an estimated six hours regarding these issues, including an hour long conversation on the evening of November 17, 2010.  The parties have more than complied with the meet and confer requirements.

## II.  Discovery Generally

"Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947).  The Rules have broadened the scope of discovery to "any matter, not privileged, that is relevant to the claim or defense of any party....  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed.R.Civ.P. 26(b)(1).

"[T]he discovery-deposition provisions of the Federal Rules, were intended to insure 'proper litigation' by making the trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent."  *Goldman v. Checker Taxi Co.*, 325 F.2d 853, 855 (7th Cir. 1963) (internal citations and quotations omitted). Furthermore, complete interrogatory responses may help the parties avoid unnecessary depositions and further cost to the parties.  *In re Shopping Carts Antitrust Litigation*, 95 F.R.D. 299, 307-308 (S.D.N.Y. 1982).

"[T]he mere statement by a party that the interrogatory was "overly broad, burdensome, oppressive and irrelevant" is not adequate to voice a successful objection to an interrogatory. On the contrary, the party resisting discovery "must show specifically how ...

each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive." *Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir. 1982).

Compelling production of materials sought promotes justice and quick resolution a matter. *Yancey v. Hooten*, 180 F.R.D. 203 (D.Conn. 1998) (compelling discovery in FDCPA case). *Lucas v. GC Services*, 226 F.R.D. 328 (N.D.Ind. 2004) (FDCPA 1692g action) (sister case lost merits on appeal) compelling all discovery requests as sanction. "The defendants do not get to determine unilaterally the scope and timing of discovery." *Lucas* at 331.

Compelling production of the materials plaintiff seeks herein will promote swift and just resolution of this case.

### III. Materials Sought and Why They Should be Compelled

#### a. <u>Class Information and List</u>

Plaintiff issued interrogatories and document requests to determine who is in the class. Those requests are:

> **Int 5:  Identify, state the number and state the time and date of all calls and date and time of notification for:**
>> **All persons located in Illinois, Indiana and Wisconsin who defendant or some person on its behalf called on their cell phone using your Predictive Dialer and/or Prerecorded Message, where defendant was notified that defendant was calling the incorrect person, where any call was made at any time between and including June 15, 2006, and June 15, 2010.**

> **Doc Req 12:    Your entire file, including any documents or data that show consent or lack thereof to receive calls made with your Predictive Dialer, Prerecorded Message, automatic telephone dialing system or using artificial or prerecorded voice calls on their cellular telephone,**
>> **All persons located in Illinois, Indiana and Wisconsin who defendant or some person on its behalf called on their cell phone using an automatic telephone dialing system and/or prerecorded or artificial voice message, where defendant was notified that defendant was calling the**

**incorrect person, where any call was made at any time between and including June 15, 2006, and June 15, 2010.**

Discovery into the class definition at this juncture in a class case is appropriate. 2003 Advisory committee note to Fed.R.Civ.P. 23(c)(1)(A); *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890 (7th Cir. 1981); *Accord, Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571-72 (2d Cir. 1982); *Dillon v. Bay City Construction Co., Inc.*, 512 F.2d at 804 (4th Cir. 1979); *Parker v. Risk Mgmt. Alternatives, Inc.*, 206 F.R.D. 211, 214 (N.D.Ill. 2002) (FDCPA Case); *Morris v. Risk Mgmt. Alternatives, Inc.*, 203 F.R.D. 336, 341( N.D.Ill. 2001) (FDCPA case); *Nash v. City of Oakwood*, 90 F.R.D. 633, 636-637 (S.D. Ohio 1981); *National Org. for Women v. Sperry Rand Corp.*, 88 F.R.D. 272, 277 (D. Conn. 1980); see also *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351, n.13 (1978).

Plaintiff expects Collecto to argue that it has spent many hours trying to come up with a computer search to determine who is in the class, that its results have been inconclusive and therefore the class cannot be certified.

However, the "wrong" cell phone numbers that Collecto called are identifiable through objective criteria in the account records – what appears to be difficult to do is create a computer program within defendant's collection software that will come up with a true list. What defendant has not <u>done</u>, is to go through the accounts by hand and identify each "wrong number" call.

A party may not use difficulties in organizing its records to prevent the adverse party from properly litigating its case. *Kozlowski v. Sears Roebuck & Co.*, 73 F.R.D. 73, 76 (D.Mass. 1976)("To allow a defendant whose business generates massive records to frustrate discovery by creating an inadequate filling system [here, by not creating an

adequate indexing system], and then claiming undue burden, would defeat the purposes of the discovery rules.").

Where there is a burdensome objection, the Court should weigh the probative value of the information requested versus the stated burden. "As the objectors, the … defendants must demonstrate that [the burden is indeed, undue.]"  *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 360 (N.D.Ill. 2005) (Cole, J.)  The "mere" fact that discovery requires work and may be time consuming is not sufficient to establish undue burden.  *Fagan v. District of Columbia*, 136 F.R.D. 5, 7 (D.D.C. 1991); see also, *Luey v.Sterling Drug, Inc.*, 240 F. Supp. 632, 634-35 (W.D. Mich. 1965); *United States v. Nysco Labs.*, 26 F.R.D. 159, 161-62 (E.D.N.Y. 1960).

Every court to consider this issue in similar cases has held that the benefits outweigh any burden.  *Donnelly v. NCO Financial Systems, Inc.*, 263 F.R.D. 500 (N.D.Ill. Dec. 16, 2009)(Nolan, J.) Fed.R.Civ.P. 72 objections overruled in toto, 2010 WL 308975 (N.D.Ill. Jan 13, 2010)(Guzman, J.); *Fike v. The Bureaus, Inc.*, 1:09-cv-2558, transcript of proceedings (Nov. 11, 2009)(Keys, J.) <u>Appendix 1</u>; *Balbarin v. North Star Capital Acquisition, LLC*, 1:10-cv-1846 (Nov. 9, 2010)(Cox, J.) <u>Appendix 2</u>.

This makes sense: each of the parties in the above cases took the position, as Collecto is expected to do, that the class  cannot be certified because to do so would be too difficult.  Miraculously, the *Donnelly* defendant produced some 250,000 records after Judge Guzman warned it that it would lose an affirmative defense if it did not do so, and the *Fike* defendant settled on a class basis, and was able to identify 61,453 persons that fit within the class definition, once class settlement had been reached.

6

Collecto should not be permitted to "win" the case by refusing to review its records the old-fashioned way, i.e. the way records were reviewed fifteen years ago. Plaintiff requests that the Court compel it to do so, and additionally compel Collecto to produce all records within the class period where there was a "B" cell phone number that was called, so that its search may be cross-checked.

### b.  Documents and Information Concerning Affirmative Defenses.

Defendant has raised six affirmative defenses:

1. At all pertinent times, Defendant acted in good faith reliance on the information provided by the creditor of the account.

2. Defendant asserts that arbitration may be the appropriate venue for plaintiff's claims, as defendant may possess certain arbitration rights based on contracts entered into by plaintiff.

3. Plaintiff's Complaint fails to state claim upon which relief can be granted under the FCC Exception to the TCPA.

4. Plaintiff's Complaint fails to state a claim upon which relief can be granted to the extent that the underlying debtor may have given consent to receive telephone calls on his or her cellular telephone.

5. Plaintiff's Complaint fails to state a claim upon which relief can be granted to the extent that the original debtor once owned the cellular telephone number that Plaintiff now claims to own.

6. Any purported violation of the TCPA, which Defendant denies occurred, was unintentional, and occurred despite of procedures reasonably adapted and maintained to avoid such error.

Answer at 9, docket item 22, filed August 12, 2010.  Plaintiff issued the following requests relating to affirmative defenses:

> **Int. 6:  If you contend that any person within the following parameters provided prior express consent to receive telephone calls from you using an automatic telephone dialing system, prerecorded voice message, artificial voice message, Predictive Dialer or Prerecorded message, please specifically**

**identify all documents, data information or things that supports this
contention.**

> **All persons located in Illinois, Indiana and Wisconsin who defendant or
> some person on its behalf called on their cell phone using an automatic
> telephone dialing system and/or prerecorded or artificial voice
> message, where defendant was notified that defendant was calling the
> incorrect person, where any call was made at any time between and
> including June 15, 2006, and June 15, 2010.**

**Int. 10. Identify and explain the basis for any claim that any violation alleged in
the complaint was unintentional and/or resulted from a bona fide error
notwithstanding the maintenance of procedures reasonably adapted to avoid
such error.**

> **Identify what procedures exist, how they are maintained, how they are
> adapted to avoid the matters complained of and why the alleged
> violations happened despite the procedures. Please answer this
> interrogatory specifically for each putative class member, if you can.**

**Doc. Req. 6: All records that show calls to cell phones made using your
Predictive Dialer and/or Prerecorded Message since June 15, 2006, for calls to
Illinois, Indiana and Wisconsin, for telephone numbers that defendant received
notice that it was calling an incorrect number at any time (either before or
after the calls had been dialed).**

> **A reminder: for all requests herein: If you contend that providing a
> complete response t is impracticable or impossible, please provide the
> most complete response as possible, explain what components or
> responsive information or documents is missing, and why you contend
> production of those materials is impossible or impracticable.**

Collecto, not plaintiff, raised these affirmative defenses, and plaintiff is entitled to learn

what documents and information upon which these defenses rely.

Fed.R.Civ.P. 26(b)(1) provides:

Unless otherwise limited by court order, the scope of discovery is as follows:

Parties may obtain discovery regarding any nonprivileged matter that is relevant to any
party's claim or **defense** -- including the existence, description, nature, custody,
condition, and location of any documents or other tangible things and the identity and
location of persons who know of any discoverable matter. [Emphasis added.]

8

All courts to have considered this issue have rejected defendant's position, and have found that

the probative value of this information exceeds any burden upon the defendant in obtaining

such.  *Donnelly v. NCO Financial Systems, Inc.*, 263 F.R.D. 500 (N.D.Ill. Dec. 16, 2009)(Nolan, J.)

Fed.R.Civ.P. 72 objections overruled in toto without briefing, 2010 WL 308975 (N.D.Ill. Jan 13,

2010)(Guzman, J.); *Fike v. The Bureaus, Inc.*, 1:09-cv-2558, transcript of proceedings,

particularly pp. 14-19 (Nov. 11, 2009)(Keys, J.) <u>Appendix 1</u>; *Balbarin v. North Star Capital

Acquisition, LLC*, 1:10-cv-1846 (Nov. 9, 2010)(Cox, J.) <u>Appendix 2</u>.

Collecto answered these interrogatories equivocally, with objections that do not make it

clear whether it has "shown all of its cards."  As Judge Keys put it, "Either you can withdraw

your defense, I know you're not going to do that, I don't blame you, or you've got to produce

evidence to support it."  Fike transcript, <u>Appendix 1</u>, at 19.

Plaintiff requests that  the Court compel it to provide complete, and final, responses

regarding its affirmative defenses.

**<u>CONCLUSION</u>**

Plaintiff respectfully requests that the Court compel defendant to produce a class list

and data, and all documents and information concerning its affirmative defenses.

Respectfully submitted,

<u>/s/ Alexander H. Burke</u>

Alexander H. Burke
**BURKE LAW OFFICES, LLC**
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288

9

(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

# Exhibit A

```
07/19/10                              EOS CCA                          PAGE 1
12:36 PM  PD                          SELECTED
--------------------------------------------------------------------------------
STATUS        Acct█████    Disposition:9999 INACTIVE          Wait: 09/16/10

DEBTOR        Name:HUNTER SHARMAINE        Ssn █████   Cbr: Ph:773-███-7272B
              Rp: ,                        Ssn:        Rp Ph:773-███-3732B
              Adrl█████           POE:              Lgl:   POE Ph:
              City:CHICAGO        Cty:              Canc:RCL Born:
                St: IL  Zip████   St:     Zip:      COF:   Sal:

              Clnt█████ at&t, █████               Org: █████
              List:04/12/10 Srv:04/07/10 Ltrs:1  Time:16  Calls:14 Con:0  Bal:  0.00

MULTIPLE ACCOUNTS
RM# Acct      Name / Client    Chk# / Lst  Srv     Lpy  Col Disp    Bal   Check Reason      Drivers License #
     PRN INT  BAD CHK  DIR ADV   AIN     CC    ATY     MSl   PJI
1 █████       HUNTER SHARMAINE
              █████ at&t                          Returned     0.00
     0.00   0.00  █████ ███ █████ 0.00      0.00      0.00   0.00

PAYMENTS No payments.


NOTES         WGR 04/12/10  9:56 ████████████CHGO, IL FLR █
              WGR 04/12/10  9:56 █████████
              WGR 04/12/10  9:56 █████████
              WGR 04/12/10  9:56 ██████████
              WGR 04/12/10  9:56 █████████
              WGR 04/12/10 10:20 ███████████████████
              WGR 04/12/10 10:20 ████████████████
              WGR 04/12/10 10:20 █████████████████
              WGR 04/12/10 10:20 ████████████████
              WGR 04/12/10 10:20 ████████████████
              sys 04/13/10  3:13 ██████████████████████
              WGR 04/13/10  3:13 █████████████████
              WGR 04/13/10  3:13 ███████████████████
              WGR 04/13/10  3:13 █████████████████
              WGR 04/13/10  3:13 █████████████
              WGR 04/13/10  3:13 FILE RETURNED FROM EXPERIAN
              WGR 04/13/10  6:41 Call Date: 04/12/10 5:20 PM
              WGR 04/13/10  6:41 Call Dtls: 773-███-7272 (ATTEMPTED ANS MACHINE HUNG UP AT)
              WGR 04/13/10  6:41 - ACR
              WGR 04/13/10  6:41 Call Date: 04/12/10 5:20 PM
              WGR 04/13/10  6:41 Call Dtls: 773-███-3732 (ATTEMPTED POSS DISC AT) - ACR
              BCM 04/13/10  1:49P ls #1
              nj  04/13/10  5:22P ████████████████
              nj  04/13/10  5:22P ████████████████
              nj  04/14/10  6:51P ████████████████████████
```

EOS CCA
SELECTED



```
nj   04/14/10   6:51P
nj   04/14/10   6:51P
nj   04/14/10   6:51P
DEB  04/15/10  12:46P
DEB  04/15/10  12:46P
DEB  04/15/10  12:46P
DEB  04/15/10  12:46P
MGR  04/19/10   8:58   Call Date: 04/16/2010 07:00:00 CDT
MGR  04/19/10   8:58   Call Dtls: 773-      7272 (WIRELESS NOT ATTEMPTED AT) - ACR
nj   04/19/10   5:32P  Updated udw 777,22 with  et DATESTMP index 347719982
nj   04/19/10   5:32P  (
DEB  04/21/10   2:01
DEB  04/21/10   2:01
DEB  04/21/10   2:01
DEB  04/21/10   2:01
WGR  04/22/10   5:57   Call Date: 04/21/10 1:01 PM
WGR  04/22/10   5:57   Call Dtls: 773-      7272 (ATTEMPTED ANS MACHINE HUNG UP AT)
WGR  04/22/10   5:57   - ACR
nj   04/22/10   5:41P
nj   04/22/10   5:41P
nj   04/30/10  12:48P
nj   04/30/10  12:48P
nj   04/30/10
nj   04/30/10
DEB  05/02/10                          date to 05/05/10 et ADVDATE index 350185756
DEB  05/02/10
DEB  05/02/10                          date to 05/05/10 et ADVDATE index 350185757
DEB  05/02/10  12:29P  (R-13126778)
WGR  05/03/10   6:01   Call Date: 05/02/10 4:51 PM
WGR  05/03/10   6:01   Call Dtls: 773-      7272 (LM ON MACH AT) - ACR
nj   05/03/10   5:28P  Updated udw 777,22 with  et DATESTMP index 350307112
nj   05/03/10   5:28P  (A-13126778)
MGR  05/04/10   9:58   Call Date: 05/03/2010 07:00:00 CDT
MGR  05/04/10   9:58   Call Dtls: 773-      7272 (WIRELESS NOT ATTEMPTED AT) - ACR
nj   05/04/10   5:20P
nj   05/04/10
WGR  05/05/10
nj   05/07/10
nj   05/07/10
nj   05/07/10
nj   05/07/10
WGR  05/10/10
DEB  05/10/10
DEB  05/10/10
DEB  05/10/10
DEB  05/10/10
MGR  05/12/10   8:51   Call Date: 05/11/2010 11:16:42 CDT
MGR  05/12/10   8:51   Call Dtls: 773-      7272 (WIRELESS NOT ATTEMPTED AT) - ACR
nj   05/12/10   5:33P                            DATESTMP index 352483103
nj   05/12/10   5:33P  (A-13126778)
```

EOS CCA
SELECTED



```
nj   05/14/10 12:39P
nj   05/14/10
nj   05/14/10
nj   05/14/10
DEB  05/17/10
DEB  05/17/10
DEB  05/17/10
DEB  05/17/10
MGR  05/19/10 6:06   Call Date: 05/18/2010 10:48:35 CDT
MGR  05/19/10 6:06   Call Dtls: 773-    7272 (WIRELESS NOT ATTEMPTED AT) - ACR
nj   05/19/10 5:16P  Updated udw 777,22 with  et DATESTMP index 354335045
nj   05/19/10 5:16P  (A-13126778)
MGR  05/20/10 9:43   Call Date: 05/18/2010 10:48:35 CDT
MGR  05/20/10 9:43   Call Dtls: 773-    7272 (WIRELESS NOT ATTEMPTED AT) - ACR
nj   05/20/10 5:13P  Updated udw 777,22 with  et DATESTMP index 354713255
nj   05/20/10 5:13P
nj   05/21/10
nj   05/21/10
nj   05/21/10
nj   05/21/10 12:50P
WGR  05/24/10 4:24   Call Date: 05/22/10 1:41 PM EST EST
WGR  05/24/10 4:24   Call Dtls: 773-    7272 (LM ON MACH AT) - ACR
nj   05/24/10 5:25P  Updated udw 777,22 with  et DATESTMP index 355518967
nj   05/24/10 5:25P
nj   05/28/10
nj   05/28/10
nj   05/28/10 12:47P Changed wait date to 05/31/10 et ADVDATE index 356963902
nj   05/28/10 12:47P (R-13126778)
WGR  06/01/10 6:17   Call Date: 05/29/10 11:11 AM EST EST
WGR  06/01/10 6:17   Call Dtls: 773-    7272 (LM W 3RD PARTY AT) - ACR
nj   06/01/10 4:53P  Updated udw 777,22 with  et DATESTMP index 357259669
nj   06/01/10 4:53P
nj   06/04/10
nj   06/04/10
nj   06/04/10
nj   06/04/10 1:14P  (R-13126778)
ANM  06/07/10 8:46   Call Date: 06/06/10 2:00 PM EST EST
ANM  06/07/10 8:46   Call Dtls: 773-    7272 (LM ON MACH AT) - ACR
nj   06/07/10 5:22P  Updated udw 777,22 with  et DATESTMP index 358443247
nj   06/07/10 5:22P  (A-
MGR  06/08/10 9:39   Call Date: 06/07/2010 13:53:13 CDT
MGR  06/08/10 9:39   Call Dtls: 773-    7272 (WIRELESS NOT ATTEMPTED AT) - ACR
nj   06/08/10 5:07P  Updated udw 777,22 with  et DATESTMP index 358740044
nj   06/08/10 5:07P  (A-13126778)
MGR  06/09/10 10:30  Call Date: 06/07/2010 13:53:13 CDT
MGR  06/09/10 10:30  Call Dtls: 773-    7272 (UA-WIRELESS NOT ATTEMPTED AT) -
MGR  06/09/10 10:30  ACR
nj   06/09/10 5:15P
nj   06/09/10
nj   06/11/10
```



07/19/10
12:36 PM  PD

PAGE 4



EOS CCA
SELECTED

nj    06/11/10 12:38P
nj    06/11/10 12:38P  (R-1312677/8)
AP3   06/14/10  3:07P  IC CBR WRG#
nj    06/18/10 12:41P  Changed wait
nj    06/18/10 12:41P

** END OF REPORT **

# Exhibit B

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

- - - - - - - - - - - - - x

DOMINGINHO POWELL, on behalf
of himself and others similarly
situated

   Plaintiff  Case No.:
V.     1:10-cv-3709
COLLECTO, INC. d/b/a
COLLECTION COMPANY OF AMERICA
d/b/a EOS CCA
   Defendants

- - - - - - - - - - - - - x

30(b)(6) Notice to Collecto, Inc.
Deposition of John F. Burns, Jr.
October 14, 2010, 9:45 a.m.
Hinshaw & Culbertson, LLP
One International Place
Boston, Massachusetts
Reporter:  Deborah Roth, RPR/CSR

Page 2

PRESENT:

On Behalf of the Plaintiff:
Alexander Burke, Esq.
155 N. Michigan Avenue, Suite 9020
Chicago, Illinois  60601
312 729 5288
aburke@burkelawllc.com

On Behalf of the Defendants:
James C. Vlahakis, Esq.
Hinshaw & Culbertson, LLP
222 North LaSalle, Suite 300
Chicago, Illinois  60601
312 704 3000
jvlahakis@hinshawlaw.com

Page 3

INDEX
WITNESS:  John F. Burns, Jr.
EXAMINATION  PAGE
By Mr. Burke  4

EXHIBITS     PAGE
EX 1  Final Notice of Deposition  8
EX 2  FAC System Manual  13
EX 3  Screen Shot (four pages)  18
EX 4  Call Search Report  36
EX 5  Calling a Consumer's Cell
  Phone Number  67

Page 4

    P-R-O-C-E-E-D-I-N-G-S
    JOHN F. BURNS, JR.,
  having been satisfactorily
identified by the production of his
Massachusetts driver's license, and duly sworn
by the Notary Public, was examined and
testified as follows:
   EXAMINATION
 BY MR. BURKE:
 Q.  Good morning.
 A.  Good morning.
 Q.  My name is Alex Burke, and I represent
the plaintiff in an action called Powell
versus Collecto, Inc.
  Could you state your name for the
record, please?
 A.  My name is John Francis Burns, Jr.
 Q.  And, Mr. Burns, have you ever given a
deposition before?
 A.  Yes, I have.
 Q.  How many times?
 A.  Approximately six times.
 Q.  Then you know the drill.
 A.  Yes, I do.

Page 5

1    Q.  Please give verbal answers.  If you
2  don't understand a question, please speak up
3  and let me know, and I'll try to rephrase it
4  or make it understandable to you; but if you
5  answer a question, I'll understand that you
6  understood the question and answered
7  completely and truthfully, okay?
8    A.  Yes.
9    Q.  Is there any reason why you wouldn't be
10  able to testify completely and truthfully
11  today?  Medication?  Anything else like that?
12    A.  No.
13    Q.  Great.  Where are you employed,
14  Mr. Burns?
15    A.  I am employed at Collecto Incorporated
16  that does business under the trade name of
17  EOS CCA.
18    Q.  Is it also known as Collection Company
19  of America?
20    A.  It formerly was known under that name.
21    Q.  Are there any other names that Collecto
22  Inc. is known as?
23    A.  The company has subsidiary entities
24  that operate under other names.

Page 6

1    Q.  What are those names?
2    A.  U.S. Asset Management, ACA Healthcare
3  Management Services, Receivables Resources,
4  California Service Bureau, True North, LLC.
5    Q.  Is that it?
6    A.  Pretty much, yeah.
7    Q.  Okay.  What is your job at -- let me
8  back up for a second.
9        During this deposition, when I
10  refer to "Collecto," please understand that to
11  mean Collecto, Incorporated, and EOS CCA,
12  okay?
13    A.  Yes.
14    Q.  Great.  What's your job at Collecto?
15    A.  My position is vice president of
16  corporate services.
17    Q.  What are your duties as vice president
18  of corporate services?
19    A.  I have oversight over the compliance,
20  risk management area, human resources,
21  facilities, asset purchasing.
22    Q.  How many people, roughly, do you have
23  underneath you then?
24    A.  15 or 16.

Page 7

1    Q.  And when you say oversight of
2  compliance, do you mean compliance with, for
3  example, the FTC TCPA?
4    A.  Compliance includes licensing,
5  approving of operational tactics and
6  strategies.  It includes the response to
7  consumer inquiries, complaints.  If there's
8  litigations that are filed against the
9  company, compliance would be responsible for
10  responding to those.
11    Q.  What about the Telephone Consumer
12  Protection Act, are you responsible for
13  Collecto's compliance with that law?
14    A.  Yes.
15    Q.  Is there anyone else who is lateral to
16  you at the company that's also responsible for
17  compliance with the TCPA?
18    A.  All employees are responsible for
19  compliance with the TCPA.
20    Q.  Right.  But you're a compliance
21  officer, right?
22    A.  That's correct.
23    Q.  Okay.  Are there any other compliance
24  officers that are responsible for ensuring

Page 8

1  compliance with the TCPA?
2    A.  Any other compliance officers?  Yes.
3  There's a person who is the vice president of
4  compliance and risk management.
5    Q.  Who is that?
6    A.  Susan Giordano.
7        EXHIBIT NO. 1 MARKED
8  (A discussion was held off the record.)
9   BY MR. BURKE:
10    Q.  I have handed you what has been marked
11  as Exhibit 1.  Do you see it?
12    A.  Yes.
13    Q.  Have you seen this document before?
14    A.  Yes, I have.
15    Q.  There are four topics on Exhibit 1.
16  Would you please read them to yourself and let
17  me know if you're competent to testify as to
18  each of these four topics.
19    A.  Yes, I am.
20    Q.  As to each of the four?
21    A.  Yes.
22    Q.  Great.
23        MR. VLAHAKIS:  And, Alex, let the
24  record reflect that we did receive yesterday a

Page 9

1    re-notice of deposition with a fifth topic
2    which states, "What human intervention is
3    involved when defendant's dialers are used to
4    call debtors?"
5            Mr. Burns is qualified and willing
6    to testify to that topic should you want to go
7    into that today; and if you want to get him on
8    the record to say he is qualified to answer
9    that, rather than me saying so, feel free to
10   do so; and if you've got time, I would like to
11   have that one done.
12           I do feel that may fall under
13   Topic 3, arguably, as well.  He would be
14   prepared to give answers regardless of whether
15   it has been highlighted in that manner.
16       Q.  Are you also competent to testify as to
17   what human intervention is used when the
18   dialers are dialing numbers?
19       A.  Yes.
20       Q.  Great.
21           MR. VLAHAKIS:  Thanks, Alex.
22           MR. BURKE:  Thank you.
23       Q.  What is the highest level of education
24   you've obtained?

Page 10

1       A.  I attended graduate business school.
2       Q.  Where did you attend business school?
3       A.  At Babson College.
4       Q.  Is that in Massachusetts?
5       A.  Yes.  It's in Wellesley, Massachusetts.
6       Q.  Any other postgraduate degrees?
7       A.  No.
8       Q.  Where did you go to college?
9       A.  I went to Colombia College in New York
10   City.
11      Q.  What was your major at Colombia?
12      A.  Anthropology.
13      Q.  How long have you been in the debt
14   collection business?
15      A.  I've been in the business, with my
16   current employer, since 1995.  Prior to that,
17   but not immediately prior to that, I worked
18   for a company called Dun & Bradstreet that was
19   also in the debt collection business, and I
20   was there for a period of three years.
21      Q.  When you began at Collecto, what was
22   your position?
23      A.  Vice president of corporate services.
24      Q.  The same as now?

Page 11

1       A.  Yes.
2       Q.  15 years.  Very good.  Have your duties
3    changes over that time?
4       A.  Yes.
5       Q.  Generally how have the duties evolved?
6       A.  After the first year of my employment,
7    I was also designated as the senior financial
8    officer and kept that position up until
9    probably five years ago, five or six years
10   ago.
11           I left the company for about a year,
12   came back in the role of interim chief
13   financial officer, and subsequently have
14   relinquished those responsibilities to a new
15   VP of finance.
16      Q.  Are you familiar with the computer
17   systems that Collecto uses to keep track of
18   its debt collection activities?
19      A.  Pretty much.
20      Q.  For example, the FACS system?
21      A.  Yes.
22      Q.  What is the FACS system?
23      A.  It's a collection program, software
24   program that was developed by Ontario

Page 12

1    Corporation that is used by many collection
2    agencies to keep track of their accounts and
3    to run programs and to sort data and to
4    interface with other vendors that provide
5    various ancillary services to the collection
6    effort.
7       Q.  How long has Collecto been using the
8    FACS system?
9       A.  Collecto has been using the FACS system
10   for 18 years.
11      Q.  Are there any other systems that
12   Collecto uses for the purpose of tracking its
13   debt collection activities?
14      A.  Not really.
15      Q.  For example -- so you say "not really."
16   Why not just an unequivocal "no"?
17      A.  There are other systems that interface
18   with FACS.  So that if a dialer system such as
19   a Soundbite is an interface with FACS, you're
20   going through FACS to access it.  So that's
21   why I answered the way I did.
22      Q.  I see.  So would it be accurate to say
23   that the base computer system is FACS, and
24   then there are other systems that sort of feed

Page 13

1  into it?
2      A.  Yes.
3          EXHIBIT NO. 2 MARKED
4      Q.  The court reporter has marked Exhibit 2
5  that you have in front of you.  Do you see
6  that?
7      A.  Yes.
8      Q.  Is this the -- what is this document?
9      A.  It appears to be the information that
10  is used in the training of the operations
11  staff at our company.
12      Q.  The operations staff?  Does that
13  include the collectors themselves?
14      A.  Yes.
15      Q.  Okay.  Turning to Page 4, on the top of
16  that page it says, "Effective Notes."  Do you
17  see that?
18      A.  Yes.
19      Q.  Are you familiar with notetaking by
20  debt collectors?
21      A.  Yes.
22      Q.  What are the notes that debt collectors
23  take?  What does that mean, notes?
24      A.  It's mostly information that pertains

Page 14

1  to the account that might have been
2  transmitted to the collector via a phone
3  conversation with the consumer or any other
4  person that might have been contacted relative
5  to an account.  It's basically a summary of
6  the information that has occurred on the
7  account.
8      Q.  So it would include, for example,
9  summaries of telephone conversations; is that
10  right?
11      A.  Yes.
12      Q.  And it would also -- notes would also
13  include records of telephone calls; is that
14  right?
15      A.  Yes.  Some notes are entered by an
16  individual collector, some are entered through
17  various processes that are done in the
18  processing of the data on the file.
19          So it might indicate that it's from
20  our IT group rather than specifically from a
21  collector.  So there's different people that
22  could answer information on the account from
23  different sources.
24      Q.  So, for example, if a dialer dials a

Page 15

1  number, it would be the dialer that enters the
2  entry on the notes; is that right?
3      A.  The phone call or the phone attempt
4  would be entered into the notes, that's
5  correct.
6      Q.  Similarly, a letter that would be sent
7  would be automatically placed into the notes?
8      A.  Yes.
9      Q.  And if there was an incoming call, that
10  would go into the notes and then there would
11  be some notation of the conversation; is that
12  right?
13          MR. VLAHAKIS:  I object to the
14  form.
15      A.  Usually, yes.
16      Q.  Would you explain to me the process by
17  which a note might be taken when there's an
18  incoming call?
19      A.  The person receiving the call would ask
20  the caller to identify themselves and to
21  identify which account they might be calling
22  on; and then they would attempt to get the
23  account on the screen and locate it, so
24  whatever information was being communicated by

Page 16

1  the person calling in could be put into the
2  note on the system.
3      Q.  And are there instructions about what
4  the collector is supposed to write down about
5  the conversation into the collection notes?
6      A.  Yes.
7      Q.  What are those instructions?
8      A.  It depends on what the information is.
9  There's -- you know, the document you handed
10  me is part of the training material, and it's
11  telling people what dispositions to put on
12  accounts, to put -- giving them examples of
13  how to make notes.  So it's part of the
14  training, the initial training.  It's part of
15  the ongoing training.
16      Q.  So would you say that this passage
17  regarding "Effective Notes" on Page 4 of
18  Exhibit 2, where it says, "Effective notes
19  will describe the debtor's situation briefly
20  but in detail," would you say that that's an
21  accurate description of what the notes
22  regarding a conversation with a debtor are
23  supposed to be like?
24      A.  Yeah.  The goal is to put in

1  information that pertains to the account that
2  assists us in how to manage the account.
3      Q.  Now, I understand from looking at this
4  Exhibit 2 that abbreviations are part of the
5  normal notetaking process; is that right?
6      A.  That's correct.
7      Q.  If you'd turn to Page 3, there's a
8  master code sheet.  Do you see that?
9          MR. VLAHAKIS:  Go back one
10 (indicating).
11     A.  Yes.
12     Q.  What is this master code sheet, do you
13 know?
14     A.  It appears to be various code numbers
15 or abbreviations that are in the FACS system
16 to assist the person in identifying proper
17 coding to be used.
18     Q.  And then there's a column that's
19 entitled "Collector Notes."  Do you see that
20 on the right-hand side?
21     A.  Yes.
22     Q.  Would that refer to notes that --
23 abbreviations that collectors are supposed to
24 use when they're talking to debtors and making

1  notes about the conversations?
2      A.  Yes.  It would give the collector a
3  reference to look at.
4      Q.  Okay.  A reference to look at in order
5  to use an abbreviations for the notes, right?
6      A.  Right.  It's a training document.  So
7  when the person is learning how to utilize the
8  system, it shows them codes that they could
9  use to abbreviate the topics that are
10 identified with that.
11     Q.  Are collectors supposed to use these
12 codes?
13     A.  It's not a firm requirement, but
14 they're directed to use these if at all
15 possible.
16     Q.  Okay.
17         EXHIBIT NO. 3 MARKED
18     Q.  I have handed you what has been marked
19 as Exhibit 3.  Do you see that?
20     A.  Yes.
21     Q.  Are you familiar with this document?
22     A.  Yes.
23     Q.  What is it?
24     A.  It's a screen print of the notes of an

1  account that was in the name of Sharmaine
2  Hunter.
3      Q.  Is this a screen print or a printout of
4  the FACS system?
5      A.  This is a printout of the information
6  on the FACS system.
7      Q.  Okay.  What I would like to do is go
8  through this Exhibit 3 and talk about some of
9  the notations that are made on this exhibit,
10 okay?
11     A.  Yes.
12     Q.  It appears that this Sharmaine Hunter
13 account was an AT&T account; would that be
14 accurate?
15     A.  Yes.
16     Q.  So beginning at the top of the first
17 page, there's a line that says, "List," and
18 then "4/12/10" and then "Srv:04/07/10," and
19 then "Ltrs:1."  Do you see that?
20     A.  Yes.
21     Q.  What does that line mean?
22     A.  It identifies the date that the account
23 was listed with us.  The service date would be
24 the chargeoff by the client.  The letters

1  would be the number of letters that were sent
2  on the account.  The time would be the time in
3  the system that the account's been worked.
4      Q.  In days?
5      A.  No.  No.  In minutes.
6      Q.  Okay.
7      A.  And then the calls would be the number
8  of phone attempts that were made on the
9  account.
10     Q.  Any number?
11     A.  Yes.
12     Q.  What is "Con"?
13     A.  "Con" is the number of contacts, when
14 the phone call connected with the consumer.
15     Q.  With a live person?
16     A.  Yes, with the...
17     Q.  With the debtor?
18     A.  Yes.
19     Q.  Okay.  And it appears that this is a
20 $110.24 debt that was being collected?
21     A.  That's correct.
22     Q.  Can you tell from looking at these
23 notes what phone numbers were provided by AT&T
24 to collect on?

Page 21

1    A.  Yes.
2    Q.  What were those numbers?
3    A.  (773) ▓ -7272 and (773) ▓ 3732,
4    (773) ▓ -7431, (773) ▓ -3583 and
5    (773) ▓ -7431.
6    Q.  Now, I'm guessing here -- and let me
7    know if I'm right -- the first two numbers
8    came from the top of the page, and then the
9    last three came from inside the notes; would
10   that be accurate?
11   A.  Yes.
12   Q.  So the first number, the 7272 number,
13   there is a notation before that number.  Does
14   that notation mean anything about the status
15   of that number?
16   A.  Are you referring to the CBR?
17   Q.  Yes.
18   A.  That's just another field for a "can be
19   reached" number that may have been given by
20   the customer to our client as an additional
21   phone number to contact.
22   Q.  Is that field blank?
23   A.  That field is blank.
24   Q.  So "Ph" is just phone number?

Page 22

1    A.  Correct.
2    Q.  And then what's the number below that,
3    the 3732?  There's an "Rp Ph."  What is that?
4    A.  That's the responsible party.
5    Q.  And I notice, it looks like that phone
6    number is included in the account number that
7    was received from AT&T.  Do you see that?
8    A.  Yes.
9    Q.  So would it be accurate to say that
10   that phone number was the AT&T phone number
11   that was part of the account?
12   A.  That may be the case.
13   Q.  All right.  Now turning down to the
14   notes, I see a lot of stuff happened on
15   April 12, 2010.
16   A.  Yes.
17   Q.  Including a bunch of stuff at 9:56.
18   Would you please go through the 9:56 items?
19   A.  The 9:56 items are just basically
20   information from the client that was on the
21   account, additional information.
22   Q.  Why are those phone numbers not
23   populated into the data on the top of the FACS
24   screen here?

Page 23

1    A.  They weren't provided as the number,
2    calling numbers on the account.  They were
3    numbers that had been associated with the
4    account but were not in the fields that would
5    be the "call to" numbers.
6    Q.  What is the second line there,
7    "N NA FOOD STAMPS"?
8    A.  A reference that the client had in
9    their notes that we just copied over into our
10   notes.  I'm not exactly sure what it means.
11   It could mean that the individual was a
12   Welfare recipient or something to that effect.
13   Q.  Going down to 10:20 a.m. on April 12th,
14   there are a bunch of notes.  Would you go
15   through those line by line and tell me what
16   they mean?
17   A.  The first one, where it says,
18   "Stopped 0 letters" means that there is a hold
19   on sending letters by the individuals doing
20   that function at that time.
21       The next code is "lr # 1,"
22   et cetera, which is basically a request being
23   made by the data processing people to have a
24   letter sent on the account, which is usually

Page 24

1    determined by various aspects of the account
2    that would indicate that a letter would be
3    sent.
4       The "NCOA HAS BEEN PERFORMED," NCOA
5    is a change-of-address scan that's done before
6    letters are sent out to see if the address is
7    a valid address, where mail would be received.
8    So we wouldn't send out a letter to a -- to
9    something that was not a good address.
10      The "2SCR" is a request through a
11   sub-vendor, Experian, for a credit score that
12   would determine what tactics would be used on
13   the account once the account started to be
14   worked on, and the next notation is "Scheduled
15   a disposition change" on a future date.
16   Q.  Now, on the far left, there is a
17   designation "WGR" for each of those entries
18   that we looked at.  What does that mean?
19   A.  That's just an IT designation.  There's
20   different people in our IT department that run
21   different functions.  So that's just the
22   individual who has the responsibility for, you
23   know, doing that aspect of that.
24   Q.  For the stuff we just went over, would

Page 25

1  WGR have looked at this particular debtor's
2  file and made these designations, or would
3  that be done in like a batch?
4      A.  It's all done in a batch.  He wouldn't
5  look at any individual accounts.  It's just an
6  automated process.
7      Q.  On April 13th at 3:13, it looks like
8  the disposition change was removed; is that
9  right?
10     A.  Yes.
11     Q.  Then what happened?
12     A.  Then the next code is "3BEG BEGIN
13  COLLECTION," which means that the hold on the
14  account to do the scrub was basically
15  released.
16     Q.  Does Collecto ever scrub phone numbers?
17     A.  Yes.
18     Q.  Does it scrub all -- well, let's back
19  up.
20         Going forward, when I ask questions
21  about the policies, practices or procedures of
22  Collecto, please understand that I'm asking
23  about the time frame of June 15th, 2006 and
24  ending June 15, 2010.  So even if I ask a

Page 26

1  question in the present tense, please answer
2  for that time period.
3         MR. VLAHAKIS:  What are the dates
4  again?
5         MR. BURKE:  June 15th, 2006 to
6  June 15th, 2010.
7         MR. VLAHAKIS:  One thing, John, if
8  there's -- maybe we can start off smaller and
9  get bigger:  Over a certain period of time, we
10  did this; and going forward, we are doing
11  this.  For this particular client, we do A, B
12  and C, and for different clients we do X, Y
13  and Z.  What is done here?  What is your
14  general practice?
15         I think that's a broad time frame.
16  Things may have changed, but maybe things
17  haven't changed.  Has it always been the same?
18  I don't know.
19         MR. BURKE:  Right.  I want accurate
20  responses.  So if things have changed, please
21  let me know.  So I will ask that scrub
22  question again, and then we can work our way
23  to get as accurate a response as possible.
24         MR. VLAHAKIS:  What was done here

Page 27

1  on this particular account that he knows of
2  and expand that out to what is done on this
3  campaign, what may be done with this client
4  and what may be done broadly.  It's up to you.
5         THE WITNESS:  Should I make a
6  statement?
7         MR. BURKE:  No.  I will ask another
8  question.
9      BY MR. BURKE:
10     Q.  Has Collecto always scrubbed telephone
11  numbers?
12     A.  No.
13     Q.  About when did Collecto begin scrubbing
14  telephone numbers?
15     A.  I can't give you an exact date, but it
16  may be eight years ago.
17     Q.  And do you know why eight years ago
18  Collecto began scrubbing telephone numbers?
19     A.  Because the technology became available
20  that allowed us to do that.
21     Q.  In order to find a more accurate number
22  for the debtor?
23     A.  Yes.
24     Q.  Any other reason that it was initiated

Page 28

1  18 years ago?
2         MR. VLAHAKIS:  He said eight.
3      Q.  Eight years ago?
4      A.  As new technologies become available to
5  us, we evaluate them and utilize them if they
6  are advantageous to use.
7      Q.  If it's efficient and feasible?
8      A.  There are a lot of things done today on
9  collections that were not available eight or
10  ten years ago.
11     Q.  Like scrubbing?
12     A.  Like scrubbing.
13     Q.  Now, eight years ago when Collecto
14  began scrubbing, did they scrub every number
15  they called?
16     A.  I'm not sure.
17     Q.  At some point did Collecto begin
18  scrubbing telephone numbers to determine
19  whether they were cell phones?
20     A.  Yes.
21     Q.  When did that first happen?
22     A.  That was probably -- I'm not going to
23  be able to put into specific dates changes in
24  certain policies because many of these things

1  are constantly evolving and the technology
2  evolves.
3        So when that technology was
4  available, which might be two or three years
5  ago, that may have been done, but I can't be
6  giving you an accurate answer because that
7  information -- I was not, in the preparation
8  of this, to have an historical account of
9  every change that happened in our policies
10  relative to tactics used on accounts.  So I
11  can give you a best guess, but I can't give
12  you an accurate exact answer.
13    Q.  What's your best guess?
14    A.  Rephrase the question.  Ask the
15  question again.
16    Q.  When did Collecto first begin scrubbing
17  for cell phones?
18    A.  I would say three years ago.
19    Q.  Why did Collecto begin scrubbing for
20  cell phones three years ago?
21    A.  I can't tell you the exact reason.
22    Q.  Was it because of the TCPA?
23    A.  That could have been one of the issues.
24    Q.  Can you think of any other reasons why

1  Collecto would begin scrubbing for cell
2  phones?
3    A.  Yes.  It would begin scrubbing for cell
4  phones so it could get contact numbers to call
5  the consumers to collect the accounts.  It
6  would be good business practice to call the
7  correct number.
8    Q.  Can you define what a scrub is for me,
9  please?
10    A.  It's giving the account information to
11  an outside vendor who performs a task in which
12  they have a specialized service.
13    Q.  And what is that specialized service?
14    A.  It could be identifying whether the
15  phone number is a cell phone or not.  It could
16  be identifying whether the person has filed a
17  bankruptcy.  It could be determining whether
18  the person is now deceased and whether there's
19  a death notice that has been recorded.  It
20  could be to locate phone numbers that are
21  attached to it.  It could be to identify a
22  credit score.  Any number of things along
23  those lines.
24    Q.  So when I'm asking about cell phone

1  scrubs, I'm asking for any determination that
2  a phone number is a cell phone number, okay?
3    A.  Yes.
4    Q.  When Collecto began scrubbing for cell
5  phone numbers two to three years ago, did it
6  begin scrubbing all the numbers that it
7  called, or did it begin with just scrubbing
8  certain phone numbers before it called them?
9    MR. VLAHAKIS:  I object to the
10  form.  When you say "called," are you saying
11  manual calls?  Calls with dialers?
12    MR. BURKE:  Just calls generally
13  for this question.
14    A.  The answer is no.
15    Q.  Was there a process by which certain
16  numbers were scrubbed before they were called?
17    A.  At what point in time?
18    Q.  When it first began using the cell
19  phone scrub.
20    A.  Yes.  There was a process.
21    Q.  What was that process?
22    A.  I can't give you the exact explanation
23  of the process three years ago, but my best
24  guess would be that it related to certain

1  clients and certain batches of business that
2  we had, but not to all clients or all
3  business.
4    Q.  Does Collecto -- I'll start that
5  question over.
6        Has Collecto ever had processes
7  whereby it is attempting to comply with the
8  TCPA?
9    A.  Yes.
10    Q.  When did Collecto first begin to comply
11  with the TCPA?
12    A.  It's always attempted to comply with
13  the TCPA.
14    Q.  Do you know when Collecto first learned
15  that the TCPA may apply to its collections?
16    A.  I don't recall that date.
17    Q.  What are the policies, practices and
18  procedures that were in place in June of 2006
19  that comply with the TCPA?
20    A.  I can't answer for that specific date.
21    Q.  Generally for 2006?
22    A.  Whatever information we had relative to
23  compliance would have been discussed by the
24  compliance staff and would have been related

1    to the operations staff for their procedures.
2        Q.  So what were the procedures?
3        A.  I can't recall what they were four
4    years ago in June of 2006.
5            MR. VLAHAKIS:  I want to object to
6    the scope on this, because when you're asking
7    for this in the dep notice, you don't identify
8    as going back that far.  The only time where
9    you discuss a time frame is in Topic 4.
10       Q.  How about for 2007, do you know what
11   the policies, practices and procedures for
12   compliance to the TCPA were during any time in
13   2007?
14       A.  I can't recall.
15       Q.  How about 2008, do you know what the
16   policies, practices and procedures for
17   Collecto compliance to the TCPA were in 2008?
18       A.  I don't recall the exact information.
19       Q.  How about 2009, do you know what the
20   policies, practices and procedures that
21   Collecto had in place in 2009 for compliance
22   to the TCPA were?
23       A.  That's closer to our current date.  So
24   I would say that the practices and processes

1    and procedures from that period of time to the
2    current period of time have not varied.
3        Q.  What are those policies, practices and
4    procedures that have not varied between 2009
5    and the present?
6        A.  That we -- the policies, practices and
7    procedures is that the staff is trained to --
8    not to contact the consumers unless there has
9    been prior consent given on the phone number,
10   that's a cell phone number.
11       Q.  So how was that policy implemented?
12   What did Collecto do in order to avoid
13   contacting consumers on their cell phone using
14   its dialer or prerecorded messages during that
15   time frame to the present?
16       A.  What did it do?
17       Q.  Yes.
18       A.  Followed the practice of calling the
19   numbers that had been supplied by our client
20   as being a valid number; and if the number had
21   otherwise been collected through a skip-
22   tracing mode, they would run it through a
23   scrub for phone numbers prior to putting the
24   numbers into a dialer pool, and the trainers

1    who train the operations staff will explain
2    the TCPA in training and the importance of
3    following the practice of that.
4            Additionally, if information is
5    obtained where a phone number is deemed to be
6    a bad number, there may not have been
7    permission granted, and it was determined that
8    that was the case, they would code the number
9    in the account so we would not re-call the
10   account and cause an issue.
11       Q.  How would the bad numbers be coded in
12   the FACS system?
13       A.  Following the number, the capital
14   letter B is placed on that number.
15       Q.  Would there also be a notation in the
16   collection notes?
17       A.  There can be, yes.
18       Q.  Is there a notation in these collection
19   notes as to that there was a wrong number?
20       A.  Yes.
21       Q.  Maybe on Page 4 on 6/14/2010.
22       A.  Yes.  That would appear to be a note
23   indicating that we got a wrong number.
24       Q.  Could you decipher the note there,

1    please.
2        A.  Incoming call, can be reached, wrong
3    number.
4        Q.  And that call, incoming call came at
5    3:07 p.m. on 6/14/2010?
6        A.  Yes.
7            MR. VLAHAKIS:  What time zone, if
8    you know?
9            THE WITNESS:  That's our time zone.
10           The account is in Chicago.  It would
11   be their time zone.  It's the zone in which
12   the account is being worked.
13           EXHIBIT NO. 4 MARKED
14       Q.  Would you turn to Page 4 of Exhibit 4,
15   please.
16           First of all, do you know what
17   Exhibit 4 is?
18       A.  No.
19       Q.  Okay.  We'll move on.
20           Directing your attention again to
21   the first page of Exhibit 3, the account
22   notice.  You can put Exhibit 4 aside.
23           At 3:13 p.m. on April 13th it says,
24   "FILE RETURNED FROM EXPERIAN."  Do you see

Page 37

1   that?
2       A.  Yes.
3       Q.  What does that mean?
4       A.  That means that one of the tactics that
5   was being done on the account had been
6   completed and the file had been returned.
7       Q.  And what did Experian perform for
8   Collecto in this case?
9       A.  Most likely, it was the credit score.
10      Q.  Does Collecto use Experian for
11  scrubbing also?
12      A.  Yes.
13      Q.  What would it look like if Experian had
14  scrubbed the data for the debtor?
15      A.  If there was information, it would
16  appear in a certain file.
17      Q.  So would the information show up in the
18  notes after the file was returned from
19  Experian?
20      A.  I don't believe so.
21      Q.  So going down to the line below that,
22  it looks like a phone call was made; is that
23  accurate?
24      A.  Yes.

Page 38

1       Q.  Okay.  Was the phone call on
2   April 12th, 2010 at 5:20 p.m.?
3       A.  April 12th, 5:20 p.m.?  I don't see
4   that.
5           MR. VLAHAKIS:  (Indicating.)
6           THE WITNESS:  Oh, okay.  Down here
7   (indicating).
8       Q.  Would that be accurate?
9       A.  That note, I think, relates to the
10  disposition change, not an actual call.
11      Q.  Okay.  Was there a call?
12      A.  The next line, where it says "Call
13  Details," and it identifies a number, and it
14  says, "ATTEMPTED ANSWER MACHINE HUNG UP."
15      Q.  Okay.  So in the call details, there's
16  a phone number there.  Is that the phone
17  number that was called?
18      A.  Yes.
19      Q.  In parentheses, you just read it.  What
20  does that mean?
21      A.  It would indicate to me that there was
22  an attempt.  There was an answering machine.
23  So no message was left.
24      Q.  And was this call made using one of

Page 39

1   Collecto's dialers?
2       A.  Yes.
3       Q.  Let's talk about the dialers for a
4   minute.
5           I understand that Collecto utilizes
6   three different types of dialers; is that
7   correct?
8       A.  Yes.
9       Q.  The Noble, the GC, and the Soundbite
10  dialer; is that right?
11      A.  That's right.
12      Q.  I understand that the Soundbite dialer
13  is offsite; is that right?
14      A.  Yes.
15      Q.  And the Noble dialer is also offsite?
16      A.  Yes.
17      Q.  And the GC dialer is onsite?
18      A.  Yes.
19      Q.  Can you tell which of those dialers
20  were used to make this phone call?
21      A.  Yes.
22      Q.  Which one?
23      A.  That was the Noble.
24      Q.  How can you tell?

Page 40

1       A.  The WGR is the code for the person that
2   runs the Noble programs.
3       Q.  And I think you testified earlier that
4   that's an IT person?
5       A.  Yes.
6       Q.  Does WGR run any dialer other than the
7   Noble?
8       A.  I'm not aware of that.
9       Q.  So would this call have been made as
10  part of a dialing campaign?
11      A.  Most likely, yes.
12      Q.  How can we tell definitively whether it
13  was or was not?
14      A.  I guess you could say every dialing
15  effort is called a campaign.  So I guess the
16  answer would be yes.
17      Q.  Well, then what's your definition of a
18  dialing campaign?
19      A.  The automated messaging being done for
20  one or more consumers.
21      Q.  So the process whereby numbers are
22  loaded into the dialer as a batch and the
23  dialer calls those numbers; is that right?
24      A.  Yes.

1    Q.  When a batch of numbers is entered into
2  the dialer, does the dialer automatically dial
3  those numbers?
4    A.  Yes.
5    Q.  Is that true for all three dialers:
6  the Noble, the GC and the Soundbite?
7    A.  The Soundbite, if it identifies the
8  number as a cell phone, would not call that
9  number.
10   Q.  Okay.  But the process by which the
11 numbers are entered in and then are dialed by
12 the dialer itself is essentially the same for
13 all three dialers, right?
14   A.  The process to enter them in is
15 similar, yes.
16   Q.  So what I am asking here is whether any
17 human being uses his fingers to dial these
18 phone numbers or whether the machine
19 automatically dials the numbers?
20   A.  No.  It's automatically dialed, if it
21 is in a dialer campaign.
22   Q.  So on that first call that we were
23 talking about earlier, I think you said that
24 Collecto did not leave a message; is that

1  right?
2    A.  That's correct.
3    Q.  Okay.  It looks like another call
4  happened a couple lines down to a different
5  phone number, correct?  On Page 1 still.
6    A.  Which line is that?
7    Q.  (Indicating).
8    A.  Yes.
9    Q.  What happened with that call?
10   A.  The note says:  Attempted possible
11 disconnect.
12   Q.  Okay.  So does that mean that the
13 dialer tried to call and something made the
14 dialer think there was a disconnected number?
15   A.  Yes.  It didn't ring through or didn't
16 have the normal answering, no answering
17 machine.
18   Q.  So there was no message left by
19 Collecto at that time?
20   A.  Yes.  There would be no connection,
21 with no answering machine or any individual.
22 So there would be no way to leave a message.
23   Q.  The last line on Page 1, it looks like
24 there was a bankruptcy scrub performed; is

1  that right?
2    A.  Yes.
3    Q.  To see whether the debtor had been in
4  bankruptcy; is that right?
5    A.  It would identify whether the
6  individual on the account who is identified as
7  the accountholder had filed bankruptcy within
8  a certain period of time.
9    Q.  Turning to Page 2, please.  It looks
10 like there was a deceased scrub performed?
11   A.  Yes.
12   Q.  To check to see if Ms. Hunter had died?
13   A.  If there was a record of that
14 individual having passed away, yeah.
15   Q.  And that's all automated; isn't it?
16   A.  Yes.
17   Q.  Now, next to both of those scrubs on
18 the far left-hand corner are the initials
19 "nj."  Do you see that?
20   A.  Uh-huh, yes.
21   Q.  Is that an employee?
22   A.  That "nj" stands for night job.
23   Q.  So given that it was a night job, I'm
24 guessing that it was automated; is that right?

1    A.  Yes.
2    Q.  Going down to April 19th at 8:58 a.m.,
3  it looks like there was another call to the
4  7272 number.
5    A.  There was an attempt in the dialer.
6    Q.  Okay.
7    A.  But the "WIRELESS NOT ATTEMPTED" would
8  indicate to me that the dialer picked it up as
9  a cell phone number and did not complete the
10 call.
11     MR. VLAHAKIS:  You're talking about
12 4/19?
13     MR. BURKE:  4/19 or 4/16.
14     MR. VLAHAKIS:  Right.
15 BY MR. BURKE:
16   Q.  Now, there are two dates associated
17 with that -- those two lines, those two rows.
18 On the left column, it says, "4/19/10," but in
19 the first row it says the call date is
20 4/16/2010.
21     Would it be accurate to say that
22 the call date was 4/16 and the date it was
23 loaded into the system was 4/19?
24   A.  I don't think so.

1    Q.  Can you tell which dialer recognized
2  that this was a wireless number and decided
3  not to call?
4    A.  That was the Soundbite.
5    Q.  Because of the "MGR"?
6    A.  Right.
7    Q.  What does "MGR" mean?
8    A.  Manager.
9    Q.  So would it be accurate to say that
10  every call that was attempted with the
11  designation "MGR" is a Soundbite call?
12    A.  Yes.
13    Q.  Going down to 4/22/2010 --
14        MR. VLAHAKIS:  Alex, do you want to
15  ask what "ACR" means?
16        MR. BURKE:  Sure.
17    Q.  Back up to 4/19, one last question.
18        At the end of the second row,
19  there's an "ACR" designation.  Do you see
20  that?
21    A.  Yes.
22    Q.  What does that mean?
23    A.  That's the designation of the route
24  that the account is located in, the collector

1  route.
2    Q.  What does that mean?
3    A.  The business is from a client such as
4  AT&T, and there's hundreds of thousands of
5  accounts.  So one collector is not going to
6  work them all.  They're going to be placed in
7  individual routes.  So the ACR is a
8  designation of a route.  So there might be
9  5,000 accounts in that route.
10    Q.  And then as the dialer works a batch or
11  a campaign, if somebody answers a call, the
12  call is routed to a collector; is that right?
13    A.  Yes.  If the dialer -- the collectors
14  are plugged into the dialers and the dialers
15  are calling out, and if a contact is made with
16  an individual, then that comes back to a
17  specific collector.
18    Q.  So is that what you're talking about
19  with the route?
20    A.  Right.  That's just saying that this --
21  for purposes of paying bonuses to employees
22  and identifying who is selecting what.  Each
23  employee has a certain code.  So the ACR is a
24  router or a code for that route.

1    Q.  For a collector?
2    A.  In this particular case, this is what
3  they refer to as a house route.  So it's not
4  associated with a specific collector.
5        You know, typically small balance
6  accounts of this type aren't associated with a
7  collector.  Any collector could take the call.
8        A larger account with higher
9  balances that might be a more complex case
10  would typically be held with specific
11  collectors.
12    Q.  So ACR is the house route?
13    A.  Yes, one of them.
14    Q.  Moving down, it looks like there is
15  another call on 4/22/2010 at 5:57 --
16    A.  Uh-huh, yes.
17    Q.  -- a.m.; is that right?
18    A.  The note that you have, the line that
19  says, "Call Dated: 4/21/10"?
20    Q.  Yes.
21    A.  I think that call date refers to a date
22  in the system where it was set up for the next
23  possible call, so that it doesn't represent
24  the actual call.

1        The next line, "Call details,
2  attempted answering machine, hung up," that
3  would be the line that is the actual call.
4    Q.  So what's the date and the time on the
5  left side then?
6    A.  You're talking about the entry that's
7  "WGR" with the call date 4/21/10, 1:01 p.m.?
8    Q.  No.  I'm just trying to figure out what
9  happened at 5:57 a.m.
10        MR. VLAHAKIS:  Are you asking if
11  the call took place at 1:01 p.m., and the data
12  was entered in on 5:57 at a different date?
13        MR. BURKE:  Yes.  I am trying to
14  determine what the times and dates are.  What
15  happened at these times and dates.
16    Q.  So what happened on 4/22/2010 at 5:57
17  a.m.?
18    A.  I'm not sure.  Where do you see "a.m."?
19    Q.  Well, if you look at all the dates, all
20  the times in that column, lots of them have
21  "P," and that one doesn't.  So I'm
22  understanding that to be a.m.
23    A.  Okay.
24        MR. VLAHAKIS:  Are you asking if

1   the call above that, Alex, it says 4/21/10,
2   1:01 p.m., are you asking if the call was made
3   if on 4/22 but it has been logged into the
4   computer at 5:57 in the morning?
5           MR. BURKE:  Let's go off the record
6   for a second.
7       (A discussion was held off the record.)
8       BY MR. BURKE:
9       Q.  All right.  Looking at the call that
10  was attempted or that's listed at 4/22/2010 at
11  5:57 a.m., do you see that?
12      A.  Yes.
13      Q.  Okay.  Can you tell me what happened at
14  5:57 a.m. on 4/22?
15      A.  The note relative to the call attempt
16  was entered into the FACS system at that time.
17      Q.  Would it be accurate to say that the
18  call date to the right of that where it says
19  4/21/2010 at 1:01 p.m. is when the call was
20  attempted?
21      A.  Yes.
22      Q.  And there was prior testimony that you
23  gave that may be inconsistent with this, but I
24  think maybe we had a misunderstanding.

1       A.  Yes.  I may have misunderstood the
2   question, but that is the case with the prior
3   one, also.
4       Q.  Okay.  So for the FACS system,
5   generally, when it says "Call Date" with any
6   of the three dialers, does that date and time
7   correspond with the date and time that the
8   call was attempted?
9       A.  Yes.
10      Q.  Or clarifying further, at least that
11  the call was sent to the dialer, because, for
12  example, with the Soundbite dialer in the
13  previous one, it was sent to the dialer on
14  4/16/2010 at 7:00 Central Daylight Time, but
15  there was no call attempted because it was
16  scrubbed?
17      A.  That's correct.
18      Q.  And it was too early?
19      A.  Correct.
20      Q.  Okay.  Going down to May 3rd at 6:01
21  a.m.
22          MR. VLAHAKIS:  Could we go off the
23  record?
24          MR. BURKE:  Sure.

1       (A discussion was held off the record.)
2       BY MR. BURKE:
3       Q.  Okay.  Looking at 5/3, it looks like
4   there was call on 5/2 at 4:51 p.m.  Do you see
5   that?
6       A.  Yes.
7       Q.  To the 7272 number?
8       A.  Yes.
9       Q.  There's a notation in parentheses.  Can
10  you please decipher that for me?
11      A.  Left message on machine.
12      Q.  Now, was that an automated message?
13      A.  Yes.  It would appear it is, yes.
14      Q.  How can you tell it was an automated
15  message?
16      A.  Because the entry was done by WGR,
17  which is the Noble dialer, not done by an
18  individual.
19      Q.  Skipping down four lines, it looks like
20  there was another call or another designation
21  for a call to the 7272 number by the Soundbite
22  dialer, but it was again aborted because of
23  the wireless scrub; is that correct?
24      A.  Yes.

1       Q.  So no call was made or attempted?
2       A.  That's correct.
3       Q.  Would it be accurate to say that
4   happened again on 5/12/2010, just a few lines
5   from the bottom?
6       A.  Yes.
7       Q.  Or actually on 5/11/2010 is the call
8   date, right?
9       A.  Yes.
10      Q.  Okay.  Again, on 5/19 there's another
11  Soundbite designation where the scrub picked
12  up the cell and decided not to call on 5/18 at
13  10:48, right?
14      A.  Yes.
15      Q.  And down to the next "WGR" destination,
16  the Noble, it looks like the Noble dialer left
17  a message on plaintiff's machine on 5/22/2010
18  at 1:41 p.m.; is that right?
19      A.  Yes.
20      Q.  And it was an automated message?
21      A.  Yes.
22      Q.  The same thing on -- moving down, the
23  entry line is 6/1/2010, it looks like there
24  was a call on 5/29/2010 at 11:11?

Page 53

1    A. Yes.
2    Q. And it says, the notation for the
3  message is a little different. Would you
4  decipher that for me, please?
5    A. Left message with third party.
6    Q. What does that mean?
7    A. It means that somebody, not the
8  consumer, answered the phone and a message was
9  left.
10   Q. Now, how did the dialer know that it
11 wasn't the consumer?
12   A. Wait a second. What line is that
13 again?
14   Q. That's on 6/1.
15   A. Because it unattended messaging. If
16 somebody picks up the call, there is a message
17 that is still left.
18       I don't know. Let me think this
19 through.
20       It may be where the party hung up.
21 It asked, "If you are not Sharmaine Hunter,
22 please hang up the call." That's would be my
23 best understanding of how that could have
24 occurred.

Page 54

1    Q. You mentioned unattended messaging a
2  moment ago. Would you explain in your own
3  words what unattended messaging is?
4    A. A phone call made by a dialer where a
5  message is left for the consumer that has the
6  account to call back to the office to discuss
7  the account.
8    Q. So "unattended" would mean that it was
9  a recorded message?
10   A. Yes.
11   Q. For an unattended message, would there
12 be anyone on Collecto's end of the call, a
13 human being, or is it just the recording?
14   A. It's a recording.
15   Q. Only?
16   A. Unattended, yes. That would be the
17 definition of "unattended" is that there is no
18 -- right.
19   Q. It looks like there is another call.
20 The line is 6/7/2010. The call date is
21 6/6/2010 at 2:00 p.m. Do you see that?
22   A. Uh-huh.
23   Q. Yes.
24   A. Yes.

Page 55

1    Q. It appears that there may have been a
2  different dialer that dialed it: ANM. Do you
3  see that?
4    A. Yes. I see that, yes.
5    Q. Is that a different dialer?
6    A. I don't know the answer to that
7  question.
8    Q. We haven't seen the GC dialer yet.
9  Could that be the GC dialer?
10   A. No.
11   Q. What's the designation for the GC
12 dialer?
13   A. GC.
14   Q. Please don't write on those exhibits.
15   A. No. I have my own copy.
16   Q. Okay.
17       MR. VLAHAKIS: Alex, let me make a
18 suggestion. To see what those initials are,
19 let's maybe have the deponent look through the
20 notes and see where that pops up again, which
21 then may explain those initials.
22       MR. BURKE: Sure.
23   Q. Would you take a moment to just --
24   A. It's the only entry --

Page 56

1        MR. VLAHAKIS: No, (indicating).
2        THE WITNESS: I don't have that on
3  my page.
4        MR. VLAHAKIS: Can we go off the
5  record.
6      (A discussion was held off the record.)
7  BY MR. BURKE:
8    Q. Okay. So for that one, we don't know
9  whether it was a dialer or what, but we do
10 know that there was a call on the date of
11 6/6/2010 at 2:00 p.m., right?
12   A. Yes.
13   Q. And we know that there was a message
14 left on the machine; is that right?
15   A. Yes.
16   Q. Okay.
17       MR. VLAHAKIS: Alex, what kind of
18 message?
19   Q. Do you know what kind of message was
20 left?
21   A. A TCPA-compliant message.
22   Q. Can you tell from these notes if it was
23 an unattended message or a live message?
24   A. I cannot, based on those initials, ANM.

1 The other entry with ANM is -- would mostly be
2 done through an individual, but I can't
3 answer. I'm not certain. So I'm not going to
4 guess.
5    Q. Okay.
6       MR. VLAHAKIS: Do you want us
7 during a break to find out?
8       MR. BURKE: Yes. Let's find out
9 what happened.
10    Q. It looks like on 6/8 --
11       MR. VLAHAKIS: Could we take a
12 break so I could ask you something outside?
13       MR. BURKE: Sure.
14       (A recess was taken from
15       11:03 to 11:12 a.m.)
16 BY MR. BURKE:
17    Q. Could you please explain what the
18 initials ANM on 6/7/2010 are?
19    A. ANM is Andrew Morgan, who works on our
20 IT staff at the office and manages the
21 functions of one of the dialers. So that
22 entry would be based on the information in the
23 dialer.
24    Q. So this was also a dialer call and then

1 also an unattended message?
2    A. Yes.
3    Q. Do we know which dialer he works with?
4    A. I'm not sure, but I would assume it's
5 Noble.
6    Q. In any event, it's not the Soundbite,
7 right?
8    A. Right.
9    Q. It looks like, moving down on 6/7/08,
10 we have the Soundbite entry, and there was no
11 call attempted; is that correct?
12    A. Yes.
13    Q. Now, it looks to me like there are two
14 entries for that non-attempt, first at 13:53
15 and 13 seconds. Do you see that?
16    A. Yep.
17    Q. And then the second one has a "UA"
18 designation at the beginning of the
19 parentheses. Do you know what that means?
20    A. I don't, offhand.
21    Q. Okay.
22       MR. VLAHAKIS: Do you want John to
23 find out at the break?
24       MR. BURKE: If you can remember

1 that, that would be great.
2       MR. VLAHAKIS: Just the UA?
3       MR. BURKE: Yes.
4 BY MR. BURKE:
5    Q. Okay. Go on to Page 4. We have our
6 incoming call with the wrong number.
7       On the left-hand column there is an
8 "AP3." Is that a collector that received that
9 call or a live person?
10    A. That's a live person, yeah.
11    Q. Do you know who that person is?
12    A. Peggy Moriarty.
13    Q. Can you spell "Moriarty"?
14    A. M-O-R-I-A-R-T-Y, Moriarty.
15    Q. Is she a collector on the floor?
16    A. She was at that time.
17    Q. Is she not -- do you know where she is
18 now?
19    A. I don't.
20    Q. Is she employed by Collecto?
21    A. No.
22    Q. How many collectors does Collecto
23 typically have working the dialer on a typical
24 weekday?

1    A. I wouldn't have any way to know that
2 number.
3    Q. More than five?
4    A. Yes. Oh, yeah.
5    Q. You think more than a hundred?
6    A. Yes.
7    Q. More than 500?
8    A. No.
9    Q. Somewhere in the 100 to 500 range?
10    A. Would be a guess.
11    Q. Okay.
12    A. Yeah.
13       MR. VLAHAKIS: I object to the
14 form, as beyond the scope; and if you want a
15 closer number, because I think that's a broad
16 range, we could try to get that for you.
17       MR. BURKE: I'm just trying to get
18 a general idea.
19       MR. VLAHAKIS: Okay.
20    Q. Do you know how often debtors or
21 non-debtors call in -- I will start over.
22       Do you know generally how often
23 Collecto gets incoming calls telling it that
24 it's been calling the wrong number?

Page 61

1    A. No.
2    Q. Do you know how many phone calls
3  Collecto makes roughly per month with its
4  dialers?
5    A. I don't have that number, no.
6    Q. A million calls?
7    A. It could be, yeah.
8    Q. A lot of calls?
9    A. Oh, yeah.
10    Q. I notice that the designation in the
11  notes here are "WRG" and the pound sign or
12  number sign?
13    A. Uh-huh, yeah.
14    Q. It is different than the wrong number
15  suggestion in Exhibit 2, Page 3, for wrong
16  number, which is "WN." Can you explain that?
17    A. The training materials give the
18  collection staff guidance as to how to enter,
19  but there is a general discussion about making
20  sure that the information is accurate, making
21  sure that it can be understood, and the
22  collectors are not required to use only those
23  codes on that script. It's given to them as a
24  training tool.

Page 62

1    Q. But the collectors are instructed to
2  use comprehensible abbreviations, right?
3    A. They should, yes.
4    Q. So when you look at an individual
5  debtor's FACS collection notes, you should be
6  able to tell if there was an incoming call
7  that notified Collecto that there was a wrong
8  number being called; is that right?
9    A. Yes.
10    Q. Moving down from the wrong number on
11  6/26/10, it says "3GPH." Do you see that?
12    A. On what date?
13    Q. 6/26.
14    A. Yep.
15    Q. Do you know what that means?
16    A. The "3GPH" would be "good phone
17  number."
18    Q. Do you know what the good phone number
19  was here?
20    A. No.
21    Q. Is there any way to tell?
22    A. No. I think the collector would look
23  in the notes or windows above to see if there
24  is a number that is there.

Page 63

1    Q. In our four pages of notes here, do we
2  have those phone numbers that the collectors
3  would look up in the other window?
4    A. The entries in the notes, the other
5  call to numbers could be identified as
6  potential numbers.
7    Q. Are there different windows for this
8  debtor that we don't have here in these four
9  pages?
10    A. I'm not certain. I would assume this
11  would be all of the information on that
12  particular account, but I can't tell you if
13  there is an Experian window that might not
14  show on here, or any other attached type of
15  thing, but all of the notes and all of the
16  information should be on these notes.
17    Q. For example, there is a file return
18  from Experian on 4/13.
19    A. Yes.
20    Q. But I don't see the file or a credit
21  score.
22    A. Yep. I'm not exactly sure where that
23  information would appear. It may be -- it may
24  be a lookup that could be done separately, but

Page 64

1  it's not on this.
2    Q. On 6/26 they found a good phone number.
3  On 6/28, it looks like CB put in an
4  instruction to begin collection; is that
5  right?
6    A. Yep.
7    Q. Now, the entry for the good phone
8  number is an automated entry, that's NG?
9    A. Uh-huh.
10    Q. Right?
11    A. Yes.
12    Q. So would that be a scrub that was
13  performed at that point?
14    A. It may be that, you know, changing one
15  number to a bad category could latch onto
16  another number to be called.
17    Q. What is the "SWEEP23GPH" there on the
18  6/26 entry?
19    A. I think "sweep" just indicates it was a
20  general tactic run on all of the accounts.
21       A sweep is normally just that there
22  is a certain tactic run, maybe to identify
23  good numbers, and then anything that has a
24  number in it is put into a certain

Page 65

1 disposition, indicating that there is a number
2 that could be called, and that would be any
3 number that doesn't have -- you know, hasn't
4 been identified as a bad number.
5     Q. So going back to our discussion about
6 the policies, practices and procedures for
7 avoiding violations of the TCPA between and
8 during January -- I'll start over.
9         Going back to our discussions of
10 the policies, practices and procedures that
11 Collecto had in place in 2009 to the present
12 regarding compliance with the TCPA. You
13 testified earlier that there were policies,
14 practices and procedures in three categories:
15 You testified that there are instructors at
16 Collecto that are instructed to only call
17 numbers that are supplied by the client with
18 the dialer; second is that if the number is
19 obtained through a skip trace or other means,
20 then there is a scrub performed; and you
21 testified that if there's a bad number, then
22 there's a code placed in the notes: B.
23     Is that correct?
24     A. Yes.

Page 66

1     Q. Is there anything else during that time
2 period that Collecto did to ensure compliance
3 with the TCPA?
4         MR. VLAHAKIS: I object to the form
5 of the question.
6     A. Yes.
7     Q. Okay. What?
8     A. The training of the staff is an ongoing
9 process, and new staff are trained at various
10 intervals of time, managers are trained at
11 various intervals of time, and information
12 pertaining to compliance is distributed with
13 -- you know, to the staff at various points in
14 time, so the operations people are aware of,
15 you know, those areas that impact our business
16 and areas where we need to be compliant. So
17 it's an ongoing process.
18     Q. Are those training materials written?
19     A. Some of them are.
20     Q. Are there oral presentations that are
21 -- that have been made about compliance with
22 the TCPA?
23     A. Yes.
24     Q. Who has given those presentations?

Page 67

1     A. Most likely the trainers that we have
2 or operations managers.
3     Q. Do you know whether they used notes or
4 other written materials to provide that
5 training?
6     A. Yes.
7     Q. Did they?
8     A. Yes.
9     Q. What written materials did they use?
10     A. They used a sheet that is called
11 "Calling a Consumer's Cell Phone Number."
12     Q. Is there anything else written that any
13 person instructing, regarding compliance with
14 the TCPA, has used?
15     A. The information in the FACS manual is
16 also -- in the manual, the FACS manual,
17 there's a section on phone flags.
18         MR. VLAHAKIS: You're looking for
19 it. That wasn't within the initial
20 production.
21         EXHIBIT NO. 5 MARKED
22     Q. I'm handing you what has been marked as
23 Exhibit 5. Is this document entitled "Calling
24 a Consumer's Cell Phone Number," is that the

Page 68

1 document you referred to in your last answer?
2     A. Yes.
3     Q. And this is a one-page document?
4     A. Yes, it is.
5     Q. In the second paragraph it says
6 something about implied consent.
7         "If our client provides a cell
8 phone number to us because the consumer listed
9 it as a reference number at the time of the
10 transaction." Do you see that?
11     A. Yes.
12     Q. Would it be accurate to say that
13 Collecto relies on its clients -- I'll start
14 over.
15         Cell phone numbers are sometimes
16 provided to Collecto from Collecto's clients,
17 right?
18     A. That's correct.
19     Q. Does Collecto know when it receives a
20 phone number from its client whether the
21 consumer listed it as a reference number at
22 the time of the transaction?
23         MR. VLAHAKIS: I object to the form
24 of the question.

Page 69

1   A. We don't know what time it was
2   provided, but we know it was provided at some
3   point on the account.
4   Q. By the consumer to the client?
5   A. The assumption is if the number is
6   being provided to us with the account, the
7   only way the client is going to get that
8   information is getting it from the consumer.
9   Q. How does Collecto know that the numbers
10  it receives from its clients were given
11  directly from the consumer to the client?
12  A. We have no absolute way of knowing
13  that, but the clients will tell us the only
14  way they're going to get the numbers is from
15  the consumer. So based on their statement to
16  us, we assume what they're telling us is
17  accurate.
18  Q. Which statement to you are you
19  referring to?
20  A. That the numbers that they enter have
21  been obtained from the consumer, either at the
22  time the account was set up, the transaction
23  was done, or at a subsequent time when the
24  information was provided for a contact number

Page 70

1   by the consumer. So if there was a need for
2   communications, the information would be
3   available in the account.
4   Q. Is this something that the client tells
5   Collecto directly, or is it an assumption that
6   Collecto makes through receipt of these
7   numbers?
8   A. No. The customers tell us that these
9   were the calling numbers on the account. They
10  represent to us that these are good numbers to
11  call.
12  Q. So with respect to the Sharmaine Hunter
13  account, was there a representation from AT&T
14  that the 7272 number was listed by the
15  consumer as a reference number at the time of
16  the transaction?
17  A. Yes.
18  Q. Where did that happen?
19  A. Where did that happen? We confirmed
20  this with AT&T, and their manager, Mary
21  Fornaire, said, "At the point of new service
22  or any time during the lifetime of this
23  account the process is to ask the customer for
24  a current number to reach them outside of the

Page 71

1   home number. If the AT&T rep gets such a
2   number, the rep updates the customer account.
3   I cannot state explicitly what
4   occurred in this account, but the rep would
5   not have known about this number without
6   asking for it and getting it from the
7   consumer."
8   Q. What is the date of that communication
9   that you just read from?
10  A. Tuesday, October 12, 2010.
11  Q. Now, is there anything -- that's the
12  day before yesterday?
13  A. Yes.
14  Q. Okay. Is there anything before that
15  email that made Collecto believe that the
16  phone numbers it was receiving from AT&T were
17  provided as a reference number by the debtor
18  at the time of the transaction?
19      MR. VLAHAKIS: I object to the
20  form.
21      Are you asking just with regard to
22  this Sharmaine Hunter account or the
23  representation that he testified to that our
24  client tells us they have this information

Page 72

1   generally?
2       MR. BURKE: Let's talk about
3   Sharmaine first.
4   Q. So is there anything other than this
5   email that Collecto relied upon in calling
6   this cell phone number a bunch of times?
7   A. Well, Collecto relies on the fact that
8   it has a relationship with AT&T for many years
9   and has handled several of hundreds of
10  thousands of accounts for AT&T, and the
11  practices and the processes and procedures are
12  very common and familiar with us.
13      So this has been standard practice
14  for any number of years that we've been doing
15  business with AT&T, maybe 10 years. So there
16  is nothing new or different about the
17  Sharmaine Hunter account than any of the other
18  three million accounts they might have given
19  to us.
20      Their practice internally of putting
21  information on the accounts is pretty much a
22  standard-industry-type practice. So we rely
23  upon their information because it's never been
24  their intent to provide us with bad phone

Page 73

1    numbers.
2        Q.  There's a difference between a bad
3    phone number and a phone number that was
4    provided by the consumer, right?
5            MR. VLAHAKIS:  I object to the
6    form.
7        A.  No.
8            MR. VLAHAKIS:  It's vague and
9    confusing.
10       A.  They could be the same.
11       Q.  They could be the same, but they're not
12   necessarily the same, right?
13       A.  That's true.
14       Q.  So would it be accurate to say that
15   Collecto relies upon this information received
16   from the clients, but it might not necessarily
17   be the case that the phone number was provided
18   by the consumer as a reference number at the
19   time of the transaction?
20       A.  We have no knowledge of that.
21           All we know is that the number was
22   provided to AT&T.  They entered it on the
23   account, and they sent us the number with the
24   account.

Page 74

1        Q.  You don't know for sure that the number
2    was provided to AT&T, right?
3            MR. VLAHAKIS:  I object to the form
4    of the question.  It misstates what he said.
5            He gave two scenarios earlier.  One
6    was when it was set up, and one later when
7    it's time to communicate with the consumer
8    that that number is being provided to the
9    client.
10           MR. BURKE:  My question stands.
11   Would you please read it?
12           (The record was read:  Q. You
13           don't know for sure that the
14           number was provided to AT&T,
15           right?)
16       A.  Yes.
17       Q.  You do know?
18       A.  No, I don't know for sure, because I
19   can't know anything for sure.  How can I be
20   sure you're Alex Burke?  I have no way of
21   verifying that.  You didn't show me your ID.
22           Am I certain that the number came
23   from AT&T?  Yes, I am, because it's on their
24   screen and system.

Page 75

1        They provided us with that number.
2    In the past history of handling accounts,
3    they've always given us accurate and good
4    numbers.
5            If that information is inaccurate,
6    or they were given incorrect information,
7    which is the possible reason why this
8    occurred, then it's a possibility, but we
9    don't know.  We can only speculate.
10           MR. VLAHAKIS:  Can we go off the
11   record?
12           MR. BURKE:  I'm in the middle of
13   this.
14           MR. VLAHAKIS:  Off the record,
15   though.
16       (A discussion was held off the record.)
17       BY MR. BURKE:
18       Q.  Do you think it's possible Sharmaine
19   gave the wrong phone number to AT&T?
20       A.  I think it's possible, certainly.
21       Q.  I mean, based on the email that you
22   read, it seems like AT&T doesn't know for sure
23   where the number came from itself?
24       A.  Unless the person sending the message

Page 76

1    was the person that wrote the information
2    down, I don't think she's going to say with a
3    hundred percent degree of certainty that that
4    was the case.
5            So it's -- you know, all she knows
6    is what is in their system, and the reps take
7    the information from the consumer, and the
8    consumer is applying for service, and they
9    entered that information on the system.
10           If the rep put a wrong digit in it,
11   or the person made up the number to give to
12   AT&T, which is, you know, a possibility, then,
13   you know, that may have been why the number
14   appeared there.
15           You know, my guess is that the
16   consumer made up a number, and it happened to
17   be your client's number.
18       Q.  So we just don't know?
19       A.  We don't know for a hundred percent,
20   sure.  All we know is AT&T had this number in
21   their system, and that is the number they
22   gave, representing that this is a valid number
23   that we could contact the consumer at.
24       Q.  And just going back, the representation

Page 77

1 that this is a valid number that the consumer
2 gave to AT&T, that representation is based on
3 a course of dealing; is that right?
4    A. Well, based on our past experience of
5 dealing with them, and then it was reconfirmed
6 when we contacted their manager, the OCA
7 manager for AT&T who gave us her information
8 once she looked up the account.
9    Q. Go ahead.
10    A. She verified what the information was
11 that they gave us.
12    Q. I mean, but she hedged a little bit.
13 She said something like I can't tell you
14 explicitly, right?
15    A. She used waffle words, as I refer to
16 them.
17    Q. Yes.
18    A. So, you know, like anything else, we
19 can say things with a high degree of
20 certainty. Unless you do it yourself, you
21 can't say with absolute certainty.
22       She wasn't the person who did it.
23 She's speaking as a manager would, in all
24 probability, or most likely, in using the

Page 78

1 waffle words that, you know, where she could
2 say, well, I told you that the probability is
3 there, but that's one-tenth of one percent
4 that it didn't happen the way things normally
5 happen.
6    Q. So as I understand it, the process that
7 Collecto had during '09 and to the present for
8 sifting out debtors where it was a wrong
9 number is that they have a process by which
10 they designate wrong numbers in the collection
11 notes; is that right?
12    A. Yeah. That is one process, yes.
13    Q. Are there any other processes by which
14 wrong numbers are designated?
15    A. Some of the skip trace. If new numbers
16 are identified as being valid to a consumer,
17 the other numbers may be deleted from the
18 record so the numbers are not called.
19       We may contact the consumer who says
20 here's my best number to reach me. So that
21 number is put into the system as a focus
22 point, and the prior numbers that may have
23 been provided by the client may have been
24 deleted, you know, which is particularly true

Page 79

1 with phone services, because people, you know,
2 once they stop paying their bills, they tend
3 not to use the phone service, and there's
4 going to be a new number to contact them.
5    Q. So doesn't the process of -- I will
6 start that question over again.
7       I understand that the automated
8 script for the automated messages that
9 Collecto uses says something like if you're
10 the wrong person, please call us and let us
11 know; is that right?
12    A. That's correct.
13    Q. Is it your understanding that some
14 people do that sometimes, call Collecto and
15 tell them that's it's the wrong number?
16    A. Yes.
17    Q. Do you have any idea how often that
18 happens?
19       MR. VLAHAKIS: Objection.
20 Foundation.
21    A. I don't know how often it happens.
22    Q. Would it be reasonable to assume that
23 it happens more than 10 times a day out of a
24 million calls?

Page 80

1       MR. VLAHAKIS: Objection. This is
2 beyond the scope of the deposition. We were
3 not noticed that you were attempting to have a
4 deponent to speak for Collecto in
5 hypothesizing about the amount of times
6 someone may call in response to the voicemail
7 message that you just described.
8    A. I have no way of knowing the number. I
9 don't really want to guess at a number because
10 I'm not supposed to guess.
11    Q. If a consumer calls Collecto after
12 having received a call from the dialer, isn't
13 it already too late when they receive the
14 message that says please call us to be taken
15 off our list? They already received the call,
16 right?
17    A. They received a message, that's
18 correct, and if the information is incorrect
19 or we have the incorrect person when they call
20 in, then we want to note that in the account
21 so we don't make the same call again.
22    Q. So it is -- it's not a perfect system,
23 but it's a system that if somebody calls in it
24 will stop them from getting more calls; is

Page 81

1  that right?
2          MR. VLAHAKIS:  I object to the
3  form.
4      A.  The system is perfect, but, you know,
5  the people that are involved in the system,
6  you know, may not follow the system.
7      Q.  Well, take, for example, Domi Powell,
8  the plaintiff in this case.  He didn't give
9  his phone number, hypothetically, he didn't
10  given his phone number to AT&T.  He never
11  consented to be called.  He got a few calls,
12  and he called and requested to be taken off,
13  but the damage was already done, he got the
14  calls, right?
15          MR. VLAHAKIS:  I object to the
16  form.
17      A.  I don't see what the damage is.  There
18  is no damage.
19      Q.  He got the calls.  I'm not asking you
20  to concede that there was damage.
21      A.  I receive wrong phone numbers, also.
22  Why?  He got wrong phone numbers not intended
23  for him, which happens to most people.
24      Q.  And given the way the system is set up,

Page 82

1  that probably happens -- that probably has
2  happened more than once in the last four
3  years; would you agree?
4      A.  Probably has happened more than once.
5  I would imagine with our 10 to 15 million
6  phone calls per year that there is a
7  possibility that that might have happened more
8  than once.
9      Q.  Okay.  Other than the testimony that
10  you've already given today -- I will start
11  that question over.
12          We have talked about some of these
13  issues, but I'm going to ask this question
14  straight on.
15          As to persons that Collecto called
16  using its dialer, any of its three dialers,
17  between June 15th of 2006 and June 6th of
18  2010, where the person at any time notified
19  Collecto that the calls were in error or asked
20  to stop the calling because of the wrong
21  number, please explain to me any prior express
22  consent that Collecto claims any of those
23  persons provided to receive cellular phone
24  calls on their cell phones using the dialers

Page 83

1  or the prerecorded messages?
2          MR. VLAHAKIS:  I object to the
3  form.  You're asking him to add to whatever he
4  discussed, or you're asking him to summarize
5  it?
6          THE WITNESS:  Summarize it.
7          MR. VLAHAKIS:  You lost me halfway
8  through it.  We got Topic 4 here.
9          MR. BURKE:  I want to stick with
10  this.
11  BY MR. BURKE:
12      Q.  We have discussed a bunch of compliance
13  procedures and policies and maybe they apply.
14  Maybe they don't.  I'm asking the direct
15  question on the fourth topic, provide the
16  prior express consent evidence.
17          MR. VLAHAKIS:  I object.  The
18  phrase "prior express consent," which is not
19  defined in this topic, if you want to define
20  it or ask my client if he has an understanding
21  of what you mean, that might be better to
22  launch into this.
23      Q.  Let's just use "consent."  Explain to
24  me how those, any of those people on Topic 4

Page 84

1  consented to receive autodialed or prerecorded
2  messages calls?
3      A.  Okay.  In order for us to work an
4  account we have to have information provided
5  by our client, who is the creditor.
6          The creditor assembles information
7  in their data file provided by the consumer
8  which is necessary to open up and set up an
9  account.
10          When the account is placed for
11  collection, the information that the creditor
12  has is transmitted to us as a way of us being
13  able to contact the consumer via the mail or
14  phone in order to effectuate a collection of
15  the account.
16          The information from the client was
17  obtained from the consumer; and based on the
18  fact that the client is providing us with
19  numbers that they have been provided from the
20  consumer, then we assume that the consumer
21  willingly provided them with the numbers, and,
22  in fact, agreed that that would be a contact
23  number for any information or any action or
24  any communication that would be required on

Page 85

1   the account.
2       So the consumer provides the
3   information to our client, and then based on
4   that -- and that information conveyed to us,
5   we then enter that into our system for
6   purposes of contacting the account, and we
7   would assume that if the consumer did not want
8   to be contacted and did not want to give
9   consent, they would not have provided the
10  number, or they would have contacted the
11  client and told them that the number was no
12  longer valid or they no longer wanted to be
13  contacted at that number, and that's the way
14  our business operates.
15      That's the way I'm sure every other
16  collection agency operates, and that's the
17  only information that we can rely upon is the
18  representation from our clients that these are
19  good and valid numbers for their customers.
20      Q. I have two followup questions. One has
21  to do with the portion of this question that
22  says that these are wrong numbers, and the
23  second has to do with our discussion earlier
24  about -- that there's maybe an understanding

Page 86

1   but there's no explicit statement one way or
2   another about whether the numbers were
3   provided by the consumer to the client. So
4   let's hit the wrong number portion of this
5   first. The topic excludes any persons for
6   whom the number was correct.
7       Does Collecto contend that it had
8   prior expressed consent from persons who were
9   called, where those persons did not provide
10  the phone number to the client?
11      MR. VLAHAKIS: I object to the
12  form. You lost me on that one.
13      A. Yeah, I would have to hear that
14  question again.
15      MR. VLAHAKIS: Why don't you ask
16  how this relates to your client and expand it
17  out?
18      MR. BURKE: No. Read it back.
19      (The record was read Q: I have
20      two followup questions. One has
21      to do with the portion of this
22      question that says that these
23      are wrong numbers, and the
24      second has to do with our

Page 87

1   discussion earlier about -- that
2   there's maybe an understanding
3   but there's no explicit
4   statement one way or another
5   about whether the numbers were
6   provided by the consumer to the
7   client. So let's hit the wrong
8   number portion of this first.
9   The topic excludes any persons
10  for whom the number was correct.
11  Does Collecto contend that it
12  had prior expressed consent from
13  persons who were called, where
14  those persons did not provide
15  the phone number to the client?)
16      MR. VLAHAKIS: I object to the form
17  of the question. Incomplete hypothetical.
18      Let me see if I understand --
19      MR. BURKE: Please, no.
20      MR. VLAHAKIS: Do you understand
21  the question?
22      THE WITNESS: Yes.
23      MR. VLAHAKIS: Okay.
24      A. Collecto works for various clients, and

Page 88

1   Collecto is an agent for those clients,
2   working to do receivables management,
3   collection work for the clients.
4       When the client provides us with the
5   information in their file, we assume that the
6   information that they have provided to us is
7   their best knowledge of what the correct
8   information is on an account.
9       They represent to us that they're
10  providing us with their accurate information
11  from their files; and under that
12  representation, we proceed forward, until we
13  find that the information may not be accurate.
14      If the information is not accurate,
15  then we take the steps to correct that so that
16  the people who may be contacted incorrectly or
17  inappropriately will then be deleted from our
18  records, and the problem will be corrected.
19      So we act, you know, on behalf of
20  our clients and contact their customers at
21  their direction based on the information that
22  they provided to us.
23      Q. Does Collecto contend for those
24  incorrect or improper phone calls that were

Page 89

1  made to people within this category were made
2  with the prior expressed consent of the
3  recipient?
4        MR. VLAHAKIS:  I object to the form
5  of the question.  We're assuming -- it's an
6  incomplete hypothetical.  I understand your
7  situation where your client --
8        MR. BURKE:  It's not a
9  hypothetical.  It's a real question.
10       MR. VLAHAKIS:  I understand you
11 showed us bills showing that your client had
12 that phone number that was owned by his mom or
13 whatever, and the assumption is that that call
14 happened in that time period and did not go to
15 the right person.
16       Topic 4 is sort of expanding that
17 scenario to an assumption that this happened
18 on other occasions, where somebody has called
19 in, and exactly like your client's scenario,
20 and we're assuming that there's proof that the
21 person is calling in and saying I'm John Doe,
22 and you called for Jane Doe.  I'm not that
23 person.
24       I'm not sure, absent further

Page 90

1  evidence, we can assume that the person
2  calling in saying it's the wrong number is
3  truly the scenario that your client is in.  I
4  don't dispute your recitation of the fact that
5  your client is the wrong person.
6        MR. BURKE:  Your objection has to
7  do with some application to this case.  My
8  question is my question.  I just want an
9  answer to my question.
10       THE WITNESS:  Repeat his question
11 again.
12       (The record was read: Q.
13       Does Collecto contend for
14       those incorrect or improper
15       phone calls that were made
16       to people within this
17       category were made with the
18       prior expressed consent of
19       the recipient?)
20    A.  In the context of the client providing
21 us with the information on the consumer and
22 the -- and the information being valid as to
23 it being provided to them, you know, we assume
24 that consent has been granted, because the

Page 91

1  client is providing us with the numbers which
2  they would only obtain from the consumer.
3        MR. VLAHAKIS:  This question was
4  different, though.
5        You're asking -- Alex, can I
6  simplify -- does Collecto believe that it had
7  express consent from anybody that has called
8  Collecto and said you have the wrong number,
9  and it's the recipient of the call, which may
10 be different than the consumer that they were
11 calling.  Is that what you are saying?
12       MR. BURKE:  I think the answer was
13 fine.
14       MR. VLAHAKIS:  Okay.
15    Q.  Why does Collecto use a dialer?
16    A.  In order to increase the number of
17 contacts it makes with the customers.
18    Q.  To collect debt more efficiently?
19    A.  The more people you speak to the more
20 likely you are to make collections.
21    Q.  Is Collecto entitled to use a dialer?
22       MR. VLAHAKIS:  I object to the
23 form.  Beyond the scope of the deposition
24 notice.  Calls for a legal conclusion as well.

Page 92

1     A.  Are we entitled?  I mean, I don't
2  understand your question.  Could you rephrase
3  it?
4     Q.  Yes.  A dialer is specific
5  technological equipment that is regulated, and
6  it's possible to make a phone call without a
7  dialer.
8        So my question is, is there
9  entitlement that Collecto has to use a dialer?
10    A.  I don't think there is an entitlement.
11 It's just a legal right, like any other
12 business entity that's a valid corporation,
13 that there's no laws or regulations that
14 preclude Collecto or any other collection
15 agency or any number of creditors, the U.S.
16 government, state, local governments that use
17 automated dialers as part of the communication
18 process with their customers, clients or
19 residents.
20    Q.  Is Collecto required to use a dialer?
21       MR. VLAHAKIS:  I object to the form
22 of the question.
23    A.  Required by whom?
24    Q.  By anybody.

1      MR. VLAHAKIS:  Beyond the scope.
2   Q.  That you know of?
3   A.  You know, the clients that we have will
4   inquire as to what our processes are, and
5   they, based on the representation as to what
6   our processes are, will make a decision as to
7   whether they want to hire us or somebody else.
8      So industry norm is that an agency
9   trying to contact consumers is going to
10  utilize a dialer to enhance and improve their
11  results.
12  Q.  If Collecto scrubbed every phone call
13  before it made the phone call to a cell, do
14  you think that it would be able to avoid
15  calling wrong numbers using its dialer?
16     MR. VLAHAKIS:  I object to the
17  scope.  Beyond the scope of the 30(b)(6)
18  notice.
19  A.  It may reduce the number.  It won't
20  eliminate the number.
21  Q.  Let's go back to the second prong of
22  what I mentioned a few minutes ago about the
23  understanding between Collecto and its clients
24  as to consent, specifically referring to the

1   fourth topic and your answer to the question
2   about the fourth topic.
3      I think you testified earlier that
4   there was no explicit understanding between
5   Collecto and its clients about where the phone
6   numbers come from that the clients transmit to
7   Collecto; is that correct?
8      MR. VLAHAKIS:  I object to the
9   form.
10  A.  No.
11  Q.  Explain.
12  A.  Well, you said "explicit
13  understanding."  There is no explicit
14  understanding where the numbers come from.
15  There is an understanding that numbers were
16  provided by the customer of our client, and
17  that the information is obtained when they set
18  up the account, you know, with the -- our
19  client.
20  Q.  Does Collecto take steps to ensure that
21  this is the case for each client?
22  A.  Once we've started working the business
23  of a client, if there's some aspect of their
24  business that is not valid, where information

1   that they are providing is not valid for some
2   reason, we would then communicate back to the
3   client to straighten out if it was something
4   that came -- you know, if there was charges or
5   something in there that shouldn't be part of
6   the file, we would communicate back to the
7   client.  Our business with AT&T has been
8   ongoing for 10 years or more.  It's not
9   anything new or different.  It's the same
10  process.
11  Q.  Did AT&T ever, except for this email on
12  Tuesday, tell Collecto explicitly these are
13  all numbers, phone numbers that we got from
14  our clients, from our customers?
15     MR. VLAHAKIS:  I object to the
16  form.  Beyond the scope of the 30(b)(6)
17  notice.
18  A.  You're asking me if there was a point
19  in time when AT&T, which is a corporation,
20  told us that these were the numbers?
21     We have been instructed by them that
22  these are the numbers that they have in their
23  system that are valid numbers for the
24  consumer, at least at the time that they put

1   the information in their system.
2      There is no guarantee that numbers
3   don't change or people move and numbers get,
4   you know, repositioned with somebody else, but
5   you know, the information they provide us is
6   that what they believe they have in their
7   records is accurate information.
8   Q.  The critical distinction is not whether
9   it's accurate information.  The critical
10  distinction is whether the customer gave the
11  client that number, that's what my question
12  is.
13     MR. VLAHAKIS:  Objection.  Asked
14  and answered.
15     THE WITNESS:  Yeah.
16  Q.  You can answer again.
17  A.  The client tells us that the source of
18  the numbers that are in the file were provided
19  by the consumer, that's what the client tells
20  us.
21  Q.  When did AT&T tell you that?
22  A.  When did they tell us that?
23  Q.  Yes.
24  A.  I can't give you the exact date and

Page 97

1  time.
2      Q.  When did any other -- who would know
3  the exact date and time when AT&T told
4  Collecto that?
5      A.  There wouldn't be a person that I could
6  think of that might have that knowledge as to
7  when that specific information is provided.
8  It may be part of the contract that they are
9  going to provide us with information, valid
10  information, but I can't give you the specific
11  date and time.
12          It's been the ongoing practice for
13  more than 10 years with this client.  So it
14  isn't a new revelation.  It isn't something
15  they just thought up.  It's been standard
16  practice for numerous years.
17      Q.  I'm not quibbling that they gave you
18  numbers that they thought were valid.  I'm
19  asking what direct knowledge Collecto has as
20  to whether the customers gave these phone
21  numbers to AT&T or any other creditor --
22      A.  We have no direct knowledge.
23      Q.  Going back to the B designation in the
24  collection notice, you testified earlier that

Page 98

1  the B is used to designate the wrong numbers;
2  is that correct?
3      A.  Yes.
4      Q.  Are there other designations that the B
5  is used for?
6      A.  No.
7      Q.  It's not used to designate a
8  disconnected number?
9      A.  If it's a bad number, it could be used
10  for that.
11      Q.  Okay.  That's what I'm trying to figure
12  out, what it's used for.
13      A.  Uh-huh.
14      Q.  So is the B used for disconnected
15  numbers?
16      A.  It's used for any bad number, which
17  could include disconnected.
18          MR. VLAHAKIS:  This is what he's
19  reading off of (indicating).
20      Q.  So other than disconnected numbers,
21  unreachable numbers or wrong numbers, is there
22  any reason that the B designation would be
23  used?
24      A.  I can't think of one.

Page 99

1      Q.  Well, as to this issue, you're
2  testifying for the corporation --
3          MR. VLAHAKIS:  Objection.  Beyond
4  the scope of the 30(b)(6) notice.
5      Q.  So I'm asking --
6          MR. VLAHAKIS:  I know what you are
7  asking.  It's not particularly identified as a
8  topic to say please have Collecto identify any
9  and all reasons for calling the wrong number,
10  including your clarification of the
11  interrogatory answer, I believe it's 4 or 3.
12          You talk about in Topic 2 the
13  notetaking process for incoming calls,
14  including requests not to be called and
15  defendant's policies, practices and procedures
16  in deciding what numbers to call and not call,
17  that's Topic 3.
18          I don't see it there, the prior
19  consent.  I don't see it there.
20          MR. BURKE:  Okay.
21          MR. VLAHAKIS:  I am willing after
22  this deposition to go through that with you
23  pursuant to 37.2 in more detail so we can
24  clarify that question.

Page 100

1          MR. BURKE:  I want a final answer
2  on that question.
3          MR. VLAHAKIS:  Fair enough.  Save
4  it for another day.
5          (Witness and counsel confer.)
6          MR. VLAHAKIS:  Oh, this reminds me,
7  Alex, that you may want to go through this
8  (indicating).
9          MR. BURKE:  Let's go off the
10  record; is that okay?
11          MR. VLAHAKIS:  Yes.
12          (A discussion was held off the record.)
13  BY MR. BURKE:
14      Q.  I'm looking at the third topic on
15  Exhibit 1.  We've talked about some policies,
16  practices and procedures about what numbers
17  Collecto calls and does not call using its
18  dialers and prerecorded messages.
19          As I understand it, phone numbers
20  that Collecto receives from a skip trace
21  service are scrubbed before they're called on
22  the autodialer; is that correct?
23      A.  That's correct.
24      Q.  Are there any other phone numbers or

Page 101

1    types of phone numbers, categories, that are
2    scrubbed before they're called using the
3    dialer?
4       A.  Yes.  I think I previously testified to
5    the fact that a scrub is used for bankrupt
6    accounts, deceased accounts.
7       Q.  Scrub for a cell phone?
8       A.  No.  Other than the Soundbite, that's
9    the...
10      Q.  So numbers that come from skip traces
11   are sent to Soundbite to scrub for cell
12   phones, right?
13      A.  Yes.
14      Q.  Are there any other types of phone
15   numbers that are sent to the Soundbite dialer
16   in order to scrub for cell phones?
17          MR. VLAHAKIS:  I object to the
18   form.
19      A.  I don't understand your question.
20          MR. VLAHAKIS:  In this case, it was
21   this campaign.
22      A.  All the numbers are sent to Soundbite,
23   and Soundbite determines those that are cell
24   phone numbers.

Page 102

1       Q.  Okay.
2       A.  So...
3       Q.  Once the Soundbite dialer determines a
4    certain number is a cell phone number, it
5    makes that notation in the notes; doesn't it?
6       A.  Yes.
7       Q.  Okay.  But then sometimes, as with what
8    happened with Mr. Powell, the cell phone
9    number is called after a determination that
10   the number is a cell phone number by a
11   different dialer; is that correct?
12      A.  Yes.
13      Q.  Would it be accurate to say that all
14   phone numbers are called using all the
15   dialers, generally, until B is placed on the
16   number?
17          MR. VLAHAKIS:  Can you ask it
18   again?
19          (The record was read: Q.
20          Would it be accurate to say that
21          all phone numbers are called
22          using all the dialers,
23          generally, until B is placed on
24          the number?)

Page 103

1          MR. VLAHAKIS:  I object to the
2    form.
3       A.  No.
4       Q.  Okay.  Explain why that's not accurate?
5       A.  Because all numbers are not necessarily
6    put into the dialer.  Only selected pools are
7    put into the dialer.
8       Q.  And how are those pools selected?
9       A.  There's criteria that's established
10   relative to the accounts.  So that, for
11   example, if the account was a very low balance
12   account, it might not be called, because it's
13   an account that's not -- there's not a value
14   to working the account.
15          If any other information that were
16   to come back that the -- you know, that the
17   account was not a valid account, then it might
18   be excluded from the pool.
19          I mean, there's a circumstance where
20   low credit scores would indicate persons that
21   are unable to pay, with numerous collection
22   accounts, would get low credit accounts.
23          They would be excluded from the
24   program.  They try to selectively tailor the

Page 104

1    accounts contacted to be accounts that have a
2    prior probability of actually being able to
3    pay the account.
4       Q.  So when a pool is put together, I would
5    imagine like a manager or somebody, not just a
6    debt collection person on the phone, some sort
7    of manager puts the pool together based on
8    criteria; is that right?
9       A.  That's correct.
10      Q.  The pool probably says, all right, take
11   these -- people that fall into this criteria
12   based on the credit scores and other criteria,
13   call all these people's primary phone based,
14   you know, on this particular criteria; is that
15   accurate?
16      A.  That's accurate, yeah.
17      Q.  And then the three dialers work in
18   concert on that particular request, is that
19   right, or do the dialers have separate
20   campaign pools?
21      A.  They have separate pools.
22      Q.  Okay.  So one pool might go to the
23   Soundbite, and the Soundbite dialer is the
24   only dialer who calls having to do with that

Page 105

1   pool unless they happen to be part of another
2   pool that's part the Noble dialer?
3       A.  The accounts can start out in one pool,
4   and they re-modify the pool to exclude
5   accounts before it is sent to another type of
6   a dialer.
7           So the account doesn't stay in one
8   category throughout the life of the account.
9   It can be moved to different categories,
10  depending upon, you know, what the tactics
11  are.
12      Q.  Because with Mr. Powell, he started at
13  the Noble dialer, and then he went to the
14  Soundbite, and then back and forth between
15  Noble and Soundbite?
16      A.  Yeah.
17      Q.  So would that be the same campaign, or
18  are those separate campaigns for the two
19  dialers?
20      A.  Separate campaigns.
21      Q.  Is there a way to tell what campaign he
22  was part of, these calls were part of?
23      A.  I don't know.
24          MR. VLAHAKIS:  That's beyond the

Page 106

1   scope as well.
2       Q.  Other than -- I will start over and
3   explain where I'm going with this.
4           I understand that phone numbers
5   that Collecto receives from a skip trace
6   company are typically scrubbed by the
7   Soundbite dialer before they're called, right?
8       A.  Yes.
9       Q.  Are telephone numbers that are received
10  from a skip trace ever called by the Noble or
11  the GC dialer?
12          MR. VLAHAKIS:  I object to the form
13  of the question.  Beyond the scope.
14      A.  I'm not certain.
15      Q.  Okay.  How does Collecto figure out
16  which telephone numbers it should call using
17  its dialer and which telephone numbers it
18  should call not using its dialers?
19      A.  The numbers that are in the top line of
20  the account that are in those fields, the
21  "can be reached" number is usually the
22  targeted number for the purposes of the
23  dialer, because that's been determined to be
24  the best calling number.

Page 107

1       If a different number is obtained,
2   it would be entered into that field so that
3   the call would be directed.
4       Q.  Now, is that the case regardless of
5   whether the number was received from the
6   client or whether it was received from a skip
7   trace?
8           MR. VLAHAKIS:  I object to the form
9   of the question.
10      A.  Yeah, I'm not sure.  Because the skip
11  trace numbers go into another field, and it
12  may be the case where the dialer can pick up
13  something from that field if it's programmed
14  correctly.  I don't know what the actual
15  programming is.
16          MR. VLAHAKIS:  (Indicating).
17          THE WITNESS:  That's not in every
18  case, though, sorry.
19      Q.  Are phone calls ever manually dialed?
20      A.  Yes.
21      Q.  How does that look in the notes when
22  that happens?
23      A.  The collector's initials would be in
24  there, and then the number dialed would be

Page 108

1   entered.
2       Q.  Now, we have a case here where --
3   Page 3 of Exhibit 3, on 6/7/10, do you see
4   that?
5       A.  Uh-huh.
6       Q.  Yes?
7       A.  Yes.
8       Q.  We've got someone's initials?
9       A.  Yep.  It was one of the dialer
10  managers.
11      Q.  Right.  A dialer manager.
12          Who are the other persons, the
13  dialer managers whose initials might appear to
14  show that it was a dialer that made the call,
15  do you know?
16      A.  I think you've got most of them on
17  here.  You know, you got the WGR and MGR.
18          MR. VLAHAKIS:  Are you asking him
19  if he knows who those people are?
20          MR. BURKE:  No.  I want to know
21  what designations there may be.
22      A.  And I found out that that other ANM is
23  16, 17 people in the IT department.  So I
24  don't always know who all of them are.  The

Page 109

```
1   nj, the DEB, those are all IT-related.
2        MR. BURKE:  All right.  I have
3   nothing more at this time.  Because I got some
4   of these documents after I had left, I'm going
5   to leave the deposition open with the
6   possibility of reconvening, if appropriate.  I
7   hope it's not appropriate or necessary.
8        MR. VLAHAKIS:  Fair enough.  Did
9   you go into that Topic 5 at all?
10       MR. BURKE:  Yes.
11       MR. VLAHAKIS:  We will reserve
12  signature.
13   (The deposition was adjourned at 12:52 p.m.)
14
15
16
17
18
19
20
21
22
23
24
```

Page 110

```
1   CERTIFICATE
2   COMMONWEALTH OF MASSACHUSETTS )
3   COUNTY OF SUFFOLK          )
4        I, Deborah Roth, a Registered
5   Professional Reporter and Notary Public duly
6   commissioned and qualified in and for the
7   Commonwealth of Massachusetts, do hereby
8   certify:
9        That John F. Burns, Jr., the witness
10  whose deposition is hereinbefore set forth,
11  was duly identified and sworn by me, and that
12  the foregoing transcript is a true record of
13  the testimony given by such witness to the
14  best of my ability.
15       I further certify that I am not
16  related to any of the parties in this matter
17  by blood or marriage, and that I am in no way
18  interested in the outcome of this matter.
19       IN WITNESS WHEREOF, I have
20  hereunto set my hand and affixed my notarial
21  seal this 15th day of October, 2010.
22  _____
23  Deborah Roth, RPR
24  My Commission Expires:  January 23, 2015
```

Page 111

```
1        The Deposition of John F. Burns,
2   Jr., was taken in the matter, on the date, and
    at the time and place set out on the title
3   page hereof.
         It was requested that the deposition
4   be taken by the reporter and that same be
    reduced to typewritten form.
5        It was agreed by and between counsel
    and the parties that the Deponent will read
6   and sign the transcript of said deposition.
    DEPOSITION ERRATA SHEET
7   Re:  Esquire Deposition Solutions
    File No.: 180300
8   Case Caption:  Powell v. Collectco
    Deponent:  John F. Burns, Jr.
9   Deposition Date:  10/14/10
    To the Reporter:
10       I have read the entire transcript of my
    Deposition taken in the captioned matter or
11  the same has been read to me.  I request that
    the following changes be entered upon the
12  record for the reasons indicated.  I
    have signed my name to the Errata Sheet and
13  the appropriate Certificate and authorize you
    to attach both to the original transcript.
14  Page No. _____ Line No. _____ Change to:
    _____
15  Reason for change:
    _____
16  Page No. _____ Line No. _____ Change to:
    _____
17  Reason for change:
    _____
18  Page No. _____ Line No. _____ Change to:
    _____
19  Reason for change:
    _____
20  Page No. _____ Line No. _____ Change to:
    _____
21  Reason for change:
    _____
22  Page No. _____ Line No. _____ Change to:
    _____
23  Reason for change:
    _____
24  Page No. _____ Line No. _____ Change to:
```

Page 112

```
1   _____
    Page No. _____ Line No. _____ Change to:
2   _____
    Reason for change:
3   _____
    Page No. _____ Line No. _____ Change to:
4   _____
    Reason for change:
5   _____
    Page No. _____ Line No. _____ Change to:
6   _____
    Reason for change:
7   _____
    Page No. _____ Line No. _____ Change to:
8   _____
    Reason for change:
9   _____
    Page No. _____ Line No. _____ Change to:
10  _____
    Reason for change:
11  _____
    Page No. _____ Line No. _____ Change to:
12  _____Page No.
    _____ Line No. _____ Change to:
13  _____
    Reason for change:
14  _____
    Page No. _____ Line No. _____ Change to:
15  _____
    Reason for change:
16  _____
    Page No. _____ Line No. _____ Change to:
17  _____
    Reason for change:
18  _____
    Signed under the pains and penalties of
19  perjury this _____ day of
    _____, 2010.
20  _____
    John F. Burns, Jr.
21       Subscribed and sworn to before me
    this ____ day  of _____, 2010.
22  _____
23  Notary Public     My Commission
    Expires:_____
24
```

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DOMINGINHO POWELL on behalf of himself and others similarly situated,<br>　　　　Plaintiff, | ) ) ) ) ) | Case No.: 1:10-cv-3709<br><br>Hon. Judge Kendall |
| 　　　　*v.* | ) ) | Magistrate Judge Mason |
| COLLECTO, INC. d/b/a<br>COLLECTION COMPANY OF<br>AMERICA d/b/a EOS CCA,<br>　　　　Defendant. | ) ) ) ) ) | |

**DEFENDANT'S ANSWERS AND OBJECTION TO PLAINTIFF'S**
**INTERROGATORIES**

NOW COMES the Defendant, COLLECTO, INC. d/b/a COLLECTION COMPANY OF AMERICA d/b/a EOS CCA ("Defendant"), by and through its undersigned counsel, and for its Answers and Objection to Plaintiff's Interrogatories, states as follows:

**General Objections**

1.　　　Objection, Plaintiff has not adequately defined the phrase "predictive dialer." Subject to and without waiving this objection, Defendant lacks knowledge or information sufficient to answer whether a "predictive dialer" was used as this term is contemplated by Plaintiff. Defendant, however, states that it operates a telephone dialing system which had the capability of leaving a prerecorded voice message under certain circumstances and that its dialing software can dial telephone numbers from a list or "dialing campaign" that consists of telephone numbers that members of the Operations department within Defendant's company has selected from its database based on criteria set by members of the Operations department.

2.　　　Plaintiff's Interrogatories exceed the permissible amount because Plaintiff has included numerous discrete subparts.

## **INTERROGATORIES**

1.     Identify all attempted and successful telephone calls to and from (773) ■-7272. Include the date and time of each call or attempted call, who or what dialed the number, all equipment and systems used, the telephone company(ies) that serviced line for each call, the Predictive Dialer that was used, the Prerecorded Message used.

**Answer**:     Objection, Defendant incorporates General Objection No. 1. Further, this request

contains eight (8) discrete and distinctly different subparts.  Defendant incorporates General

Objection No. 1. Subject and without waiving these objections, and pursuant to FRCP 33(d), see

attached records which identify the date and time of each call or attempted call related to the

subject account.  Additionally, Defendant received a six second call from (773) ■-7272 on

June 8, 2010.  Further answering, Defendant used a Noble dialer, a GC dialer and a Soundbite

dialer.  The name of the telephone company(ies) that serviced line for each call is irrelevant and

burdensome.  The prerecorded message used is identified in Request to Admit No. 7.


2.     If you contend that plaintiff did not call you in June 2010, to notify you that you were calling the wrong number, identify all sources of documents or information, including backup tape(s) and documents and information from third parties including attorneys, that pertain to whether such call or request was made, or whether defendant knew or had reason to know it was calling an incorrect telephone number, in June and July 2010.

**Answer**:     Objection, this is a premature contention interrogatory.   Additionally, this

Interrogatory contains two discrete and distinctly different subparts.  Subject to and without

waiving these objections, Defendant states that the information it knows and can readily obtain is

insufficient to enable it to answer whether Plaintiff called Defendant in June 2010, to notify

Defendant that Plaintiff was calling the wrong number.  Further answering, Defendant states that

it has made a reasonable inquiry by reviewing its telephone logs of inbound call and notes that its

records demonstrate that it appears to have received a six second call from the telephone number

identified in the Complaint, (773) ■-7272, on June 8, 2010.  Defendant did not make an audio

2

recording of the June 8th call and Defendant's records do not identify the name of the caller. Defendant's records also identify what appears to be an inbound call on June 14, 2010, but an examination of its records fail to reflect a call from the telephone number identified in the Complaint, (773) ███-7272. While Defendant's collection notes for the subject account identify an inbound call on June 14, 2010, Defendant did not make an audio recording of the alleged call, and Defendant's records do not identify the name of the caller. Pursuant to FRCP 33(d), see previously produced collector notes and attached phone logs for June 14, 2010. Investigation continues.

3. Identify and explain all written and unwritten policies, practices and procedures concerning use of Predictive Dialers and Prerecorded Messages, going back to when you began using such, and ending on June 15, 2010.

**Answer**: Objection, Defendant incorporates General Objection No. 1. Further, this Interrogatory is overly broad and overly burdensome and seeks irrelevant information that is not related to the purported class. The purported class relates to persons who allegedly called Defendant to state that they were not the debtor in question, and were called before and after such call by a so-called "predictive dialer." The use or misuse of so-called "prerecorded messages" relative to FOTI, or any other substantive issue related to messages in general, are not an issue of this case. For these reasons, providing "all written and unwritten policies, practices and procedures concerning use of . . . Prerecorded Messages" will not lead to the discovery of admissible evidence. Further objecting, this Interrogatory is a topic at an upcoming FRCP 30(b)(6) deposition which seeks information relative to Defendant's use of a so-called "autodialer". Requiring Defendant to attempt to answer this topic twice is overly burdensome. Subject to and without waiving these objections, and pursuant to FRCP 33(d) see attached

3

documents. Defendant may produce policies, practices and procedures concerning use of so-called "predictive dialers" prior to the deposition.

4.      Identify and state the location and the person who has possession, custody or control of any document, data or information responsive to any discovery request in this case, that is not being produced because of any objection, privilege, or because you contend that such is not within your possession, custody or control.

**Answer**:      Objection, this requests is overly burdensome. Defendant should not be required

to identify every person who has possession of a document that is not being produced subject to

an objection or any contention that any documents are not within Defendant's possession,

custody or control.

5.      Identify, state the number and state the time and date of all calls and date and time of notification for:

>       All persons located in Illinois, Indiana and Wisconsin who defendant or some person on its behalf called on their cell phone using your Predictive Dialer and/or Prerecorded Message, where defendant was notified that defendant was calling the incorrect person, where any call was made at any time between and including June 15, 2006, and June 15, 2010.

**Answer**:      Objection, the requested material is premature prior to an order certifying the

class. Defendant also incorporates General Objection No. 1. This Interrogatory is also overly

burdensome. Further objecting, Defendant currently lacks knowledge or information sufficient

to identify whether it "was calling the incorrect person," because its records to not readily

identify the requested information. Rather, a code "B" is placed next to a telephone number for a

number of reasons, including, but not limited to, disconnected numbers, unreachable numbers

(such as a fax number or modem) or wrong telephone numbers. Additionally, Defendant's

records cannot independently be searched for the "B" code. Further, even if Defendant's records

could be searched for this code by an computer program that has yet to be created, Defendant

4

cannot readily search the "B" code to determine when a person called to have their phone number removed from Defendant's records. Defendant does not utilize a "hot button" or universal code to designate when a person calls to have their phone number removed from Defendant's records. Instead, consistent with Defendant's polices and procedures, collectors are instructed to type in a short summary when a person calls to have their phone number removed. Therefore, it is not possible to conduct a single word search to capture all of the requested data on wrong or incorrect number designations. Accordingly, even if all accounts with a "B" code designation were identified, Defendant would be required to engage in a time consuming and labor intensive file-by-file review of all "B" codes by a human in order to determine whether a person called to have their phone number removed from Defendant's records as opposed to the subject number being identified as a disconnected or otherwise invalid or bad number. Subject to and without waiving these objections, Defendant will maintain records of all outbound calls and calls logs as it attempts to identify a potential class. Defendant's records are kept on-site and are not stored by a third-party.

6.     If you contend that any person within the following parameters provided prior express consent to receive telephone calls from you using an automatic telephone dialing system, prerecorded voice message, artificial voice message, Predictive Dialer or Prerecorded message, please specifically identify all documents, data information or things that supports this contention.

> All persons located in Illinois, Indiana and Wisconsin who defendant or some person on its behalf called on their cell phone using an automatic telephone dialing system and/or prerecorded or artificial voice message, where defendant was notified that defendant was calling the incorrect person, where any call was made at any time between and including June 15, 2006, and June 15, 2010.

**Answer**:     Objection, this is a premature contention interrogatory. This Interrogatory is also overly burdensome. Further, the requested material is premature prior to an order certifying the class. Defendant also incorporates General Objection No. 1. Further objecting, Defendant

currently lacks knowledge or information sufficient to identify whether it "was calling the incorrect person," because its records to not readily identify the requested information. Rather, a code "B" is placed next to a telephone number for a number of reasons, including, but not limited to, disconnected numbers, unreachable numbers (such as a fax number or modem) or wrong telephone numbers. Additionally, Defendant's records cannot independently be searched for the "B" code. Further, even if Defendant's records could be searched for this code by an computer program that has yet to be created, Defendant cannot readily search the "B" code to determine when a person called to have their phone number removed from Defendant's records. Defendant does not utilize a "hot button" or universal code to designate when a person calls to have their phone number removed from Defendant's records. Instead, consistent with Defendant's polices and procedures, collectors are instructed to type in a short summary when a person calls to have their phone number removed. Therefore, it is not possible to conduct a single word search to capture all of the requested data on wrong or incorrect number designations. Accordingly, even if all accounts with a "B" code designation were identified, Defendant would be required to engage in a time consuming and labor intensive file-by-file review of all "B" codes by a human in order to determine whether a person called to have their phone number removed from Defendant's records as opposed to the subject number being identified as a disconnected or otherwise invalid or bad number. Subject to and without waiving these objections, Defendant will maintain records of all outbound calls and calls logs as it attempts to identify a potential class. Defendant's records are kept on-site and are not stored by a third-party.

7. Identify and explain all written and unwritten policies, practices and procedures concerning the use of your Predictive Dialer or Prerecorded message as to incorrect recipients. A complete response to this interrogatory would likely include (but not be limited to) policies,

130018016v1 0914300 65872

practices and procedures concerning implementing instructions from persons who call "to remove "their" phone number from [your] records." (quotation derived from the Prerecorded Messages left for plaintiff).

**Answer**:  Objection, Defendant incorporates General Objection No. 1. Further, this request

is overly broad and burdensome.  This Interrogatory is also overly burdensome in light of the

fact that Defendant will be submitting a designated deponent pursuant to FRCP 30(b)(6) who

will discuss this answer in the context of the identified deposition topic(s).  Subject to and

without waiving these objections, Defendant states that it is its policy to avoid calling so-called

"incorrect recipients."  Defendant also states that it is its practice to instruct collectors to respond

to requests to remove persons from Defendant's records by identifying the subject telephone

number as a bad number by flagging the number in the subject collection notes with a "B" and by

identifying such requests in the collection notes.  For example, pursuant to FRCP see previously

produced collection notes dated June 14, 2010 which contain an entry which states  "IC CBR

WRG#".  Once the number is flagged as a "B", it should no longer called.  Further, answering,

pursuant to FRCP 33(d) see attached documents, including, but not limited to document entitled

"Calling a Consumers Cell Phone".

8.    Identify, and provide the source, for all records that exist that show outgoing and incoming telephone calls as to any putative class member between June 15, 2006 and the present, including plaintiff and (773) ███-7272. A complete response to this request might include but is not limited to: collection notes, telephone company records, Predictive Dialer records, records of any third party involved in the making or receiving of calls, backup tapes and other types of data and records.

**Answer**:    Objection, the requested material is premature prior to an order certifying the

class.  This Interrogatory is intended to harass Defendant into incurring great expense to produce

the requested materials.  Defendant is still in the process of reviewing its records to determine

who to identify the purported class members.  Further objecting, as noted above, Defendant

currently lacks knowledge or information sufficient to identify whether it "was calling the incorrect person," because its records to not readily identify the requested information. Rather, a code "B" is placed next to a telephone number for a number of reasons, including, but not limited to, disconnected numbers, unreachable numbers (such as a fax number or modem) or wrong telephone numbers. Additionally, Defendant's records cannot independently be searched for the "B" code. Further, even if Defendant's records could be searched for this code by an computer program that has yet to be created, Defendant cannot readily search the "B" code to determine when a person called to have their phone number removed from Defendant's records. Defendant does not utilize a "hot button" or universal code to designate when a person calls to have their phone number removed from Defendant's records. Instead, consistent with Defendant's polices and procedures, collectors are instructed to type in a short summary when a person calls to have their phone number removed. Therefore, it is not possible to conduct a single word search to capture all of the requested data on wrong or incorrect number designations. Accordingly, even if all accounts with a "B" code designation were identified, Defendant would be required to engage in a time consuming and labor intensive file-by-file review of all "B" codes by a human in order to determine whether a person called to have their phone number removed from Defendant's records as opposed to the subject number being identified as a disconnected or otherwise invalid or bad number. Subject to and without waiving these objections, Defendant will maintain records of all outbound calls and calls logs as it attempts to identify a potential class. Defendant's records are kept on-site and are not stored by a third-party.

9.      State the name, employer, most current home address, title and job description of each person (including present or former third parties, companies, officers and/or employees)

who is responsible for your Predictive Dialer(s), Prerecorded Messages, telephony systems and operations, and state specifically what that person's duties with respect to telephony are.

**Answer**:          Objection, Defendant incorporates General Objection No. 1.  Further, Further, this Interrogatory contains seven (7) discrete and distinctly different subparts. Additionally, this Interrogatory is overly broad and overly burdensome and seeks irrelevant information that is not related to the purported class, such as the broad and undefined terms "telephony systems and operations." The purported class relates to persons who allegedly called Defendant to state that they were not the debtor in question, and were called before and after such call by a so-called "predictive dialer." The use or misuse of so-called "prerecorded messages" relative to FOTI (or any other substantive issue related to the messages) is not an issue of this case.  For these reasons, providing "all written and unwritten policies, practices and procedures concerning use of . . . Prerecorded Messages" will not lead to the discovery of admissible evidence.  Further objecting, this Interrogatory is a topic at an upcoming FRCP 30(b)(6) deposition which seeks information relative to Defendant's use of a so-called "autodialer".  Requiring Defendant to attempt to answer this topic twice is overly burdensome.  Finally, the phrase "responsible" is undefined, vague and overly broad.  Subject to and without waiving these objections, Defendant identifies the following employees:  Brittiany Leary, Vice President Operations; Peter Cappola, Manager Telephony & Dialer Services; Alex Sosa, National Dialer Manager; Deb Corwin, FACS Analyst/Dialer Support; Steve Madden, Manager Application Development; Mark Alves, Vice President IS & T.  Investigation continues.  These individuals can be contacted through the undersigned attorney.

10.     Identify and explain all policies, practices and procedures regarding use of automatic dialing systems, prerecorded voice messages and artificial voice messages and the complete history of each. Please include a detailed description of policy, practices or procedure the date it was first considered, the date it was implemented, all persons involved in its

9

consideration, implementation and, if applicable, termination. Please respond to this interrogatory without regard to time; in other words, disregard the timeframe set forth in the instructions for these requests.

**Answer**: Objection, this Interrogatory contains six (6) discrete and distinctly different subparts. Further, this Interrogatory is overly broad and overly burdensome and seeks irrelevant information that is not related to the purported class. The purported class relates to persons who allegedly called Defendant to state that they were not the debtor in question. Accordingly, "policies, practices and procedures regarding use of . . . prerecorded voice messages and artificial voice messages and the complete history of each" is not related to the purported class. For these reasons, this Interrogatory will not lead to the discovery of admissible evidence. Subject to and without waiving these objections, see Answer to Interrogatory No. 3 for policies, practices and procedures regarding use of what Plaintiff has identified as "predictive dialers."

11. Describe all document destruction and retention policies of the defendant.

**Answer**: Objection this request is irrelevant. Pursuant to FRCP 33(d), see attached document.

12. Identify and explain the basis for any claim that any violation alleged in the complaint was unintentional and/or resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error. Identify what procedures exist, how they are maintained, how they are adapted to avoid the matters complained of and why the alleged violations happened despite the procedures. Please answer this interrogatory specifically for each putative class member, if you can.

**Answer**: Objection, this Interrogatory is overly burdensome given its request to "answer this interrogatory specifically for each putative class member . . . ." Further, this Interrogatory contains six (6) discrete and distinctly different subparts. Additionally, because aspects of this Interrogatory related to the FRCP 30(B)(6) notice, it would be unduly burdensome to require Defendant to provide detailed answers at this time. Subject to and without waiving this

10

objection, the subject telephone number, (773) ███-7272, was identified by AT&T a belonging

to the identified debtor and that AT&T had consent to call the debtor at the subject number.

Phone records provided by Plaintiff's counsel appear to demonstrate that the time of the calls in

question, the subject telephone number was owned by a Vanessa Powell.    Pursuant to FRCP

33(d), see attached documents, including, but not limited to document entitled "Calling a

Consumers Cell Phone".


     13.    With respect to each expert, retained or nonretained, whom you will or may call
upon to give evidence or testimony in connection with this case, please state: (a) his name,
address, telephone number, occupation, and current employment; (b) the subject matter of his
expertise; (c) his educational background, academic degrees, employment history, employment
experience, and any other matters which you contend qualify him as an expert; (d) the substance
of all facts and opinions to which he could testify if called as a witness; (e) a summary of the
grounds for each such opinion.

**Answer**:    This Interrogatory contains five (5) discrete and distinctly different subparts.

Further, this Interrogatory is premature.  At the appropriate time, Defendant will issue a Rule 26

expert report.


COLLECTO,    INC.    d/b/a
COLLECTION  COMPANY  OF
AMERICA d/b/a EOS CCA

*/s/ James C. Vlahakis*
James C. Vlahakis
ARDC No. 6230459
Hinshaw & Culbertson LLP
222 North LaSalle, Suite 300
Chicago, IL 60601
tel: 312-704-3000
fax: 312-704-3001
jvlahakis@hinshawlaw.com

130018016v1  0914300  65872

**Verification**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, that to the best of my knowledge, information and belief, that the above Interrogatory Answers are true and correct.

By: *Susan Giordano for Collecto, Inc. dba EOS CCA*

Susan Giordano
VP Compliance and Risk Management

Date: <u>October 6, 2010</u>

i30018016v1 0914300 65872

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 6, 2010, I emailed a copy of the above document to counsel of record for Plaintiff:

Alexander Burke
Burke Law Offices, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com

Counsel for Defendant,
COLLECTO, INC. d/b/a
COLLECTION COMPANY OF
AMERICA d/b/a EOS CCA

s/James C. Vlahakis
James C. Vlahakis
ARDC No. 6230459
Hinshaw & Culbertson LLP
222 North LaSalle, Suite 300
Chicago, IL 60601
tel: 312-704-3000
fax: 312-704-3001
jvlahakis@hinshawlaw.com

130018016v1  0914300  65872

# Appendix 1

```
 1

 2                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 3                           EASTERN DIVISION

 4    TODD FIKE, on behalf of        )
      himself and others similarly   ) Docket No. 09 C 2558
 5    situated,                      )
                                     ) Chicago, Illinois
 6                  Plaintiffs,      ) November 13, 2009
                                     ) 9:30 a.m.
 7            v                      )
                                     )
 8    THE BUREAUS, INC.,             )
                                     )
 9                  Defendant        )

10
                        TRANSCRIPT OF PROCEEDINGS
11              BEFORE THE HONORABLE ARLANDER KEYS

12
      PRESENT:
13
      For the Plaintiff:        ALEXANDER H. BURKE
14                              Burke Law Offices, LLC
                                155 North Michigan Avenue
15                              Suite 9020
                                Chicago, Illinois  60601
16

17    For the Defendant:        PETER E. PEDERSON, JR.
                                Hinshaw & Culbertson LLP
18                              222 North LaSalle Street
                                Suite 300
19                              Chicago, Illinois  60601-1081

20    (TRANSCRIBED FROM ELECTRONIC RECORDING.
       PLEASE SUPPLY CORRECT SPEAKER  IDENTIFICATION)
21

22    Court Reporter:          Lois A. LaCorte
                               219 South Dearborn  Room 1918
23                             Chicago, Illinois 60604
                               (312) 435-5558
24

25
```

```
 1          THE CLERK:  09 C 2558, Fike v The Bureaus.

 2          THE COURT:    Good morning, counsel.

 3          MR. BURKE:    Good morning, Judge, Alexander Burke for

 4  the plaintiff.

 5          THE COURT:    Good morning, Mr. Burke.

 6          MR. PEDERSON:  Good morning your Honor, Pete Pederson

 7  for defendant.

 8          THE COURT:    Good morning, Mr. Pederson.  We have The

 9  Bureaus' motion to compel and also plaintiff has a motion to

10  compel, right, Mr. Burke?

11          MR. BURKE:    That's right, Judge.

12          THE COURT:    Let's talk about plaintiff's -- first of

13  all, the defendant's motion to compel, isn't that moot now.

14          MR. BURKE:    I think so, Judge.  We provided the

15  signature under oath that they asked for.  Mr. Fike went to his

16  cell phone carrier and obtained all the records that he could

17  going through 2007 and those have been produced The Bureaus.  If

18  The Bureaus wants more records, they can subpoena them and we

19  certainly won't oppose that, but my understanding and my client's

20  understanding is that we have provided everything that he is able

21  to obtain.

22          And then as to the interrogatory response that they

23  want, I think Mr. Fike has given everything, all the information

24  he knows in response to the interrogatory.

25          MR. PEDERSON:  Well, your Honor, there were three
```

1  aspects of the motion to compel.  We sought Mr. Fike's signature

2  under oath.  That was provided, it's moot.  We also sought the

3  phone bills.  So far we have the phone bills for May 2007 to May

4  2008 and then September 2008 through January 2009, which was the

5  period -- the last period when the phone calls by TBI were made.

6  There is a gap from May 2008 to September 2008.  We haven't

7  received those phone bills.

8            THE COURT:  It's those three, May, June -- four months

9  there.

10            MR. PEDERSON:  Right.  So that aspect of the motion to

11  compel isn't moot.  And then we have also requested contacts

12  between Mr. Fike and the original creditor.  We have a very bare

13  bones response in the original interrogatory answer, which says

14  "I remember scheduling the dentist appointment and making certain

15  payments."  We would like the actual cancelled checks and any

16  written communication between the creditor and Mr. Fike because

17  the checks and the written communications would go to whether Mr.

18  Fike provided the phone number, his cell phone number to the

19  creditor, which would constitute consent under the TCPA.

20            THE COURT:  Do you agree with that, Mr. Burke?

21            MR. BURKE:  Well, I take issue with the comments about

22  what constitutes consent.  I don't know about the cancelled

23  checks.

24            THE COURT:  Do you agree if he contacted, if your

25  client contacted the creditor by cell phone, that that is consent

[3]

1  for him to be contacted by the creditor by phone?

2        MR. BURKE:  I certainly do not agree with that, Judge.
3  In fact, in our response to the motion to compel, we cited a
4  footnote in the FCC order which is controlling on the merits of
5  this case that says that that, expressly says that that is not
6  consent under the TCPA.

7        THE COURT:  Okay.  Still we're talking about discovery
8  here, not about the ultimate, whether it's going to get it into
9  evidence.

10       MR. BURKE:  I agree, Judge.  I didn't know about this
11  gap in the records.  I know that Mr. Fike went and tried to find
12  his phone records and he got everything he could get.  I'll go
13  back to him and see if he can get this gap.  We will try to get
14  that gap.  As far as cancelled checks, I haven't spoken with him
15  about the cancelled checks.  We can see if he can find the
16  cancelled checks.  Otherwise, we will subpoena the cancelled
17  checks.

18       THE COURT:  Okay.  Now, with regard to the motion to
19  compel filed by the plaintiff, you raise the consent defense, but
20  you claim that you don't have to produce evidence on the defense
21  unless the class is certified.  You're absolutely wrong on that
22  one.  You're not going anywhere with that one.  You claim that in
23  your opinion it's never going to be certified, the class is never
24  going to be certified and that you're producing the evidence
25  that's being sought here prior to any, in view of the fact that

1  it's not going to be certified, it's too burdensome, and you

2  shouldn't have to do it.  That is not the law in this area.

3      You have to -- it's going to be up to Judge Dow at some

4  point to decide whether the class is going to be certified and

5  one of the issues is going to be whether there was consent,

6  right, of the class -- of the putative class?

7      MR. PEDERSON:  I don't disagree with most of what your

8  Honor said.  I think the thrust of the motion was that discovery

9  on the merits of a class claim is improper if the plaintiff fails

10  to make a threshold showing that the class is suitable for class

11  certification, and plaintiff has not cited a single case which

12  has certified for class treatment the theory under the TCPA that

13  Mr. Fike brings.

14      When a debt collector is making auto dialed and

15  prerecorded message calls to consumers, those calls will comply

16  with the TCPA unless the consumer never provided his cell phone

17  number to the creditor.  But the court cannot without conducting

18  mini trials into the dealings between each potential class member

19  and the creditor figure out whether the class member actually

20  provided his number to the creditor and thereby consented, and

21  this individual question precludes certification under Rule

22  23(b)(3) and it also precludes identification of the class.

23      So the argument was that he has not shown a case that's

24  prima facie capable of being certified under Rule 23, therefore,

25  merits based discovery on the class claim is inappropriate.

1          THE COURT:   But you're claiming that this, what he is
2  seeking is going to the merits of the claim.
3          MR. PEDERSON:   It goes to whether they consented and so
4  it's not, it doesn't go to the question of numerosity or the
5  typicality, it goes to the question of whether these individuals
6  are subject to a defense that can only be proven through a mini
7  trial, which would preclude class certification.  And in many
8  cases the evidence concerning consent is in the hands of third
9  parties and therefore, we are not required under the discovery
10 rules to produce that information as it's not in our possession
11 or control.
12         THE COURT:   Well, who has it?
13         MR. PEDERSON:   It would be in the hands of --
14         THE COURT:   The client, right?
15         MR. PEDERSON:   It would be in the hands of the creditors
16 and the class members.
17         THE COURT:   Well, do you know who the class members
18 are?
19         MR. PEDERSON:   No, your Honor, we don't because we can't
20 generate a list of individuals who received calls on their cell
21 phones without having consented to the calls.
22         THE COURT:   Well, how does the plaintiff find out who
23 the class members are if you don't produce discovery to them
24 regarding --
25         MR. PEDERSON:   We can produce a list of numbers with the

1  relevant area codes that we contacted during the time frame, but
2  we can't provide a list of numbers that we contacted where the
3  individual did not consent to be contacted because we don't have
4  information about the dealings between each class member and the
5  creditor.
6        So we could produce an overinclusive list of individuals
7  who were contacted, period, but many of those individuals will
8  not be class members because they consented to receive calls or
9  because the call was actually placed to a land line rather than a
10 cell phone.
11       THE COURT:  Can't you find out which ones of them
12 consented and did not consent?  I know it's burdensome, but can't
13 you do it?
14       MR. PEDERSON:  Not without an extremely burdensome and
15 time-consuming investigation into the dealings between every
16 class member and the creditor, and under the discovery rules, we
17 aren't required to go out and obtain information in the hands of
18 third parties, we're only required to turn over information in
19 our control.  If we turn over the information in our control, the
20 list will be overinclusive.
21       THE COURT:  Well, somebody has got to -- I know you
22 feel like you're between a rock and a hard place here, but on the
23 one hand, the plaintiff is entitled to know which of the
24 individuals on your list consented.  They shouldn't have to --
25 say there are a thousand people on your list.  They shouldn't

[7]

1  have to interview all thousand of those people to determine

2  whether they are properly part of this class because they

3  consented when you could get that information easier from your

4  records.

5        MR. PEDERSON:  Your Honor, our records won't disclose in

6  all cases whether the consumer consented to be contacted because

7  that information will be in the hands of the creditor, and the

8  Chaveriat opinion that we cited in our brief states that the

9  litigant is not required to produce information that is in the

10  possession or control of a third party.  The litigant has a duty

11  to produce information in its own possession or control.

12        In that case the plaintiffs had hired an engineering

13  contractor or some scientific contractor to do I believe soil

14  chemistry assessments.  They were requested in discovery to

15  produce certain information in that contractor's possession.

16  They failed to produce it and the district court entered a

17  sanction against them for failing to produce it.  The Seventh

18  Circuit reversed on the ground that the information in the

19  contractor's possession was not in the possession of the

20  plaintiffs and therefore, they could not be -- they could not be

21  sanctioned for failing to produce information in the third

22  party's possession.

23        And this is a similar case where is evidence related to

24  consent is in the possession of a third party and therefore, we

25  are not -- we have no duty and we have no ability to produce that

1  information.

2        THE COURT:   So under the ruling on the Chaveriat,

3  wasn't it?

4        MR. PEDERSON:   Chaveriat.

5        THE COURT:   You as a debt collector have no duty to

6  insure that the creditor that you represent here --

7        MR. PEDERSON:   That's correct.

8        THE COURT:   What does the plaintiff do here, make the

9  creditor also a defendant in this case?

10        MR. PEDERSON:   Well, your Honor, it goes to the

11  impracticality of handling this case on a class basis because the

12  information concerning whether potential class members have valid

13  claims is distributed across many parties.  It could be in the

14  hands of the creditor, it could be in the hands of the consumer.

15  In some cases the consumer might expressly consent to TBI and

16  there will be a notation in the database, but none of these

17  evidence -- none of the categories of evidence of consent can be

18  resolved in a straightforward manner for the entire class.  It

19  would have to be -- the question of consent would have to be

20  resolved for each class member individually.

21        THE COURT:   Okay, then you're arguing against

22  certification.

23        MR. PEDERSON:   Correct.

24        THE COURT:   But what does -- what would Mr. Burke say

25  to try to refute that --

[9]

1        MR. PEDERSON:  Well, your Honor --

2        THE COURT:   When you make that argument if he doesn't

3   have some evidence from you?

4        MR. PEDERSON:  Your Honor, what we could do is produce a

5   sample of our database on a random sample of class members and

6   that would include the information in our database about those

7   individual class members.  But it would be improper I think for

8   the court to order us to produce the complete universe of

9   information in our possession and all 7,000 potential class

10  members when such production would be overinclusive because maybe

11  some of the individuals are not members of a class either because

12  they did not receive calls on their cell phones or because they

13  consented.

14       THE COURT:   Well, what does the plaintiff -- not just

15  Mr. Burke, but what does a plaintiff do in that situation, just

16  simply back away and say "Since they won't give it to us, we will

17  just voluntarily dismiss this" or how does he prove it?

18       MR. PEDERSON:  Your Honor --

19       THE COURT:   He can't prove it.

20       MR. PEDERSON:  Well, plaintiff can make the argument

21  that the court should disregard the question of consent and

22  presume --

23       THE COURT:   I don't think that's going to fly.

24       MR. BURKE:   I think the defendant is making that

25  argument, that you should disregard the question of consent.

1        MR. PEDERSON:  And the other argument the plaintiff can

2   make is that the, a production of a random sample of potential

3   class members would show that the question of consent does not

4   prevent the class from being certified.

5        THE COURT:  And you would oppose that argument, of

6   course.

7        MR. PEDERSON:  We would oppose that argument.  But we

8   think, your Honor, if you order us to produce the complete

9   universe of information on all potential class members or on a

10  random sample of class members, we will argue vigorously to Judge

11  Dow that consistent with the other cases that have examined this

12  type of theory, the question of consent precludes class

13  certification.

14       THE COURT:  Yes, it precludes class certification, but

15  it doesn't preclude discovery.  It doesn't preclude discovery.

16  This case has not been bifurcated, first of all, so you talk

17  about merits versus class certification issues.  That's not --

18  you're not going to get anywhere with that.

19       The issue is that the plaintiff is going to have to show

20  how many or approximately how many of the individuals whom you

21  have attempted to collect from actually consented to your taking

22  your cell phone call.  He has got to prove that.  How does he

23  prove that if you don't give him the information, the evidence on

24  it that you have because he has nothing?

25       MR. PEDERSON:  My response to that, your Honor, is that

1  the plaintiff cannot prove on a class wide basis for all class

2  members whether consent was given without mini trials on the

3  question of consent.  And that precludes class certification.

4       It doesn't matter, your Honor, what information we give

5  Mr. Fike in response to this court's order on the pending motion.

6  Mr. Fike will be unable as a matter of law to resolve this

7  question on a class wide basis such that a class can be certified

8  under Rule 23.

9       THE COURT:  Mr. Burke, you agree, right?

10      MR. BURKE:  Well, if they withdraw their consent

11 defense, if it doesn't matter what information they give me,

12 that's fine.  You know, if they say "We have nothing and we're

13 not providing anything," I think the class will be certified

14 because they have no consent defense.

15      We're -- I don't think they have any evidence and I

16 don't think they can get any.  I mean, Mr. Fike did not consent.

17 They got his, they got his cell phone number from a third-party

18 skip trace company and we have asked subsequently in discovery

19 for all the people they got phone numbers from the skip trace

20 company and there is some law on that too.

21      But the bottom line as to the consent issue is that they

22 brought an affirmative defense of prior express consent.  They

23 have the burden of proof on this defense and we have asked, we

24 have asked for the evidence.

25      THE COURT:  And I think that's really the bottom line

[12]

1  here, counsel.  You have raised an affirmative defense of consent

2  as to some of these people.  You're not saying that everybody

3  consented, are you?

4         MR. PEDERSON:  We don't know, your Honor.

5         THE COURT:   You don't know if they did or not?

6         MR. BURKE:  That raises Rule 11 implications, Judge.

7         THE COURT:   How can you consistent with Rule 11 make

8  that defense if you don't know?

9         MR. PEDERSON:  Well, your Honor, it's a fact of modern

10 life that people use their cell phones.

11        THE COURT:   And you're probably right.

12        MR. PEDERSON:  As the default means of communication.

13 For example, in my own case, your Honor, I haven't had a land

14 line since I think 2000.  So every creditor I deal with I provide

15 my cell phone number to, and under the FCC ruling I'm deemed to

16 consent to receive auto dialed and prerecorded message calls on

17 my cell phone.  So it's reasonable to assume that a very

18 substantial percentage of the debtors who were contacted by TBI

19 did in fact consent by providing their number either to TBI or

20 the creditor.

21        And if your Honor orders us to produce information on

22 the class members or the potential class members, of course, we

23 will comply with your Honor's order.  Our argument is at the end

24 when the smoke settles, Mr. Fike will be unable to provide Judge

25 Dow with the means of resolving the question of consent on a

1  class wide basis such that the class will be certified.

2      THE COURT:    And that happens a lot, that we order stuff

3  to be produced and in the final analysis they can't use it so

4  they lose.

5      MR. PEDERSON:   I would just ask, your Honor, that

6  instead of ordering TBI to produce the complete universe of

7  information on all potential class members, many of whom will not

8  be members of the class because they consented or they were

9  contacted on a land line rather than a cell phone, that your

10  Honor order TBI to produce information on a random sample of the

11  potential, the 7,200 potential class members that TBI has

12  identified based on a database search.

13      THE COURT:    But in this kind of case I don't think

14  sampling -- I have done sampling in cases, but this is probably

15  not one that I would want to, want to have engaged in sampling.

16  So I know it is somewhat burdensome for you, but I think it can

17  be done, and more importantly, without you producing something to

18  them, you know, with regard to your affirmative defense of

19  consent, you know, they're going to have a tough time trying to

20  prosecute this case.

21      I don't care who wins the case, it doesn't matter to me,

22  but at least you have got to give the plaintiff an opportunity to

23  go to the next level, that is, to argue for certification of the

24  class.  And if they don't -- if they can't -- if they can't give

25  some indication to the district court as to the number of those

1 people who did not give consent, well, then that's their case.

2 And you claim that they're never going to be able to do it

3 because these are individualized assessments that have to be

4 made, and you may or may not prevail on that.

5         But we are talking about discovery here and even though

6 it might be costly, time-consuming, I don't know how

7 time-consuming it is because I have listened to you two lawyers

8 making your arguments, but nobody has come forward from your

9 company to tell me exactly what they have to do to get all this

10 information.  I can't just accept your representations in that

11 regard.  I saw the affidavit that was filed by, what's her name?

12         MR. PEDERSON:  Marian Sangalang.

13         THE COURT:   But I think it can be done, it can be done.

14 It may be rather burdensome and I, you know, I recognize that in

15 these kinds of cases that the kind of discovery that's being

16 sought could influence a defendant to try to settle the case

17 rather than litigate it.  I know that's an argument that comes

18 down, but I think this is a legitimate area that the plaintiff

19 should be able to get information from, and to the extent that

20 you have it, you will have to give it up.  And that is with

21 regard to the -- Mr. Burke, what was it particularly that you

22 were asking for?

23         MR. BURKE:  It's on page 6 of our motion.  We're asking

24 for responses to those particular interrogatories and document

25 requests:  Interrogatory 4, 9, 10 -- there should be some overlap

1  with these -- document requests 3, 4, 5, 6, 28 and misnumbered

2  28 -- pardon me, misnumbered 12 that I renumbered 28A.

3      THE COURT:  Okay.  I have reviewed those and I don't

4  see how you can get around not having to respond to those and

5  that's going to be my order.

6      MR. PEDERSON:  Well, your Honor, we will comply with the

7  court's order.  It would be helpful for us to know exactly what

8  information we are required to produce so that we can comply with

9  the order.  Are you ordering production of the evidence of

10  consent in TBI's possession relating to all potential class

11  members?

12      THE COURT:  Right.  The class members there are limited

13  to Illinois, right?

14      MR. BURKE:  That's correct, Judge.  I think that we

15  during the talks, the Rule 37 talks we narrowed that a little bit

16  more.

17      MR. PEDERSON:  The class definition was modified, your

18  Honor.  It now covers only individuals who had 312 and 773 area

19  code numbers.

20      MR. BURKE:  That's correct, Judge, but I take issue with

21  the 7,000 number that Ms. Sangalang put in her affidavit.

22      THE COURT:  Is there more?

23      MR. BURKE:  There absolutely is more, your Honor.

24  That's apparently the number of persons that were, that TBI left

25  prerecorded messages for, but they haven't provided the number

[16]

1 for the number of people that they called that they're auto

2 dialing.

3          MR. PEDERSON:  Your Honor, the estimate of 7,200 was for

4 the number of prerecorded message calls to accounts with 773 and

5 312 area code numbers.  They did not include --

6          THE COURT:  The auto dial, you did not include that?

7          MR. PEDERSON:  We did not include auto dialed calls

8 where there would have been a collection agent available to take

9 the call if a live human being answered.

10          THE COURT:  She is not saying that you can't retrieve

11 that information.

12          MR. PEDERSON:  No, we didn't say that, your Honor.

13          MR. BURKE:  They just ignored it.

14          THE COURT:  And auto dial of course, that's a real

15 problem for you.

16          MR. PEDERSON:  Your Honor, I don't want to retread

17 ground or replow ground we have already plowed.  The difficulty

18 with a production for all individuals who received calls is that

19 many individuals had land lines that were called and our

20 information does not in all cases show whether the call was

21 placed to a land line or a cell phone.

22          So if your Honor orders us to produce evidence of

23 consent on all individuals who received either auto dialed or

24 prerecorded message calls during this time period, many of these

25 individuals will not be members of the class because of the

1  question of consent, which we have already gone over, but also

2  because we don't know whether the phone is a land line or a cell

3  phone, which I think would also counsel in favor of doing a

4  sample of, a production on a sample of class members rather than

5  the complete universe.

6       THE COURT:  Well, a sample we're not going to do.  Mr.

7  Burke.

8       MR. BURKE:  I agree, a sample won't give me what I'm

9  entitled to, I think, under the discovery rules.  You know, I

10  think this goes back to the possibility of Rule 11.  I mean, if

11  they have no idea which numbers they called that were cell phone

12  numbers, I look forward to telling the jury that.  But how can

13  they raise a defense in the case if they don't even know the

14  first step, they don't know who falls into the first step of

15  their defense?  I think there is a problem here.

16       THE COURT:  I don't want to tread on their Rule 11, but

17  I understand what you're saying.  I have read it.

18       MR. PEDERSON:  We have already addressed that, your

19  Honor.  We know for a certainty that many of these individuals

20  did give their cell phone numbers so there will have been

21  consent.

22       THE COURT:  I don't think that argument is going to win

23  for you that well, you know, considering modern day technology,

24  more than likely some of them did give their consent.  That's not

25  to get you anywhere.  But that's a Rule 11 issue.  I don't want

1  to deal with that at this point.

2        You're going to have to do better.  You're going to have

3  to -- you have an affirmative defense.  Either you can withdraw

4  your defense, I know you're not going to do that, I don't blame

5  you, or you've got to produce evidence to support it.

6        MR. BURKE:  And, Judge, I just wanted to mention that

7  unlike the Chaveriat case that was cited by the defendant, we

8  issued interrogatories asking for not only information that is in

9  their possession, but information that they know about that

10 supports their defense.  So I just wanted to mention during this

11 hearing that The Bureaus isn't limited to just information that's

12 in their possession, but anything that they know about must be

13 disclosed.

14       THE COURT:  Well, if that's the way it's worded.

15       MR. BURKE:  Absolutely.

16       THE COURT:  But you understand now what they're looking

17 for?

18       MR. PEDERSON:  I understand that your Honor is ordering

19 us to produce --

20       THE COURT:  Right.

21       MR. PEDERSON:  -- evidence in our possession related to

22 the question of whether potential class members --

23       THE COURT:  Evidence that you have.

24       MR. BURKE:  That they know about, that supports their

25 defense.

[19]

1          THE COURT:   I don't agree that in the context of this

2 particular case that you're not required to produce evidence that

3 might be in possession of third parties, third parties here being

4 your client, that is, the creditors.  I don't read Chaveriat or

5 whatever that case is, I didn't read that as in the context of

6 this case as allowing you to simply sit on your hands or go to

7 the client and get things.  I didn't read it that way at all.

8          So I'm going to order you to comply, respond to all of

9 the outstanding discovery and that is both the interrogatories

10 and documents.  Are there interrogatories in it also?

11         MR. BURKE:  Yes.

12         THE COURT:   All right.  And with regard to the costs

13 here, I think because there could have been some confusion,

14 counsel, as to what your responsibilities are in this particular

15 case, I'm going to deny the fees and costs without prejudice.

16 Let your client know that if we have to revisit the issue again

17 I'll allow Mr. Burke to renew the motion.

18         Okay, the fees and costs sanctions are denied without

19 prejudice, give you some incentive to try to get your clients

20 to -- I know your clients -- you're an officer of the court --

21 your clients don't take to turn over stuff, but you know that

22 they have to and you have to, as their lawyer you have to

23 convince them that it's the right thing to do or they could have

24 sanctions as well.

25         MR. PEDERSON:  Your Honor, we will fully comply with

1   your Honor's order and our obligations under the Federal Rules of

2   Civil Procedure.

3           I do need some clarification about the production you're

4   ordering.  My understanding was that you were ordering the

5   production of the information in our possession.

6           THE COURT:  You keep saying "possession."  That's not

7   the word.  I mean, you have -- if this information is in the

8   possession of your client, then you have to give it to them.

9           MR. PEDERSON:  We will produce that information, your

10  Honor.  My point is that we do not have the power or the duty to

11  produce the information in the creditors' possession related to

12  the question of consent.  In Chevariat it speaks expressly to

13  this question.

14          THE COURT:  Your client, the creditor is your client in

15  this case.

16          MR. PEDERSON:  And Chevariat deals with this fact

17  pattern.  It says that the existence of a contractual

18  relationship between a litigant and a third party does not

19  obligate the litigant to produce information in litigation that

20  is in the possession of the third party.

21          THE COURT:  Your client is not a typical third party,

22  though.

23          MR. PEDERSON:  In the Chevariat case, though --

24          THE COURT:  You work for that client.

25          MR. PEDERSON:  My client typically has some type of

1  ongoing relationship where they will collect receivables for the

2  creditors, but there is no attorney-client relationship.  It's

3  not like they are fiduciaries necessarily.  The Chevariat case

4  dealt with an expert for the plaintiffs and the plaintiffs failed

5  to produce information in the expert's possession.  Judge Posner

6  writing for the Seventh Circuit said that the plaintiff had no

7  duty to produce information in the expert's possession simply

8  because the expert might have given the plaintiff that

9  information if the plaintiff had requested.  It's because the

10 possibility that a party might be able to obtain information from

11 a third party does not mean that the plaintiff or the litigant

12 actually has the control over that information, it means the

13 opposite because it's just that there is a mere possibility that

14 the party to the litigation can obtain the information from the

15 third party.  This is the holding of the Chevariat case.

16      So under this case law, we -- our client has no ability

17 and no duty to produce evidence in the hands of third parties,

18 the creditors in this case.

19      THE COURT:   So in theory you as the debt collector can

20 bury your head in the sand and say "We don't have to give

21 anything." Go after these guys.  They are the guys who did the

22 phone calls to the plaintiff.

23      MR. PEDERSON:  The plaintiff is able to serve subpoenas

24 for information he wants.  We will produce -- our obligation, our

25 obligation is to produce the information in our possession,

1    custody, or control, and we will produce that, but we have no

2    duty under the rules and under Chevariat to produce the evidence

3    and information that's in the lands of the creditors.

4         THE COURT:   Do you believe that if you went back to

5    your creditors and asked them for information that they would

6    refuse to give it to you?

7         MR. PEDERSON:  We have no idea.

8         THE COURT:   If you do that, if you do that and they

9    refuse to give it to you, that's another issue.

10        MR. PEDERSON:  We have no idea whether they will give us

11   the information.  And the --

12        THE COURT:   I think they would.

13        MR. PEDERSON:  Well, it's unknown.  It's a possibility.

14   Judge Posner said that the possibility that the third party will

15   hand over the information to the party does not mean that the

16   party has control over that information, it means the opposite

17   because it's uncertain.

18        MR. BURKE:  I suspect that what counsel is worried about

19   brings us to another portion of the motion to compel.  We asked

20   for the contract between The Bureaus and their creditors, and I

21   suspect, as I have seen in other cases, the contracts contain a

22   no warranty about information clause.  The creditors don't

23   want -- they won't to be bothered by The Bureaus.  This is a

24   major problem for The Bureaus in proving their defense.  I don't

25   think they can prove it.

1      But the bottom line is that this is their defense.

2      THE COURT:  Well, certainly the creditor is not going

3 to be very happy with you when you go back to them and say "Look,

4 we have got this court order that I have got to get this

5 information from you."  They're not going to be happy with you.

6 But so be it.  I mean, these are legal proceedings and I don't

7 think that the holding in that Seventh Circuit Chevariat case is

8 applicable in the case and I'm going to order that you comply

9 now.

10      On the other hand, if you try to get this information

11 from your clients and they tell you they're not going to give it

12 to you, that brings another issue, but at least you've got to

13 make an attempt to do that.  It might not make your client happy,

14 but you have got to make an attempt -- your clients have to make

15 an attempt, which they don't want to do, which is understandable.

16      MR. PEDERSON:  I just respectfully disagree with your

17 Honor that under the Chevariat case we have to --

18      THE COURT:  Okay, you disagree, but that's the order,

19 okay?  All right.

20      MR. BURKE:  Judge, there are two other sections.

21      THE COURT:  Let's give them 30 days.  30 days to comply

22 with the order.  The sanctions motion is denied without

23 prejudice.

24      MR. PEDERSON:  Your Honor, I don't believe there was a

25 sanctions motion, was there?

1      THE COURT:   Didn't you ask for fees in this?

2      MR. BURKE:  I think we asked for whatever the court

3  feels is appropriate and fee shifting is the --

4      THE COURT:   So you didn't ask specifically for fees.

5      MR. PEDERSON:  There is no prayer for fees.

6      THE COURT:   Well, then we will forget about it.  Strike

7  that.  If he didn't ask for it -- usually you guys ask for fees

8  and costs and all that.

9      MR. BURKE:  I just want the information, your Honor.

10      THE COURT:   Okay.

11      MR. BURKE:  Part 2, information and materials concerning

12  the Automatic Dialer and the messages.

13      THE COURT:   Well, I just said I granted your motion.

14      MR. BURKE:  Very good.

15      MR. PEDERSON:  Your Honor, part 2 of the motion sought a

16  number of categories of information and our position is that we

17  have fully responded to most of these requests.  As to the

18  automatic telephone dialer, we produced approximately 500 pages

19  of technical manuals about the capacities of the dialer.  We have

20  produced the contract for acquisition of the dialer and for

21  technical support relative to the dialer.  I'm not sure what

22  further information plaintiff would be entitled to under the

23  Federal Rules related to the dialing system.  I'm sure there are

24  customer support e-mails or letters related to the dialer, but

25  plaintiff has not met his burden of showing that the customer --

1  that the customer support e-mails would have any bearing on the

2  issues in this case.  I mean, TBI is a company that places a

3  large number of telephone calls, so there are going to be a large

4  number of communications that have some potential connection to

5  the dialer, but they won't have any bearing on the actual issues

6  in this case.  And the only issues in this case relative to the

7  dialer are whether it is an automatic telephone dialing system

8  under the statute.

9           THE COURT:   They want to know how it works.

10          MR. PEDERSON:  We have given them the manuals.

11          THE COURT:   What else do you want to know, Mr. Burke?

12  You have got them now so let's not have any confusion.

13          MR. BURKE:  Your Honor, we asked for contracts.

14          MR. PEDERSON:  We provided the contracts.

15          MR. BURKE:  Page 12 is the list of --

16          THE COURT:   Explain it to him because I have got

17  another matter here.  Explain to him what you're seeking here so

18  there is no confusion.

19          MR. BURKE:  Document requests 7, 8, 9, 10, 11, 12 and

20  14.  Your Honor, they have taken the position that they only have

21  to give us the 500 pages that they want to give us.  I don't know

22  whether counsel has even searched e-mails, for e-mails having to

23  do with the TCPA. Furthermore, we have a burden to prove that the

24  violation was willful and so we are entitled to look and see what

25  sort of interactions they have with anybody about the TCPA to

1  show that their actions were willful.

2      MR. PEDERSON:  Your Honor, we produced all the

3  information related to TCPA compliance and related to whether the

4  dialing system can store or produce numbers with a random or

5  sequential number generator.

6      MR. BURKE:  That is, that is --

7      THE COURT:  With regard to this portion of the order,

8  to the extent that you have not already done so, you will comply

9  completely with it.

10     Now, Mr. Burke says you haven't, and that's going to be

11 an issue you will have to point out to me how they haven't and he

12 will have to respond to that.  I would rather get rid of it now

13 so you don't come back again with the same argument.

14     MR. BURKE:  Absolutely.  What they have done is they

15 have provided, they have placed an artificial limitation upon the

16 discovery that they want to provide to us.  So they took language

17 from the statute, which strangely enough is not controlling as to

18 certain issues in this case.  And they say "Well, we're only

19 going to give you stuff that is relevant pursuant to the standard

20 that's in the statute."

21     The material that we are asking for is material that's

22 relevant under the FCC order from January 4, 2008, which like I

23 said, amazingly enough trumps the statute as far as issues of

24 liability, and what we are looking for is evidence or materials

25 that have to do with whether the autodialer calls people or is

1  able to dial without human intervention.  And once again, Judge,
2  we have to prove that this was willful.
3       MR. PEDERSON:  Your Honor, we have admitted that the
4  autodialer can dial numbers without a human being dialing them
5  and we have also, like I said, produced the 500 pages of
6  technical manuals showing what capacities the dialer has.  I
7  don't know what more information we could produce to show whether
8  the dialer is subject to the statute.
9       MR. BURKE:  Judge, he is telling you that they have
10  produced a bunch of stuff, but he is not saying that they
11  produced everything responsive.
12       THE COURT:  Well, let's get a declaration from someone
13  who knows, a high official there as to what they have and what
14  they will produce and that's all of it.
15       MR. BURKE:  I suspect that that declaration is going to
16  have some limitation in it similar to what we see in the response
17  to the motion to compel, and if so, I suppose I'll bring it back
18  to your Honor's attention and I'll ask for fees at that time.
19       THE COURT:  All right.  If this case comes back again
20  on these issues, and you ask for fees, you probably will get
21  them.  These TCPA cases, information you guys seek is basically
22  the same information on all of them and I have seen these many,
23  many, many times and this is no different than the others.
24       MR. PEDERSON:  Your Honor, I respectfully disagree --
25       THE COURT:  Have you had other cases before me that I

1  went the other way or what?

2        MR. PEDERSON:  I disagree that this is like other TCPA

3  cases because the plaintiff cannot point to a single case which

4  has certified this theory for class treatment under the TCPA.

5        THE COURT:   I'm talking about other cases that come

6  before me.  I have seen probably at least 50 of them.

7        MR. BURKE:  Judge, there are five, five other small

8  issues.  One is we have asked for information, documents and --

9        THE COURT:   I just granted your motion completely.

10       MR. BURKE:  This has to do with the FDCPA claim, your

11 Honor.  We have a claim for violation of the FDCPA.  We asked for

12 the information again relating to their bona fide error defense.

13 Their response to our motion to compel was that they have a

14 pending motion to dismiss and they don't have to provide that

15 information.

16       THE COURT:  Well, obviously, that can't fly.  Just

17 because you have got a motion to dismiss, you still provide the

18 information.  What's next?

19       MR. BURKE:  They provided Caller ID data, the

20 information about -- well, they provided some information about

21 what Caller ID that will show up on the recipient's cell phone

22 when they receive a call.  But we have asked for Caller ID data

23 going back a full year along the class definition and for all the

24 class members.  They have provided two months of information.

25 And also, they designated the Caller ID numbers as confidential.

1 　　　　MR. PEDERSON:  Your Honor, we withdrew the

2 confidentiality designation with regard to the Caller ID data

3 over a month ago.  I sent an e-mail to plaintiff's counsel with

4 the subject Withdrawal of Confidentiality Designation.

5 　　　　The bona fide error defense that Mr. Burke first

6 mentioned, the claim alleges that TBI concealed the purpose of

7 its calls by using phone numbers other than the phone number on

8 its letterhead when it would call debtors and really --

9 　　　　THE COURT:   The idea.

10 　　　　MR. BURKE:  -- this confidential information may or may

11 not rebut that assertion.

12 　　　　MR. PEDERSON:  TBI only calls debtors from numbers that

13 belong to TBI.  So the numbers use our TBI phone numbers and when

14 the number appears on someone's screen, it doesn't mislead the

15 called party to believe that one other than TBI is being called.

16 But there really is no information or procedures related to

17 whether we are, you know, trying to make sure that our numbers

18 appear on Caller ID correctly because our numbers do appear on

19 Caller ID correctly.

20 　　　　MR. BURKE:  If I understood what counsel just said --

21 　　　　THE COURT:   You have got more than one number.

22 　　　　MR. PEDERSON:  We have more than one number.  There is

23 many.

24 　　　　MR. BURKE:  Including three cell phones that they pass

25 around from collector to collector.

[30]

1      MR. PEDERSON:  I believe, your Honor, that there are two

2  numbers associated with the dialer, there are two cell phones and

3  there is a land line.

4      THE COURT:  Okay.

5      MR. BURKE:  Well, if it's not confidential anymore, that

6  moots part of the issue, but if there were any other numbers

7  during the class period that were used, we request that those be

8  produced and also responsive to the interrogatory would be the

9  dates that those numbers were used.

10      THE COURT:  That should be easy to find out.

11      MR. PEDERSON:  Your Honor, I don't think it would be a

12  problem to produce the phone numbers that were used.

13      MR. BURKE:  Judge, we also asked for statistics having

14  to do with auto dialed and prerecorded messages.

15      THE COURT:  Do they keep the statistics?  If they keep

16  them, you have to produce it.

17      MR. PEDERSON:  Well, it's -- statistics is an undefined

18  term in this discovery request.  We know what calls are placed

19  through our dialing system.  Does he want the complete contents

20  of our database?

21      MR. BURKE:  We asked for statistics, studies and

22  reports.  I suspect that the autodialer spits out a report every

23  week or every month about how many calls were completed, how much

24  money was collected, that sort of information.

25      THE COURT:  Do you have that information?  Do you keep

1  that information?

2          MR. PEDERSON:  Your Honor we have information about all

3  calls that are placed.  We're not required --

4          THE COURT:   But do you accumulate statistics on the

5  number of calls that were made for a particular period?

6          MR. PEDERSON:  Your Honor, I don't know the answer to

7  that question.

8          THE COURT:   Well, if you have it, this is discovery,

9  this is discovery.

10         MR. BURKE:  I don't know how he doesn't know if we asked

11 for it.

12         MR. PEDERSON:  What bearing, though, do undefined

13 statistics on the questions raised by this case have, whether

14 consumers are being contacted on cell phones without their

15 consent, whether the phone calls are being placed?

16         THE COURT:   Well, one thing that you know, counsel,

17 when the plaintiff gets your client for deposition, these issues

18 do come up and they should be able to refer back to statistics

19 that they keep internally.  That's one thing that they can do it

20 for.  That's pretty simple.

21         MR. PEDERSON:  We have disclosed the number of

22 prerecorded message calls that were placed to the potential class

23 members during the class time period.  I'm not sure why

24 additional statistics are --

25         THE COURT:   If, for instance, your managers are deposed

[32]

1  and they testify that they made only, let's say, a small sample

2  of calls, number of calls per months and that they only collected

3  X amount of dollars, if the statistical data that they have shows

4  something different, they should be able to question about it.

5  That's all I'm saying.  It doesn't mean you're going to get that

6  into evidence, but certainly for depositional purposes they

7  should have all this stuff.  Before they take these depositions

8  they should have all this stuff in front of them.

9        MR. PEDERSON:  And can you give us some guidance, your

10  Honor, about what production of --

11        THE COURT:  You guys are lawyers.

12        MR. BURKE:  We just want to get document request No.

13  27.

14        THE COURT:  Okay.

15        MR. BURKE:  Judge, recordings, the auto, prerecorded

16  message that the defendant left for 7,000 people, it's been

17  produced.  It was produced I think last week.  It was designated

18  confidential.  We filed a motion last night saying that this is

19  obviously, has been placed, it has been recorded on third

20  parties' voicemails over 7,000 times.

21        THE COURT:  Is it designated as confidential on a

22  protective order?

23        MR. BURKE:  Yes.

24        THE COURT:  So somebody can see it.

25        MR. BURKE:  They actually recorded it on third parties'

[33]

1  voicemails 7,000 times at least.

2      MR. PEDERSON:  Your Honor, I offered to withdraw the
3  confidentiality designation.

4      THE COURT:  Okay.

5      MR. PEDERSON:  As long as plaintiff's counsel would
6  agree not to use the recording for purposes unrelated to this
7  lawsuit.  We don't want -- we simply asked that he would agree
8  not to, for example, upload it to an Internet blog or use it in
9  any connection other than in connection with this lawsuit.

10     THE COURT:  Or if he files another lawsuit later, you
11 want him to go back and reinvent the wheel, right?

12     MR. PEDERSON:  The purpose isn't to prevent him from
13 using the prerecorded message in another lawsuit, although I
14 can't imagine what relevance it would have in another lawsuit.
15 It's only to prevent it from being distributed for purposes
16 unrelated to this lawsuit.

17     MR. BURKE:  It's the violation itself, and it was left
18 on over 7,000 people's voice mail intentionally.  They recorded
19 it on third parties' recording devices, and now they're claiming
20 it's confidential.

21     THE COURT:  It's simply not confidential.  Okay, we are
22 going to strike the confidential designation for that.

23     Okay, what else?

24     MR. BURKE:  I think that's finally it, Judge.  We have
25 an assertion that other complaints and lawsuits have all been

1  disclosed and we are taking them at face value, although we don't
2  have an affidavit stating such.
3            THE COURT:   This is the only one, right?
4            MR. PEDERSON:  This is the only TCPA lawsuit, your
5  Honor.
6            THE COURT:   Okay.
7            MR. BURKE:   Insurance policy and reservation of rights
8  letter.  We have the insurance policy, we don't have the
9  reservation of rights letter.
10           THE COURT:   All right, you will get all that.
11           MR. BURKE:    Thank you, Judge.
12           THE COURT:   Set it for status.  Give them 30 days to
13 turn all this stuff over.
14           THE CLERK:  By December 14th.
15           THE COURT:   I'll grant your motion in its entirety as
16 set forth during oral argument.  The discovery to be turned over
17 by December what, 17th?
18           THE CLERK:  December 14th.
19           THE COURT:   December 14th, and don't say anything about
20 fees and costs because he didn't ask for them.  My mistake there.
21           MR. BURKE:    Maybe it was my mistake.
22           THE COURT:   No.  Okay, all right, we will see you then.
23           MR. BURKE:    Thank you, your Honor.
24           THE COURT:   Is that the date we set for another status?
25           THE CLERK:  We will set it for December 14th at 9 a.m.

[35]

1        MR. BURKE:   Thank you.

2        THE COURT:   All right.

3        *                    *                    *

4    I certify that the above is a true and correct

5    transcript of proceedings had in the above matter.

6              /s/ Lois A. LaCorte

7

8    _____   _____
                Lois A. LaCorte                    Date
9              Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

[36]

# Appendix 2

Order Form (01/2005)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | Susan E. Cox |
|---|---|---|---|
| **CASE NUMBER** | 10 C 1846 | **DATE** | 11/9/2010 |
| **CASE TITLE** | Joanne F. Balbarin  vs. North Star Capital Acquisition, LLC, et al | | |

**DOCKET ENTRY TEXT**

Plaintiff's motion to compel [101] is granted.  Defendant is ordered to provide information responsive to the discovery requests on or before 11/24/10.

■[ For further details see text below.]

Docketing to mail notices.
*Copy to judge/magistrate judge.

## STATEMENT

In this putative class action plaintiff alleges a violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, claiming that defendant's alleged use of an automatic dialing system with an artificial or pre-recorded voice that placed multiple calls to her cell phone without her express prior consent.  Defendant has alleged in an affirmative defense that plaintiff (and unnamed class members) have consented to these calls.  Plaintiff seeks to compel responses to Interrogatory No. 9 and Request to Produce No. 7.  Both of these discovery requests seek information which supports defendant's asserted "prior express consent" defense.

In an agreement, which the Court finds highly constructive in this kind of a case, the parties agreed to limit defendant's response to a fifty person random sample of the putative class.  However, defendant continues to object to this discovery.  These objections are overruled.

Defendant's primary objection is that plaintiff has not yet obtained class certification and that it should not be forced to respond to burdensome class-wide discovery unless and until she does.  This objection lacks merit for a number of reasons.  First, the district judge in this case did not bifurcate discovery here.  All discovery is ordered closed on February 9, 2011.  Further, this discovery is hardly class-wide, but limited to fifty possible class members.  We are entirely persuaded by the opinion of our colleague, Judge Nolan, that a defendant in such an action must produce documents and information regarding its prior express defense.  *Donnelly v. NCO Financial Systems, Inc.* 263 F.R.D. 500, 504 (N.D. Ill. 2009).  We note that the court in that case ordered such discovery on a class-wide basis and found that the benefit of the discovery outweighed the burden and expense.  *Id.*  In this case, plaintiff only has requested this information for a random fifty person sample.

We also find unavailing defendant's argument that it does not possess these documents itself, but will have to obtain them at great expense from third parties.  If defendant does not have documents or other information which substantiates the defense it is difficult to fathom why it interposed that defense in the first place.  If defendant cannot substantiate this defense with documents or information responsive to the interrogatory, it should say so under verification and withdraw that defense.

**STATEMENT**

Defendant is ordered to provide information responsive to the discovery requests on or before November 24, 2010.  Plaintiff's motion to compel is, thus, granted [dkt 101].